63. Plaintiff has been unlawfully discriminated against, was humiliated, retaliated against, has been degraded and belittled; and as a result suffers loss of rights, emotional distress, loss of income and earnings.

64. Plaintiff's situation at the job was intolerable as a result of the discrimination by Defendants to which he was subjected.

65. Plaintiff's performance was, upon information and belief, superior during the course of employment with the defendants.

66. During Plaintiff's employment with the defendant, Plaintiff was regularly exposed to a discriminatorily offensive and hostile work environment.

67. Defendant's actions and conduct were intentional and intended to harm the Plaintiff.

68. After Plaintiff protested to Defendants, Plaintiff became the subject of discriminatory retaliation by Defendants.

69. As a result of defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

70. Defendants' hostile actions created an unlawfully hostile working environment which no reasonable person would tolerate.

71. As a result of the defendants' discriminatory and intolerable treatment of Plaintiff, he suffered severe emotional distress and physical ailments.

72. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and

other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

73. As a result of the above Plaintiff has been damaged in an amount in excess of the jurisdiction of all lower courts.

74. As Defendants' conduct has been willful, outrageous, done with full knowledge of the law, and malicious, Plaintiff also demands punitive damages against Defendants.

75. Other conduct of the defendants, prior to September 15, 2005, merely as evidence of the hostile work environment existing after September 15, 2005, as evidence of Plaintiff's wrongful termination on account of age, disability, citizenship, and perceived sexual orientation, and to demonstrate additional motivation behind all retaliation for Plaintiff opposition, is as follows:

76. On or about, September 2002, Plaintiff was invited by Mr. Paolo Fabiani (Plaintiff's immediate superior) to participate in a meeting in Rome, to present to Mr. Francesco Mengozzi, CEO of the company, the economic situation and the budget result for the year 2002, of the territory under Plaintiff's jurisdiction (NORTH AMERICA & MEXICO & CENTRAL AMERICA).

77. Plaintiff left New York for Rome to participate in the meeting. When Plaintiff arrived at the meeting room, the majority of his colleagues from all over the world were in the auditorium.

78. After only two minutes of Plaintiff's 30 minute presentation, Mr. Mengozzi interrupted Plaintiff, and stated, *inter alia*, "It is time that we understand that this company needs young people...People who have new visions. People over 50 should

make space for younger people." Mr. Mengozzi went on to scream at Plaintiff, "You sit down, and I don't have time or desire to waist time with you."

79. The meeting went on and the other younger presenters had the chance to present their presentations with no intervention at all.

80. It was clear to Plaintiff that the meeting was intended to give him a message to retire from Alitalia. That evening, Plaintiff went back to the hotel and was very sick. Plaintiff ended up in the Hospital from his reaction to the Defendants' conduct.

81. The following week, Plaintiff received a phone call from Mr. Fabiani, who told him that he was very sorry for what happened, but to be strong, because Mr. Mengozzi hated Plaintiff and he wanted him out, because, *inter alia*, Mr. Mengozzi wanted new and younger people. Plaintiff opposed this policy.

82. On or about the month of December 2002, Plaintiff felt very sick and was hospitalized. He was in the psychiatry ward for more than a month, and another month as an outside patient, going to the hospital at 9.30 in the morning, till 2.30.

83. During his stay in the hospital, he was visited by Mr. Fabiani and Mr. Luigi Di Bianco. (Mr. Fabiani, Plaintiff's superior and Mr. Di Bianco, Head of Human Resources, Worldwide.) They told Plaintiff: (Mr. Fabiani with tears in his eyes) "Franco, we have a terrible notice to give to you, Mr. Mengozzi, decided, to split the responsibilities of the territory of North America in two, so from today on, your title won't be Managing director North America anymore, but Senior Vice president Corporate Affairs for Alitalia Group. While Mr. Niels Wulf will be transferred from London to New York and will be responsible for Sales and Marketing North America, and his title would be Senior Vice President Sales. Both of you will report to the main office directly and

to the various responsible person, according to the function responsibilities." Mr. Di Bianco stated that according to him this was a very wrong and dishonest decision, and that Alitalia, would have paid terrible consequence for this decision. Defendants were clearly retaliating against Plaintiff because of his age and because of his opposition to Defendants unlawful employment practices.

84. On or about the month of March, 2003 Mr. Wulf, arrived in New York, and while Plaintiff was still in the Hospital, he telephoned Plaintiff. Mr. Wulf and asked Plaintiff to vacate his office, because it was decided, that his office would now be occupied by him. Plaintiff called Mr. Di Bianco in Rome and asked why he had to release, his office space to Wulf. Mr. Di Bianco said that since the office was quite large, Plaintif and Mr. Wulf had to share the space, dividing it with a partition. Mr. Wulf refused such order.

85. Plaintiff thereafter learned that Mr. Maurizio Pace had become his new boss. At the beginning of April 2003, Plaintiff returned from his sick leave and found all his office belongings as well as his personal items in the corridor. Plaintiff was forced to use a meeting room, without a window as his office. Plaintiff felt very humiliated, especially when the employees were asking Plaintiff "What was going on" and "What terrible thing did you do to deserve that."

