UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK          Case # 07 CV 06418 (CM)(HP)

-----------------------------------------------------------------X

FRANCESCO GALLO,

                              Plaintiff,

          -against-                                    **AMENDED COMPLAINT**

                                                       <u>Plaintiff Demands a Jury</u>

ALITALIA - LINEE AEREE ITALIANE –
SOCIETA PER AZIONI,
PIERANDREA GALLI, and
GIULO LIBUTTI,

                              Defendants

-----------------------------------------------------------------X

        Plaintiff, by his attorneys, AKIN & SMITH, LLC complains of defendants upon

information and belief as follows:


1.  Plaintiff complains pursuant to the laws of the State of New York and the Administrative

    Code of the City of New York, seeking damages to redress the injuries Plaintiff has

    suffered as a result of, *inter alia*, being harassed, discriminated and retaliated against, and

    discharged by Defendants, Plaintiff's former employer as a result of his age, citizenship,

    disability, perceived sexual orientation and in retaliation for opposing the unlawful

    employment practices of defendants.

2.  Plaintiff is a resident of the State of New York, is over the age of 40, male, and is an

    American Citizen.

3.  Defendant ALITALIA - LINEE AEREE ITALIANE – SOCIETA PER AZIONI

    (hereinafter also referred to as "Alitalia") is a foreign business corporation duly existing

    under the laws of the State of New York.

4. Defendant ALITALIA - LINEE AEREE ITALIANE – SOCIETA PER AZIONI is a foreign business entity which does business in the State of New York.

5. Defendant PIERANDREA GALLI ("GALLI" or "Mr. Galli") was at all times material an employee of Defendant ALITALIA.

6. Defendant PIERANDREA GALLI was at all times material a supervisor of Plaintiff.

7. Defendant PIERANDREA GALLI was at all times material a resident of Italy.

8. Defendant PIERANDREA GALLI was at all times material the direct supervisor of Plaintiff.

9. Defendant GIULIO LIBUTTI ("LIBUTTI" or "Mr. Libutti") was at all times material an employee of Defendant ALITALIA.

10. Defendant GIULIO LIBUTTI was at all times material a supervisor of Plaintiff.

11. Defendant GIULIO LIBUTTI was at all times material a resident of Italy.

12. Defendant GIULIO LIBUTTI was at all times material the direct supervisor of Plaintiff.

13. Plaintiff began working for ALITALIA around September of 1968 as an accountant.

14. Plaintiff worked his way up through Alitalia to become Managing Director of Alitalia - North America.

15. Around September 15, 2005 Plaintiff was purportedly reassigned as a "Consultant" to Alitalia pursuant to an agreement between the parties.

16. However, in reality, Plaintiff was not reassigned as a "Consultant" but was rather kept on and reassigned as the Senior Vice President of Alitalia for Corporate and Regulatory Affairs for North America, working under LIBUTTI.

17. After September 15, 2005, Plaintiff continued as an employee of Defendants.

18. The above Agreement also purported to release Alitalia from all claims up to September 15, 2005.

19. Defendants wrongfully terminated Plaintiff on or around the end of May, 2006.

20. Plaintiff brings this action for all discrimination and retaliation for all instances of unlawful employment conduct and discrimination after September 15, 2005. However, Plaintiff fully reserves the right to introduce all previous instances of unlawful discrimination as evidence of the hostile work environment, discriminatory adverse employment actions, and as evidence of unlawful retaliation against Plaintiff. Any mention of dates and instances prior to September 15, 2005 are for evidentiary reasons pertinent to the work conditions and employment actions after September 15, 2005.

21. Defendants fired plaintiff because of his age. Defendants wanted younger employees at Alitalia and Plaintiff was too old for them.

22. Up until his termination, each of the Defendants created a hostile work environment for Plaintiff because of his age on a continual and almost daily basis, by telling plaintiff, *inter alia*, that he was too old and that he should quit and that he was no "young chicken" and numerous other derogatory comments referring to his age.

23. Plaintiff opposed such unlawful employment practices by frequently telling Defendants up until he was fired that what they were doing was illegal and that if it did not stop, he would sue them. Not only did it not stop, it got worse and Defendants ultimately fired Plaintiff for same.

24. Defendants fired Plaintiff because of his disability(ies). Plaintiff suffered from Depression, Anxiety and Coronary Disease. Defendants did not want someone with Plaintiff's disabilities in his position working for them.

25. Up until his termination, each of the Defendants created a hostile work environment for Plaintiff because of his disabilities on a continual and almost daily basis, by telling plaintiff, *inter alia*, he was sick and could not do the job, and that he was crazy, and numerous other derogatory comments referring to his disabilities.