86. On or about December of 2003, Mr. Mengozzi during a visit in the office, with Mr.Zanichelli., P.R. Executive S.V.P., Mr.D'angelo, H.R. V.P., and Mr. Antonio Pola. Director Administration during a meeting with Plaintiff, Mr. Wulf and Mr. Mengozzi started attacking Plaintiff, in a very brutal and humiliating way, accusing plaintiff of not having terminated the "old" employees; that Plaintiff was not the right guy to do

what he ordered. Mr. Mengozzi said to plaintiff, "Since you are now a psychiatric subject, how can I trust that you understand what I really want to be done?"

87. After the meeting, Mr Mengozzi, requested to meet the H.R. Director, Mr. Howard Tiegel. Mr Tiegel, that evening, reported to Plaintiff that Mengozzi, asked him to prepare a list with the names of all employees over 50 years of age, and making a statement that all these people had to leave the company.

88. Mr. Tiegel protested Alitalia's discriminatory policies so Alitalia paid Mr. Tiegel money to secure a release, and terminated Mr. Tiegel.

89. Alitalia requested Plaintiff to take over the responsibility of H.R. in the interim, directly under his supervision, while keeping all of his other responsibilities until a new H.R. Director could be nominated.

90. After about six months, a new H.R. was nominated: Mr. Andrea Sciarresi, a 32 years old expatriate, from Rome, with only two months of seniority with company.

91. Mr. Sciarresi, after a month in service, in North America, around April of 2004 informed Plaintiff that Mr. D'Angelo (V.P. H.R. foreign markets) has instructed Mr. Sciarresi to try to learn from Plaintiff as much as possible in the shortest time possible, because it was Defendants' plan to terminate Plaintiff, because Plaintiff knows too much about all of the skeletons that the company has in the closet.

92. Around the fall of 2003, Mr. Wulf was terminated by the company. Mr. Galli and Mr. Libutti were transferred to New York. Both of them are much younger than Plaintiff: Mr. Galli about 45 years old and Mr. Libutti about 42.

93. When Galli and Libutti were transferred to New York, Mr. Galli decided to have his office in the building at Rockefeller center, where Plaintiff was, Libutti instead at

666 fifth avenue where the majority of the employees were located. Plaintiff asked Mr. Galli why he didn't want to be in Plaintiff's former office at the other building, after all it was a much bigger office and very executively decorated. Being number one in the North America organization of Alitalia, Galli told Plaintiff that Plaintiff's former office will now be occupied by Mr. Libuti and that he preferred to be near Plaintiff.

94. Since the very first day and on a daily basis, Mr. Gallli playing the friend's role, started and continued to tell Plaintiff on a daily basis to resign, from Alitalia; that Plaintiff was not a young guy anymore; and that would have been just stupid to continue to work, considering that in the past he was in a psychiatric ward. Plaintiff was very stressed and depressed from the realization that the company which he loved so much, and to which he dedicated most of his life, was ready to dispose of him as a dirty object.

95. During Mr. Galli's stay in New York, while in the office Plaintiff noticed very frequently Mr. Galli looking at him and with a maliciously smile, was keeping moving his penis inside his pocket. After about 20 times that such an event took place, since this all was making Plaintiff very uncomfortable, Plaintiff decided to confront Mr. Galli and told him that I wouldn't accept any longer his genital game maneuverings, and that if he was in the urge to touch himself he should go to the men's room and play as long as he wanted. Mr. Galli smiling and getting closer to Plaintiff with his right arm, on Plaintiff's shoulder said: "Franco I know that you may want to play with it, you could come to the bathroom with me, but I have one

condition, you must shave your beard first" Plaintiff felt disgusted, and asked him to leave Plaintiff's office immediately.

96. Plaintiff's working relationship with Galli changed deeply.

97. Plaintiff was later very happy when he learned that Galli was recalled to Rome for a big promotion, but Plaintiff was still very sad knowing that Galli would continue to be his boss.

98. On or about the fall of 2004, Mr.Galli organized a meeting in New York, inviting Mr. Michele Ruggiero from Rome (He was the administrator of Alitlia's Executives of the company) to finalize Plaintiff's package out of Alitalia. Plaintiff refused to accept Defendants' package. The following day, Mr. Galli told Plaintiff "Franco, this company, is not for you anymore, you have the possibility to get a great package that I presented to you and that Ruggiero presented to you. I tell you as a brother, this company has few more months of life then will go bankrupt and you will lose everything. I'm looking after your interest because you have been good to the company, but remember that the company that you know doesn't exist anymore.

99. As further evidence of the mistreatment of their employee, Defendants also wrongly misappropriated funds from the employee pension plan, thereby negatively affecting the worth of Plaintiff's pension, in addition to the worth of all of the other employees' pensions.

100. Eventually, Plaintiff was beaten down to the point where he did sign an Agreement With Alitalia which purported to make Plaintiff a "consultant" to Alitalia.

101. According to the Agreement, September 15, 2005 was the last day of employment for Plaintiff.

102. However this is not true. Plaintiff was held on and was continued as an employee of Defendants as Senior Vice President of Corporate and Regulatory Affairs working under Giulio Libutti until May of 2006.

103. If it is ultimately decided that Plaintiff was not held on as an employee after September 15, 2005, Plaintiff claims he was a consultant and was entitled to protection under the law as a consultant.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

104. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

105. Executive Law § 296 (1) provides that It shall be an unlawful discriminatory practice:

> (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

106. Defendant engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of his age, disability, citizenship, and perceived sexual orientation.

107. Plaintiff also claims that defendants violated any and all applicable sections of New York State's Executive Law pertaining to the facts herein.