26. Plaintiff opposed such unlawful employment practices by frequently telling Defendants up until he was fired that what they were doing was illegal and that if it did not stop, he would sue them. Not only did it not stop, it got worse and Defendants ultimately fired Plaintiff for same.

27. Defendants fired Plaintiff because of his citizenship. Plaintiff is an American Citizen and Defendants are of Italian Citizenship.

28. Up until his termination, each of the Defendants created a hostile work environment for Plaintiff because of his citizenship on a continual and almost daily basis, by telling plaintiff, *inter alia*, he was an "American Shit" or telling plaintiff he should quit since Plaintiff was no longer Italian, and numerous other derogatory comments referring to his citizenship.

29. Plaintiff opposed such unlawful employment practices by frequently telling Defendants up until he was fired that what they were doing was illegal and that if it did not stop, he would sue them. Not only did it not stop, it got worse and Defendants ultimately fired Plaintiff for same.

30. Defendants fired Plaintiff because of his perceived sexual orientation. Defendants considered Plaintiff to be gay.

31. Up until his termination, each of the Defendants created a hostile work environment for Plaintiff because of his perceived sexual orientation on a continual and almost daily basis, by telling plaintiff, *inter alia*, comments like "you must be very busy taking it in the ass" and numerous other derogatory comments referring to his perceived sexual orientation.

32. Plaintiff opposed such unlawful employment practices by frequently telling Defendants up until he was fired that what they were doing was illegal and that if it did not stop, he would sue them. Not only did it not stop, it got worse and Defendants ultimately fired Plaintiff for same.

33. Up until his termination, Plaintiff also frequently told Defendants that their employment discrimination towards other workers based on age, sexual orientation, citizenship, was illegal and that it should stop.

34. Defendants fired Plaintiff in retaliation for same as well.

35. Below is even further detail as to the unlawful acts of the Defendants.

36. On or about December 2003, during a meeting held in New York, Mr. Francesco Mengozzi, the CEO of the Alitalia, directed Plaintiff to make sure, by the same year ending, to terminate at least 50% of Alitalia's North American Division employees, supervisors and managers who were over the age of 50 years, and to replace these "older" workers with younger individuals, not older than "30/32 years of age."

37. Plaintiff himself, was over the age of 50 years.

38. During the first week of October 2005, Plaintiff was told by Defendant PierAndrea Galli, (Senior Director Sales Worldwide) located at Alitalia's Headquarters in Rome, Italy, that as of that date, he was not reporting to him directly any longer, and that his new direct Supervisor was Defendant Giulio Libutti (SVP. Sales North American).

39. Almost every single morning, Mr. Libutti would call Plaintiff into his office and, always closing his office's door, and ask Plaintiff questions related to the sexual orientation of various employees male and female alike.

40. On or about the second week of December 2005, Mr. Libutti asked Plaintiff, "Franco, (Plaintiff's nickname for Francesco), I would like to know from you, why do you always defend gays and lesbians? Why don't you want to fire them? Is it possible that you are one of them?"

41. On or about the end of December 2005, while Mr. Libutti was either on vacation, or out on business, during an initially work-related telephone conversation, Mr. Libutti told Plaintiff "I'm having the greatest time on the beach, so much pussy available!! Even if my wife is here. I making sure to get all my opportunities! Well I forgot that you don't care about pussy. . . How are all the queers (FROCI was the Italian word used which has a much worse connotation than Fag) at Alitalia? . . Since I'm not there, you must be very busy taking it in the ass. Try to be good. . . Think what would happen if your wife would find it out!"

42. Upon Mr. Libutti's return to the office, making reference to the telephone conversation, Plaintiff related to him that he did not appreciate at all his conduct, and it was necessary to stop immediately. While leaving his office, Mr. Libutti grabbed Plaintiff's arm, forcefully closed the office's door and yelled: "sit down on this

fucking chair, and listen to me carefully, or I will break your ass........oh no, no you
might like that very much, but listen to me once and for all: as you should know by
now, I am a real and convinced fascist, like your friend Mazzucco, I hate with all my
passion gays, lesbians, Jews, and all these fucking Americans attorneys, that protect
them. Now I understand why you negated your Italian citizenship and became one of
them. Do you think that I don't know that you rushed to become an American, in
order to fuck my strategy?"

43. On the following day, during a telephone conversation with Mr. Galli in Rome
Plaintiff informed Mr. Galli that his working conditions with Mr. Libutti were
unbearable and that Libutti's objective was to force Plaintiff to quit the company. Mr
Galli replied that he was very busy at that particular time, but promised Plaintiff that
he would talk to Libutti. After not even 20 minutes, Mr. Galli called Plaintiff back
and said: "Franco, I spoke to Giulio (Mr. Libutti) and I can assure you, that it is all in
your imagination, Giulio loves you, and he needs your professionalism and
capabilities to solve the company's problems. Is it possible that with your health
conditions, you are making this up?"

44. Two days later, Mr. Libutti called Plaintiff for coffee as usual, and said to Plaintiff:
"Franco, remember, that you must do what I tell you to do, I am the Boss here, and if
you think that Mr. Galli is your friend, you are fucking wrong, how can you be so
fucking stupid, don't you understand? I had an order from him, before I came to work
in the States to make sure to fire you.... Franco, remember, again I am the boss here,
and as you can see I talk to you only on a one-on-one basis. It will always be my
word against yours." Mr. Libutti then took a pad out of a folder and told Plaintiff,

"Franco, it is your responsibility to find a way at zero cost to the company, to fire the following people: Angela Ross, Esther Lo Russo, Betty Santella, Gabriele Mariotti, Concetta Corso, Marylin Abbott etc and all others that didn't accept the retirement package. It is also your responsibility, to select and hire two new employees, a manager in the HR Department will replace Angela Ross, and a vice president, that will replace Orlando D'oro, and will report to you. . . Do also remember that I don't give a shit . . about your adoptive country, all new employees must be young, no more then 30 years old, no gays, no lesbians, and no blacks."

45. Plaintiff greatly opposed this discriminatory practice and told Libutti so.

46. In response to Plaintiff's complaints, Libutti, stated that he was all over the world and never faced with all these complications. He continued with negative remarks about this country, and he was sure, that "as the Roman Empire came to an end, soon the United States of America would also follow the same destiny."

47. Libutti asked Plaintiff to follow him to his office, closed his office's door, and then slammed Plaintiff against the door, grabbing Plaintiff's arms and pushing him again toward the other wall, near the window. Plaintiff was terrified, especially looking at Libutti's face which was red and seeing how extremely angry he was.(Alitalia's office is located at the Empire State Building on the 37th floor) Plaintiff did his best to free his body from Libutti's hands, and Plaintiff told Libutti that it was his firm request, to leave his office. Libutti stated, inter alia, in return: "You will be free to go, only after you have listened to me. . . . " and Libutti continued to berate Plaintiff.

48. In the following days, walking around the office, Plaintiff noticed and felt a big change on the part of his coworkers; that their usual behavior was exactly the

opposite than before, preferring to avoid him as much as possible. In fact, Mr. Orlando D'oro, Vice President of Regulatory Affair and Plaintiff's Assistant, informed Plaintiff that Libutti, while Plaintiff was in Chicago for a legal deposition, visited D'oro's office, asking questions about Plaintiff's trip, and telling D'oro numerous denigrating comments about Plaintiff.

49. Around the end of February, 2006, Plaintiff selected a new candidate, for the HR Manager position, but contrary to the past practice, before hiring her, Plaintiff invited the HR manager from Rome and Libutti to be present at the final interview. Libutti stated that professionally Plaintiff selected OK, but physically he didn't like her at all, stating that she was "Fat Horse." Again, Plaintiff opposed this employment practice.

50. On or about Feb. 21 2006, Plaintiff reported all the credentials of Mr. Dursun Oksus to Libutti for possible promotion.. Libutti told Plaintiff "Good. He is a Turk, and he was born in Istanbul, I know Turks very well, I have many Turkish friends. They are not American like you, and I trust Muslim people a lot."

51. With Libutti's permission, Plaintiff promoted Mr. Oksuz.

52. Mr. Oksus is a homosexual male.

53. Around April, 2006, Mr. Oksuz, was vigorously complaining to Plaintiff that he was being continuously harassed by Libutti. Plaintiff asked Mr. Oksuz to prepare a letter to Plaintiff regarding his complaints of harassment by Libutti. The following day, Plaintiff decided to talk to Libutti, about Mr. Oksuz. After mentioning Mr. Oksuz to Libutti, Libutti told Plaintiff "I'm very sorry. This is a disgrace. This guy is worth nothing. He is a very strange person. I know now that he is a dirty gay, and now I

know why you promoted him. You must make sure that he will not pass the probation period. You must fire him. He is a fucking son of a bitch"

54. Plaintiff informed Libutti that he was tired of his conduct and his accusations, his hostility towards him, and his harassment and discriminatory actions. At this point, Libutti stated: "You don't scare me. Nor you or any other Gay, Old, American shit, son of bitch like you."

55. Plaintiff frequently saw Libutti and Mr. Oksuz having what appeared to be confidential meetings.

56. For the next 3 days Plaintiff didn't go to the office and was enduring much suffering. He decided after 3 days to go back to work at the office and try to avoid Libutti, which was not easy. So Plaintiff decided to keep his office's door closed as much as possible, and focus on his work.

57. On or about May 8, 2006, while Plaintiff was working, Mr. Galli and Mr. Libutti (Mr. Galli just arrived from Rome at Newark airport) entered Plaintiff's office, closed the door and Mr. Galli said: "Franco I know that you don't deserve all this, after all the good things that you have done for the company, but I am here to tell you that the same company now, wants you out of here, you have been fired, and I am sorry to be the one to tell you. You must leave the Alitalia office, as soon as possible. They don't want you here anymore." Plaintiff asked who they were, but received no response. Plaintiff told Mr. Galli, that he needed some time to prepare his personal belongings, after 38 years of service, he needed at least a week of time, also because he had certain corporate responsibilities with respect to the American government, as well as other institutions for which he was a fiduciary in name and for the account of Alitalia.

58. On or about May 23, 2006 while Plaintiff was preparing his boxes to leave, Libutti entered Plaintiff's soon-to-be former office, and told Plaintiff "I'm telling everybody that you will be going on a medical leave of absence, I urge you to say likewise."

59. Around the end of May, 2006, Plaintiff was no longer an employee of defendants.

60. Each of the Defendants fired Plaintiff because of his age, his disability of depression and anxiety, a perceived sexual orientation, his citizenship, and because of Plaintiff's opposition to Defendants unlawful employment practices.

61. Additionally, on or about May 12, 2006, two managers of Alitalia from Rome were in New York on a business trip. They visited Libutti in his office. Libutti told these two officers of the company that Francesco Gallo (Plaintiff) was fired by him and Galli because he is gay, and that it was necessary to "clean up" Alitalia, and that the majority of Alitalia's North American employees were "Gays and Lesbians."

62. Soon thereafter, Plaintiff was receiving, numerous telephone calls from Alitalia's offices all over the world; From colleagues and long time friends, expressing affection and support, and asking Plaintiff to please take all necessary steps to defend his reputation, but also to put a stop to this kind of company's practice.

63. Around this time, Plaintiff learned that Mr. Oksuz was leaving the company.

64. Thereafter, on or about the third week of June, Plaintiff received a threatening telephone call from Libutti stating: "Franco, I'm very sorry for you, but Mr. Oksuz has sued you and the company. I want you to contact our new law office, that represents Alitalia. If you promise me, that you won't sue Alitalia, for what we did to you, Alitalia will take care of the case and we will pay some money to keep his mouth shut. Mr. Oksuz, is accusing you of sex abuse, but I know that it is not true,

and that he is doing this, to get some money. I do repeat, it is very important for you not to sue Alitalia, otherwise, you must pay Oksuz . . . " Defendants continued to pressure Plaintiff into not enforcing his rights under the discrimination and anti-retaliation laws.

65. Plaintiff had been so unlawfully humiliated, defamed, harassed and emotionally strained by the Defendants, that two or three days later, he found himself as an in-patient at New York Presbyterian Hospital where he remained for about 10 days to help alleviate his mental suffering.

66. Once discharged from the hospital, Plaintiff's wife informed him that while he was at the hospital, she received a telephone call from Libutti, telling her that he was very sorry for Plaintiff, that he wanted to help her, not asking Plaintiff to repay the amount that Alitalia had to pay Mr. Oksuz for his claims. Libutti told Plaintiff's wife, in order to minimize the big scandal, she had to promise Libutti that she would force Plaintiff to not sue Libutti and Alitalia. Libutti also told Plaintiff's wife that if Plaintiff would sue Alitalia, he would ruin Plaintiff's reputation among everyone in the world that Plaintiff knew.

67. In the same conversation with Plaintiff's wife, Mr. Libutti told Plaintiff's wife that Plaintiff was a homosexual and he told Plaintiff's wife that Plaintiff had had anal sex with Mr. Oksuz.

68. The above defamatory statements were false and Mr. Libutti knew them to be false at the time of making them.

69. Plaintiff's wife informed Plaintiff that many people had called her and offered her support, since Mr. Libutti made sure to advertise the matter, within the entire Alitalia,

Italy, including, the General Consulate Of Italy. Even Plaintiff's children were made aware at their school.

70. On or about the second week of August, Plaintiff received a telephone call, from Mr. Oksuz, who told Plaintiff that he attempted suicide, and that he was at Beth Israel Hospital. Mr. Oksuz told Plaintiff, that he wanted Plaintiff to know, that he (Mr. Oksuz) was "the worst man in the world"; that he was very sorry, but at this time he badly needed Plaintiff's pardon and try not to judge him extremely for what he was forced to do. Mr. Oksuz promised that he learned at a high price the lesson that will guide him for his future, if there will be one. Plaintiff's suspicions of what went on in the confidential meetings between Oksuz and Libutti were now confirmed.

71. Plaintiff's wife eventually left Plaintiff as a result of the defamatory statements and emotional toll the above events took on Plaintiff.

72. Plaintiff complained about the discriminatory and unlawful conduct, yet the discrimination continued.

73. Plaintiff and Defendants also entered into an agreement dated September 15, 2005 wherein Defendants agreed to provide Plaintiff with continuation of all employee benefits to which Plaintiff was then entitled and in which he was then participating up to age 65.

74. Defendants breached that agreement and as a result Plaintiff suffered damages.

75. Plaintiff's opposition to Defendants' unlawful conduct culminated in Plaintiff's termination.

76. The above are just some of the examples and this type of behavior occurred to Plaintiff on a daily, continuous and pervasive manner.

77. Defendants treated Plaintiff differently because of perceived sexual orientation and age.

78. Plaintiff complained to Defendant about his discriminatory conduct and Defendant retaliated against plaintiff for his good-faith complaints about said discriminatory conduct.

79. Plaintiff has been unlawfully discriminated against, was humiliated, retaliated against, has been degraded and belittled; and as a result suffers loss of rights, emotional distress, loss of income and earnings.

80. Plaintiff's situation at the job was intolerable as a result of the discrimination by Defendants to which he was subjected.

81. Plaintiff's performance was, upon information and belief, superior during the course of employment with the defendants.

82. During Plaintiff's employment with the defendant, Plaintiff was regularly exposed to a discriminatorily offensive and hostile work environment.

83. Defendant's actions and conduct were intentional and intended to harm the Plaintiff.

84. After Plaintiff protested to Defendants, Plaintiff became the subject of discriminatory retaliation by Defendants.

85. As a result of defendants' actions, Plaintiff felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

86. Defendants' hostile actions created an unlawfully hostile working environment which no reasonable person would tolerate.

87. As a result of the defendants' discriminatory and intolerable treatment of Plaintiff, he suffered severe emotional distress and physical ailments.

88. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

89. As a result of the above Plaintiff has been damaged in an amount in excess of the jurisdiction of all lower courts.

90. As Defendants' conduct has been willful, outrageous, done with full knowledge of the law, and malicious, Plaintiff also demands punitive damages against Defendants.

91. Other conduct of the defendants, prior to September 15, 2005, merely as evidence of the hostile work environment existing after September 15, 2005, as evidence of Plaintiff's wrongful termination on account of age, disability, citizenship, and perceived sexual orientation, and to demonstrate additional motivation behind all retaliation for Plaintiff opposition, is as follows:

92. On or about, September 2002, Plaintiff was invited by Mr. Paolo Fabiani (Plaintiff's immediate superior) to participate in a meeting in Rome, to present to Mr. Francesco Mengozzi, CEO of the company, the economic situation and the budget result for the year 2002, of the territory under Plaintiff's jurisdiction (NORTH AMERICA & MEXICO & CENTRAL AMERICA).

93. Plaintiff left New York for Rome to participate in the meeting. When Plaintiff arrived at the meeting room, the majority of his colleagues from all over the world were in the auditorium.

94. After only two minutes of Plaintiff's 30 minute presentation, Mr. Mengozzi interrupted Plaintiff, and stated, *inter alia*, "It is time that we understand that this company needs young people. . .People who have new visions. People over 50 should make space for younger people." Mr. Mengozzi went on to scream at Plaintiff, "You sit down, and I don't have time or desire to waist time with you."

95. The meeting went on and the other younger presenters had the chance to present their presentations with no intervention at all.

96. It was clear to Plaintiff that the meeting was intended to give him a message to retire from Alitalia. That evening, Plaintiff went back to the hotel and was very sick. Plaintiff ended up in the Hospital from his reaction to the Defendants' conduct.

97. The following week, Plaintiff received a phone call from Mr. Fabiani, who told him that he was very sorry for what happened, but to be strong, because Mr. Mengozzi hated Plaintiff and he wanted him out, because, *inter alia*, Mr. Mengozzi wanted new and younger people. Plaintiff opposed this policy.

98. On or about the month of December 2002, Plaintiff felt very sick and was hospitalized. He was in the psychiatry ward for more than a month, and another month as an outside patient, going to the hospital at 9.30 in the morning, till 2.30.

99. During his stay in the hospital, he was visited by Mr. Fabiani and Mr.Luigi Di Bianco. (Mr. Fabiani, Plaintiff's superior and Mr. Di Bianco, Head of Human Resources, Worldwide.) They told Plaintiff: (Mr. Fabiani with tears in his eyes) "Franco, we have a terrible notice to give to you, Mr. Mengozzi, decided, to split the responsibilities of the territory of North America in two, so from today on, your title won't be Managing director North America anymore, but Senior Vice president

Corporate Affairs for Alitalia Group. While Mr. Niels Wulf will be transferred from London to New York and will be responsible for Sales and Marketing North America, and his title would be Senior Vice President Sales. Both of you will report to the main office directly and to the various responsible person, according to the function responsibilities." Mr. Di Bianco stated that according to him this was a very wrong and dishonest decision, and that Alitalia, would have paid terrible consequence for this decision. Defendants were clearly retaliating against Plaintiff because of his age and because of his opposition to Defendants unlawful employment practices.

100. On or about the month of March, 2003 Mr. Wulf, arrived in New York, and while Plaintiff was still in the Hospital, he telephoned Plaintiff. Mr. Wulf and asked Plaintiff to vacate his office, because it was decided, that his office would now be occupied by him. Plaintiff called Mr. Di Bianco in Rome and asked why he had to release, his office space to Wulf. Mr. Di Bianco said that since the office was quite large, Plaintif and Mr. Wulf had to share the space, dividing it with a partition. Mr. Wulf refused such order.

101. Plaintiff thereafter learned that Mr. Maurizio Pace had become his new boss. At the beginning of April 2003, Plaintiff returned from his sick leave and found all his office belongings as well as his personal items in the corridor. Plaintiff was forced to use a meeting room, without a window as his office. Plaintiff felt very humiliated, especially when the employees were asking Plaintiff "What was going on" and "What terrible thing did you do to deserve that."

102. On or about December of 2003, Mr. Mengozzi during a visit in the office, with Mr.Zanichelli., P.R. Executive S.V.P., Mr.D'angelo, H.R. V.P., and Mr. Antonio

Pola. Director Administration during a meeting with Plaintiff, Mr. Wulf and Mr. Mengozzi started attacking Plaintiff, in a very brutal and humiliating way, accusing plaintiff of not having terminated the "old" employees; that Plaintiff was not the right guy to do what he ordered. Mr. Mengozzi said to plaintiff, "Since you are now a psychiatric subject, how can I trust that you understand what I really want to be done?"

103. After the meeting, Mr Mengozzi, requested to meet the H.R. Director, Mr. Howard Tiegel. Mr Tiegel, that evening, reported to Plaintiff that Mengozzi, asked him to prepare a list with the names of all employees over 50 years of age, and making a statement that all these people had to leave the company.

104. Mr. Tiegel protested Alitalia's discriminatory policies so Alitalia paid Mr. Tiegel money to secure a release, and terminated Mr. Tiegel.

105. Alitalia requested Plaintiff to take over the responsibility of H.R. in the interim, directly under his supervision, while keeping all of his other responsibilities until a new H.R. Director could be nominated.

106. After about six months, a new H.R. was nominated: Mr. Andrea Sciarresi, a 32 years old expatriate, from Rome, with only two months of seniority with company.

107. Mr. Sciarresi, after a month in service, in North America, around April of 2004 informed Plaintiff that Mr. D'Angelo (V.P. H.R. foreign markets) has instructed Mr. Sciarresi to try to learn from Plaintiff as much as possible in the shortest time possible, because it was Defendants' plan to terminate Plaintiff, because Plaintiff knows too much about all of the skeletons that the company has in the closet.

108. Around the fall of 2003, Mr. Wulf was terminated by the company. Mr. Galli and Mr. Libutti were transferred to New York. Both of them are much younger than Plaintiff: Mr. Galli about 45 years old and Mr. Libutti about 42.

109. When Galli and Libutti were transferred to New York, Mr. Galli decided to have his office in the building at Rockefeller center, where Plaintiff was, Libutti instead at 666 fifth avenue where the majority of the employees were located. Plaintiff asked Mr. Galli why he didn't want to be in Plaintiff's former office at the other building, after all it was a much bigger office and very executively decorated. Being number one in the North America organization of Alitalia, Galli told Plaintiff that Plaintiff's former office will now be occupied by Mr. Libuti and that he preferred to be near Plaintiff.

110. Since the very first day and on a daily basis, Mr. Gallli playing the friend's role, started and continued to tell Plaintiff on a daily basis to resign, from Alitalia; that Plaintiff was not a young guy anymore; and that would have been just stupid to continue to work, considering that in the past he was in a psychiatric ward. Plaintiff was very stressed and depressed from the realization that the company which he loved so much, and to which he dedicated most of his life, was ready to dispose of him as a dirty object.

111. During Mr. Galli's stay in New York, while in the office Plaintiff noticed very frequently Mr. Galli looking at him and with a maliciously smile, was keeping moving his penis inside his pocket. After about 20 times that such an event took place, since this all was making Plaintiff very uncomfortable, Plaintiff decided to confront Mr. Galli and told him that I wouldn't accept any longer his genital game

maneuverings, and that if he was in the urge to touch himself he should go to the men's room and play as long as he wanted. Mr. Galli smiling and getting closer to Plaintiff with his right arm, on Plaintiff's shoulder said: "Franco I know that you may want to play with it, you could come to the bathroom with me, but I have one condition, you must shave your beard first" Plaintiff felt disgusted, and asked him to leave Plaintiff's office immediately.

112. Plaintiff's working relationship with Galli changed deeply.

113. Plaintiff was later very happy when he learned that Galli was recalled to Rome for a big promotion, but Plaintiff was still very sad knowing that Galli would continue to be his boss.

114. On or about the fall of 2004, Mr.Galli organized a meeting in New York, inviting Mr. Michele Ruggiero from Rome (He was the administrator of Alitlia's Executives of the company) to finalize Plaintiff's package out of Alitalia. Plaintiff refused to accept Defendants' package. The following day, Mr. Galli told Plaintiff "Franco, this company, is not for you anymore, you have the possibility to get a great package that I presented to you and that Ruggiero presented to you. I tell you as a brother, this company has few more months of life then will go bankrupt and you will lose everything. I'm looking after your interest because you have been good to the company, but remember that the company that you know doesn't exist anymore.

115. As further evidence of the mistreatment of their employee, Defendants also wrongly misappropriated funds from the employee pension plan, thereby negatively affecting the worth of Plaintiff's pension, in addition to the worth of all of the other employees' pensions.

116. Eventually, Plaintiff was beaten down to the point where he did sign an Agreement With Alitalia which purported to make Plaintiff a "consultant" to Alitalia.

117. According to the Agreement, September 15, 2005 was the last day of employment for Plaintiff.

118. However this is not true. Plaintiff was held on and was continued as an employee of Defendants as Senior Vice President of Corporate and Regulatory Affairs working under Giulio Libutti until May of 2006.

119. If it is ultimately decided that Plaintiff was not held on as an employee after September 15, 2005, Plaintiff claims he was a consultant and was entitled to protection under the law as a consultant.

## AS A FIRST CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

120. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

121. Executive Law § 296 (1) provides that    It shall be an unlawful discriminatory practice:

> (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

122. Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of his age, disability, citizenship, and perceived sexual orientation.

123. Defendant Alitalia is also liable under New York City Administrative Code Title 8-107(13) "Employer liability for discriminatory conduct by employee, agent or independent contractor."

124. Plaintiff also claims that defendants violated any and all applicable sections of New York State's Executive Law pertaining to the facts herein.

## AS A SECOND CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

125. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

126. New York State Executive Law §296(7) also provides that "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article. 8. It shall be an unlawful discriminatory practice for any party to a conciliation agreement made pursuant to section two hundred ninety-seven of this article to violate the terms of such agreement."

127. Defendants engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

128. Defendant Alitalia is also liable under New York City Administrative Code Title 8-107(13) "Employer liability for discriminatory conduct by employee, agent or independent contractor."

## AS A THIRD CAUSE OF ACTION
## FOR DISCRIMINATION UNDER STATE LAW

129. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

130. New York State Executive Law §296(6) provides that it shall be an unlawful discriminatory practice:

"For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

131. Each of the Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law §296(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

## AS A FOURTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## THE NEW YORK CITY ADMINISTRATIVE CODE

132. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

133. The Administrative Code of City of NY § 8-107 [1] provides that "It shall be an unlawful discriminatory practice: "(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

134. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(1)(a) by actually and constructively discharging, creating and maintaining discriminatory working conditions, and otherwise discriminating against the Plaintiff because of his age, disability, citizenship, and perceived sexual orientation.

135. Defendant Alitalia is also liable under New York City Administrative Code Title 8-107(13) "Employer liability for discriminatory conduct by employee, agent or independent contractor."

136. Plaintiff also claims that defendants violated any and all applicable sections of New York City's Administrative Code pertaining to the facts herein.

## AS A FIFTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## THE NEW YORK CITY ADMINISTRATIVE CODE

137. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

138. The New York City Administrative Code Title 8, §8-107(1)(e) provides that it shall be

unlawful discriminatory practice:

"For an employer . . . to discharge . . . or otherwise discriminate against any
person because such person has opposed any practices forbidden under this
chapter. . . "

139. Each of the Defendants engaged in an unlawful discriminatory practice in violation of

New York City Administrative Code Title 8, §8-107(1)(e) by discriminating against the

Plaintiff because of Plaintiff's opposition to the unlawful employment practices of

Plaintiff's employer.

140. Defendant Alitalia is also liable under New York City Administrative Code Title 8-

107(13) "Employer liability for discriminatory conduct by employee, agent or

independent contractor."

## AS A SIXTH CAUSE OF ACTION
## FOR DISCRIMINATION UNDER
## THE NEW YORK CITY ADMINISTRATIVE CODE

141. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this complaint.

142. The New York City Administrative Code Title 8, §8-107(6) provides that it shall be

unlawful discriminatory practice:

"For any person to aid, abet, incite, compel; or coerce the doing of any of the acts

forbidden under this chapter, or attempt to do so."

143. Each of the Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8, §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

### AS A SEVENTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER THE
### NEW YORK CITY ADMINISTRATIVE CODE

144. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

145. New York City Administrative Code Title 8-107(19) Interference with protected rights. It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

146. Each of the Defendants violated the herein section as set forth herein.

### AS A EIGHTH CAUSE OF ACTION
### NEGLIGENT AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

147. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

148. Defendants engaged in extreme and outrageous conduct.

149. Defendants intended to cause, or disregarded a substantial probability of causing, severe emotional distress to Plaintiff.

150. There exists a causal connection between the above conduct and said injury.

151. As a result of said conduct Plaintiff suffered and suffers from severe emotional distress.

## AS A NINTH CAUSE OF ACTION
## DEFAMATION AND SLANDER AS AGAINST ALITALIA AND LIBUTTI

152. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

153. Defendant Libutti's statements were false and defamatory and were of and concerning the plaintiff.

154. Defendant Libutti published said statements to numerous persons including but not limited to Plaintiff's wife, a third party.

155. There exists fault on the part of the defendants Alitalia and Libutti.

156. Plaintiff sustained injury and damages as a result of the above.

157. Additionally, defendants' defamation and slander constitute slander *per se*.

## AS A TENTH CAUSE OF ACTION
## BREACH OF CONTRACT

158. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

159. Plaintiff and Defendants had an agreement dated September 15, 2005.

160. Under said agreement, defendants were to provide Plaintiff with a "continuation of all employee benefits to which Employee is currently entitled and in which he is currently participating, or payment necessary to privately purchase their equivalents, up to age sixty-five (65) . (401-K; Social Security; Medicare)."

161. Defendants stopped paying for numerous employee benefits to which Plaintiff was entitled at the time of the agreement; namely, Defendants stopped paying for his automotive expenses such as garage fees, gas, tolls; defendants stopped paying for Plaintiff's Health Insurance; Defendants stopped contributing towards Plaintiff's 401(k) plan; Defendants failed to give Plaintiff a gold Rolex watch to which he was entitled; Defendants cancelled the Supplemental Pension Plan; Defendants failed to continue paying for plaintiff's cell phone.

162. Also, when the Italian Vice-Prime Minister was visiting New York City from Italy, Defendants told Plaintiff to pay for said politician's entertainment expenses; to pay for a limousine to take him around New York; to pay for various meals and entertainment. However, despite said promise to repay, Defendants failed to repay plaintiff for same.

163. Defendants Breached said agreements.

164. Plaintiff suffered damages as a result of said damages.

**INJURY AND DAMAGES**

165. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of a career and the loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses, disability benefits, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, injury to reputation, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

**JURY DEMAND**

Plaintiff hereby demands a jury of all issue to be tried.

WHEREFORE, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that the Defendants engaged in unlawful employment practice prohibited by state common law, New York State Executive Law §296 et. Seq. and The New York City Administrative Code Title 8, §8-107 et. Seq.; and that the Defendants harassed, discriminated against, constructively discharged, and retaliated against Plaintiff on the

basis of Plaintiff's age, disability, citizenship, perceived sexual orientation, and retaliation;

B.  Awarding damages to the Plaintiff, retroactive to the date of discharge, for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful termination of employment and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practice;

C.  Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation in a amount in excess of the jurisdiction of all lower courts;

D.  Awarding Plaintiff damages from defendants' Breach of Contract.

E.  Awarding Plaintiff punitive damages;

F.  Awarding Plaintiff attorney's fees, costs, and expenses incurred in the prosecution of the action;

G.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated:       New York, NY
             September 4, 2007

                        AKIN & SMITH, LLC

                        By: _____
                              Derek T. Smith (DS 1747)

                        Attorneys for Plaintiff
                        305 Broadway
                        Suite 1101
                        New York, NY 10007
                        (212) 587-0760