2 of 3 DOCUMENTS

KEVIN SPRINGLE, Plaintiff, -v- METROPOLITAN TRANSPORTATION AUTHORITY and NEW YORK CITY TRANSIT, Defendants.

06 Civ. 734 (GEL)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

**2008 U.S. Dist. LEXIS 7875**

February 1, 2008, Decided
February 1, 2008, Filed

**COUNSEL:** [*1] Gregory R. Preston, Preston, Wilkins, Martin & Rodriguez, New York, NY, for Plaintiff.

Martin B. Schnabel, Vice President and General Counsel, New York City Transit Authority (Robert K. Drinan, Assistant General Counsel, Gena Usenheimer, Agency Attorney, of counsel), Brooklyn, NY, for Defendants.

**JUDGES:** GERARD E. LYNCH, United States District Judge.

**OPINION BY:** GERARD E. LYNCH

**OPINION**

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

Plaintiff Kevin Springle brings this employment discrimination action alleging that defendants Metropolitan Transportation Authority ("MTA") and New York City Transit Authority ("NYCTA") [1] subjected him to a racially hostile work environment and demoted him for retaliatory and discriminatory reasons in violation of *42 U.S.C. § 1981*, the New York State Human Rights Law, *N.Y. Exec. Law §§ 296 et seq.*, and the New York City Human Rights Law, *N.Y.C. Admin. Code §§ 8-107 et seq.* [2] Defendants now move for summary judgment on all claims. The motion will be granted in part and denied in part.

    1  Plaintiff's complaint sues NYCTA under the name "New York City Transit." (Compl. P4.)
    2  The complaint also asserted claims under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*, but [*2] Springle has since withdrawn his Title VII claims in light of his failure to exhaust administrative remedies. (P. Rule 56.1 Stmt. n.2.) See *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006).

**BACKGROUND**

Plaintiff Kevin Springle, an African-American man, [3] has been employed by defendant NYCTA since December 1985. (D. Rule 56.1 Stmt. P2.) Over the years, Springle has received several promotions, the last of which was in September 2002, when he was promoted to Superintendent, Rail Transit Investigations Unit ("Unit"), [4] in the Office of System Safety ("OSS"). (Id. P4.) At the time of Springle's promotion, the Unit employed five superintendents -- three white and two black men -- all of whom reported to Joe Leader, the Manager of the Unit. (Id. PP24-25.) In September 2003, Patrick Lavin, a white man, replaced Leader as Manager. (Id. PP27-28.) Lavin reported to William Walter, the Director of Investigations, who reported to Cheryl Kennedy, Vice President for System Safety. (Id. P29.) As described below, Springle's allegations of discrimination and retaliation stem largely from incidents involving Lavin, Walter, Kennedy, and other OSS personnel during the period from [*3] September 2003 to September 2005.

    3  Springle testified that he is "half Black and . . . half Asian, but what you see is Black." (Springle Dep. 86:12-13.)
    4  The Rail Transit Investigations Unit "respond[s] to and investigate[s] accidents, derailments, and collisions in the subways." (D. Rule 56.1 Stmt. P23.)

**I. Springle's 2003 Managerial Performance Report**

As Manager of the Unit, Lavin was responsible for drafting a Managerial Performance Report ("MPR") for each of the superintendents under his supervision. (Id. P63.) The MPR functioned as an annual report card which evaluated work performance in eleven different categories including, inter alia, "customer service skills," "diversity management," and "team and interpersonal skills." (Id. P44.) On December 29, 2003, Lavin signed an MPR for Springle that gave him "excellent" or "good" ratings in all relevant categories except for a "marginal" rating in "team and interpersonal skills." (Id. P46.) Despite receiving an overall MPR rating of "good," Springle was upset about the "marginal" rating, particularly since Lavin had worked with him for only three months prior to the MPR. (See Springle Dep. 113:10-21.) Although Lavin drafted Springle's [*4] 2003 MPR, both Vice President Kennedy and Leader, Lavin's predecessor, reviewed and signed the report. (D. Rule 56.1 Stmt. P59.)

## II. Core Managerial Training Referral

As part of the MPR process, Lavin was charged with developing a performance improvement plan for each employee under his supervision. (Id. P72.) In Springle's 2003 MPR, Lavin directed that he attend "Core Managerial Training to improve his team and interpersonal skills." (Id. P71.) In March 2004, Springle attended a two week core management training course. (Id. P75.) Although Springle acknowledged that the course was "good," he testified that no one else was scheduled to attend the course at the time, and that it was only after he "started questioning" why he was "the only one scheduled" that other superintendents started attending the course. (Springle Dep. 130:25, 132:24-133:3.) Springle admitted, however, that he knew that Lavin himself had previously attended the course. (Id. at 132:17-18.) According to Lavin, all of the other superintendents eventually attended the course. (Lavin Dep. 72:23-73:2.)

## III. Morning Staff Meetings

Lavin held monthly staff meetings with the superintendents in the Unit to discuss current [*5] investigations. (D. Rule 56.1 Stmt. PP80, 82.) These meetings were generally held in the morning and lasted ten to twenty minutes. (Id. P81.) On a weekly rotating basis, one of the superintendents in the Unit was assigned to work evenings on the "p.m." shift, which precluded that superintendent from attending the morning staff meeting. (Id. PP84-86.) At some unspecified point, Springle requested that Lavin change the time of the staff meeting from the morning to the afternoon to permit the superintendent working the "p.m." shift to attend the meeting. (Id. P88.) Lavin declined to change the meeting time because, in his view, various crises often arose throughout the day that made it difficult to meet later in the day. (Id. P89.) From September 2003 through October 2004, Springle attended eight out of thirteen staff meetings, while his colleagues attended between nine and twelve meetings during the same time period. (Id. PP93-94.)

## IV. October 15 Staffing Memo

On October 15, 2004, Lavin arrived at his office to find that none of the superintendents scheduled for work that day had reported for duty. As a result, Lavin issued a staffing memo to all superintendents in the Unit requiring, [*6] inter alia, that all emergency requests for time off include supporting documentation and that all sick notifications be made a minimum of two hours prior to a tour of duty. (Id. PP112-13.) On two previous occasions that year, Lavin had issued email notices to his staff expressing concerns about inadequate coverage when numerous superintendents failed to show up for work the preceding day. (Id. P110.) Upon receiving the October 15 memo, Springle complained to Walter, Lavin's supervisor, that the two-hour sick notice requirement was contrary to NYCTA's internal rules, which require only one-hour notice. (Id. P118.) A revised memo was subsequently issued changing the two-hour notice for sick leave to one hour. (Id. P120.)

On October 27, Springle met with Lavin to discuss the October 15 staffing memo. With regard to the memo's requirement that requests for time off include supporting documentation, Springle told Lavin, "I live in a house [where] the sewer backs up a lot and if you want proof would you want me to bring a bag of that in for you[?]" (Springle Dep. 119:6-8.) Lavin replied that if Springle brought him anything other than a plumbing receipt, Springle's MPR would be negatively [*7] affected. (D. Rule 56.1 Stmt. P125.)

## V. Meeting With OSS Management

On October 28, 2004, Springle met with Walter and for the first time, raised concerns that Lavin was subjecting him to racial discrimination. (Id. P138.) OSS management subsequently held a meeting the next day at which Springle presented his grievances to Vice President Kennedy and several OSS directors. Specifically, Springle cited six allegedly discriminatory actions taken by Lavin: (1) the "marginal" rating in one category in Springle's December 2003 MPR; (2) the MPR's directive that Springle attend core managerial training; (3) the decision to hold staff meetings in the morning at a time that excluded Springle when he worked the "p.m." shift; (4) the October 15 memo implementing new procedures for time off and sick leave; (5) Lavin's habit of interrupting Springle by using hand gestures and the phrase "time out"; and (6) Lavin's alleged carrying of Springle's reports to the bathroom on several occasions, which

Springle viewed as treating his reports "like shit." (Id. PP8, 141, 143.)

Prior to the October 29 meeting, Walter had informed Kennedy that Springle was actively looking to transfer out of OSS. (Kennedy Dep. [*8] 59:11-13.) As a result, Kennedy told Springle at the end of the meeting that she "did not object to him looking" elsewhere and that she "would have no problem helping him." (Id. at 59:16-18.) Sometime thereafter, Kennedy and Springle again discussed the possibility of transferring out of OSS into a new position with another department. Springle alleges that Kennedy "raised her voice" during this discussion and asked him "to choose a department" to work in. (Springle Dep. 30:24-25, 32:17-19.) Springle also claims that Kennedy advised him "that he had to go because the department was not big enough to absorb him in a different capacity." (P. Mem. 20.) According to Kennedy, however, she had previously identified a job in another department that would have been a promotion for Springle and merely asked him whether he was interested. (Kennedy Dep. 60:8-16.) When Springle declined, Kennedy stopped trying to help him find another position. (Id. at 62:2-8.)

Although Springle objected to Lavin's presence at the October 29 meeting, Lavin was permitted to attend and listen to Springle's grievances. (D Rule 56.1 Stmt. PP142, 144.) At one point near the end of the meeting, Springle allegedly became [*9] agitated, rose from his chair, and told Lavin that he was not "going to kiss his ass." (Id. PP40; 145.) As a result of this outburst, Walter issued a performance advisory to Springle on November 2. (Id. P151.) Springle filed a written statement responding to the performance advisory in which he denied using loud and abusive language at the October 29 meeting and claimed that he merely told Lavin that he was "not going to kiss his aft." (Id. P154.)

### VI. Equal Employment Office Investigation

On the same day that he received the performance advisory from Walter, Springle filed a written complaint of racial discrimination with the MTA's Equal Employment Office ("EEO"). (Id. P153.) Springle's EEO complaint repeated the six allegations of racial discrimination that he had raised at the October 29 meeting with OSS management. (Id. P175.)

Approximately one month after Springle filed his EEO complaint, Lavin learned from one of the superintendents, John Szurlej, that in October 2004, Springle had told a colleague, Ramon Paez, that he was going to "screw Pat Lavin by playing the race card." (Id. PP190-92.) As a result, Lavin filed his own complaint with EEO alleging that Springle had subjected [*10] him to racial harassment and created a hostile work environment. (Id. P183.) Patrick Damas, an African-American male, was assigned by EEO to investigate both the Springle and Lavin complaints. (Id. PP176, 184; D. Mem. 27.)

During the course of his investigation, Damas interviewed both complainants as well as numerous other OSS employees. (D. Rule 56.1 Stmt. PP179-80.) In his interview with Szurlej, Szurlej confirmed to Damas that he had heard from Paez that Springle was "going to screw Pat Lavin by playing the race card." (Id. P193.) Damas also interviewed Paez himself, who testified at his deposition:

> I do recall telling Mr. Damas that Kevin [Springle] had told me that he was going to use the racial card to file a complaint against Mr. Lavin. As [Springle] told me that, he gestured with his hand on his skin (indicating). Mr. Springle is African-American, so he would gesture like this (indicating), as he had said he was going to use the racial card.
>
> And I do recall another specific thing that I told Mr. Damas, was [that] Kevin told me that he was going to screw Pat Lavin, gesturing with his hand, pumping this way (indicating) . . . .

(Paez Dep. 22:8-19.) Springle denies ever making [*11] these statements to Paez. (Springle Dep. 208:17-25.)

On June 16, 2005, Damas concluded that there was "no reasonable cause" to believe that Springle was subjected to discriminatory conduct in violation of the NYCTA's Equal Employment Policy. (D. Ex. V.) Damas also found "no reasonable cause" to believe that Springle had subjected Lavin to racial harassment or created a hostile work environment. [5] (D. Ex. X, at 1.) Damas did find, however, that Springle's complaint violated an NYCTA rule that "prohibits NYCT[A] employees from knowingly making a report containing false statements." (Id.) Based on his determination that Paez's account of Springle's "race card" statement was credible, Damas concluded that Springle filed complaints with both OSS and EEO "knowing that the claim of race discrimination contained in the complaints was false." (Id.) As a result, EEO recommended that OSS take "appropriate" disciplinary action against Springle. (Id. at 6.)

---

5   Lavin appealed EEO's decision and subsequently met with Naeem Din, Deputy Director at the MTA's Office of Civil Rights. Din informed Lavin that he did not believe that Lavin had filed a false complaint, but that the level of racial hostility [*12] revealed in the investigation was not

"pervasive" enough to meet the criteria of a hostile work environment. (Lavin Dep. 182:8.)

### VII. OSS Investigation

Separate from the EEO investigation, Vice President Kennedy instructed James Bromfield, an OSS director, to engage in additional "fact finding" and to interview various individuals, including Paez, following the October 29 meeting. (Bromfield Dep. 70:22-71:2.) After interviewing Paez, Bromfield instructed him to memorialize his interview responses. Paez subsequently wrote a memorandum in mid-December 2004 stating:

> During his dealings with his manager, Mr. Springle would comment that he was going to quote "screw him" and would gesture with a hand pumping manner. At one point I told Mr. Springle *not* to play the "race card." It was obvious to me that he was preparing to do so, even though I advised him not to do it during several occasions.

Preston Decl. Ex. G. Bromfield did not share Paez's memorandum with Walter or Kennedy. (See Bromfield Dep. 157:19-24; Walter Dep. 45:4-7; P. Rule 56.1 Stmt. P42; D. Rule 56.1 Resp. P42.)

### VIII. OSS Disciplinary Decision

After receiving EEO's report and recommendation, OSS management consulted with the [*13] NYCTA Office of Labor Relations ("Labor Relations") to determine the appropriate punishment for Springle. (D. Rule 56.1 Stmt. PP209-13.) Labor Relations noted that, although dismissal was an option, given Springle's long tenure and "good" work history at NYCTA, a demotion was the most appropriate penalty. (Id. PP220-21.) Vice President Kennedy adopted that recommendation, and Springle was subsequently served with written disciplinary charges alleging that he engaged in "gross misconduct and conduct unbecoming a Transit Manager." (Id. PP224-25; Preston Decl. Ex. N.)

Pursuant to NYCTA policy, a "step one" meeting was held in which Springle was afforded the opportunity to offer evidence in response to the charge. [6] (D. Rule 56.1 Stmt. PP215, 227.) Two directors from OSS, Walter and Bromfield, as well as an attorney from Labor Relations, attended the meeting. (Id. P226.) Springle argued that it was unfair that he was being disciplined while Lavin, who had also filed an EEO complaint, was not. (Id. P229.) Walter told Springle that his complaint was distinguishable from Lavin's because another individual, whom Walter did not name, had stated that he heard Springle say that he was going to [*14] "screw" Lavin. (Id. P230.) When Springle denied making that comment, Walter asked Springle whether there was any reason why another individual would make that assertion about him. (Id. P231.) Springle replied that he had a dispute over a radio deal with a "surface superintendent," but did not specifically name that individual. (Walter Dep. 40:19-25.)

> 6  According to NYCTA policy, once a disciplinary charge is issued, an employee may offer evidence in response to the charge at a "step one" meeting. (D. Rule 56.1 Stmt. P215.) If the charge is sustained at step one, an employee can then appeal to an OSS supervisor and discuss the charge at a "step two" proceeding. (Id. P216.) The step two decision constitutes the final disciplinary determination.

As a result of Springle's statements at the step one meeting, Walter planned to interview all of the surface superintendents to determine whether any of them had a motive to make false accusations against Springle. (Id. at 41:23-25, 43:23-44:4.) Walter's first interview was with Paez, who confirmed that he had lent some radio equipment to Springle for his use, and that when he learned Springle was going to sell the equipment, he wanted monetary [*15] compensation. (Id. at 44:7-11.) Rather than paying money to Paez, Springle returned the radio equipment. (Id. at 44:11-12.) Paez told Walter that "there were never any ill feelings" between him and Springle regarding the deal. (Id. at 44:13-14.) Walter did not question Paez about the "race card" statements that Paez had purportedly attributed to Springle. (P. Rule 56.1 Stmt. P40; D. Rule 56.1 Resp. P40.)

Following his interview with Paez, Walter met with Bromfield and Kennedy to advise them of his findings and discuss the step one determination. (P. Rule 56.1 Stmt. P41; D. Rule 56.1 Resp. P41.) On July 29, 2005, Walter issued the step one decision sustaining the disciplinary charge against Springle. (D. Rule 56.1 Stmt. P234; P. Rule 56.1 Stmt. P43; D. Rule 56.1 Resp. P43.)

On August 4, 2005, Springle appealed the step one decision to Kennedy, who held a meeting with Springle and his attorney later that month. (D. Rule 56.1 Stmt. P235.) On September 8, 2005, Kennedy issued her "step two" decision sustaining the disciplinary charge and the recommended penalty. (Id. P236.) Springle was subsequently demoted from Superintendent to Associate Railroad Signal Specialist, Level 2. (Id. P237.)

In [*16] November 2005, Springle filed an action in New York Supreme Court alleging that defendants MTA and NYCTA subjected him to a racially hostile work environment and demoted him for discriminatory and

Case 1:07-cv-06418-CM-RLE    Document 24-2    Filed 04/28/2008    Page 5 of 11

Page 5
2008 U.S. Dist. LEXIS 7875, *

retaliatory reasons in violation of federal, state, and city employment discrimination laws. Defendants filed a notice of removal to this Court on January 31, 2006.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. *Id. at 254-55*. However, summary judgment may be granted "[i]f the evidence is merely colorable, or is not significantly probative." *Id. at 249-50* (citations omitted). [*17]

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See *Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995)*. Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact. *Anderson, 477 U.S. at 250*. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the nonmoving party. *Id. at 248*.

### II. Claims Against the MTA

As an initial matter, defendants contend that the MTA is not a proper defendant in this action because it had no involvement in the events giving rise to Springle's claims. (D. Mem. 41-42.) Although affiliated with the MTA, the NYCTA is a distinct legal entity with the statutory authority to sue and be sued in its own name. See *N.Y. Pub. Auth. Law § 1204(1)*. It is undisputed that all of the individuals responsible for the alleged discriminatory and retaliatory acts against Springle were employed by NYCTA. Although Springle filed a complaint with the MTA's EEO that ultimately resulted in that office recommending that OSS take "appropriate [disciplinary] action" [*18] against Springle for filing a false complaint (D. Ex. X., at 6), Springle himself acknowledges that EEO "is only empowered to make recommendations," and that the final determination regarding the filing of disciplinary charges and the imposition of penalties rested with Kennedy, an employee of NYCTA. (P. Rule 56.1 Stmt. P29 n.1; Kennedy Dep. 9:8-15; see Din Dep. 35:15-36:13.) Accordingly, because Springle has identified no basis for liability against the MTA, his claims against the MTA must be dismissed. See *Reiter v. Metro. Transp. Auth., No. 01 Civ. 2762, 2002 U.S. Dist. LEXIS 18537, 2002 WL 31190167, at *5 (S.D.N.Y. Sept. 30, 2002)* (dismissing claims against MTA where plaintiff was employed by NYCTA and "MTA was not responsible for any of the personnel decisions in this case").

### III. Municipal Liability

Defendants assert that Springle's claims pursuant to *42 U.S.C. § 1981* should be dismissed because he has failed to adduce any evidence that could support a finding of municipal liability. [7] (D. Mem. 6-8; D. Reply Mem. 4.) Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." *Patterson v. County of Oneida, 375 F.3d 206, 224 (2d Cir. 2004)*. [*19] Claims against a municipal entity under *§ 1981* may proceed only if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or is conducted "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*; see *Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735-36, 109 S. Ct. 2702, 105 L. Ed. 2d 598 (1989)*. A municipal entity cannot be held vicariously liable under *§ 1981* for the actions of its employees under the doctrine of respondeat superior. See *Monell, 436 U.S. at 691*; *Jett, 491 U.S. at 735*.

----

7   Although defendants curiously suggest that Springle also raises a *§ 1983* claim "predicated on the *First Amendment* and the *Equal Protection Clause*" (D. Mem. 6), nothing in Springle's complaint references the *First Amendment*, the *Equal Protection Clause*, or *§ 1983*.

Springle contends that NYCTA is liable under *§ 1981* because Vice President Kennedy, who made the decision to demote Springle, was "responsible for establishing the final policy" of NYCTA "as it [*20] related to the discipline of Kevin Springle." (P. Mem. 13.) Although municipal liability attaches "where the decisionmaker possesses final authority to establish *municipal policy* with respect to the action ordered," *Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)* (emphasis added), Springle has failed to adduce any evidence demonstrating that Kennedy was an official with "final policymaking authority,"

Case 1:07-cv-06418-CM-RLE   Document 24-2   Filed 04/28/2008   Page 6 of 11

Page 6
2008 U.S. Dist. LEXIS 7875, *

*City of St. Louis v. Praprotnik, 485 U.S. 112, 123, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988)* (internal quotation marks omitted). "The fact that a particular official -- even a policymaking official -- has *discretion* in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur, 475 U.S. at 481-82* (emphasis added); see *Praprotnik, 485 U.S. at 127* ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies . . . are the act of the municipality."). At best, Kennedy possessed the discretionary authority to make a final decision regarding the discipline to be meted out to Springle, but "[a]uthority to make a final decision need not imply authority to establish rules." *Auriemma v. Rice, 957 F.2d 397, 401 (7th Cir. 1992)*. [*21] Springle has not presented any evidence that Kennedy had the authority to alter existing NYCTA disciplinary procedures or was otherwise "responsible for establishing final government policy" with regard to disciplinary matters at NYCTA. *Pembaur, 475 U.S. at 483*; see *Jeffes v. Barnes, 208 F.3d 49, 57-58 (2d Cir. 2000)* (holding that plaintiff bears burden of establishing that conduct of official represents official policy). Accordingly, because Springle cannot demonstrate that any of the alleged discriminatory or retaliatory acts were performed by a municipal official with final policymaking authority, his § 1981 claims must be dismissed.

## IV. State and City Law Claims

Although Springle has no federal claim that survives summary judgment, his claims under the Human Rights Laws of New York City and New York State arise from the same facts and rely on the same evidence as his federal claims, and thus the Court retains the discretion to exercise supplemental jurisdiction over those state and city law claims. See *28 U.S.C. § 1367(a)*; *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 308 (2d Cir. 2004)* (noting that supplemental jurisdiction exists where pendent claims share a "common [*22] nucleus of operative fact" with federal claims (internal quotation marks omitted)). Given the substantial resources already expended by the parties in developing, and the Court in reviewing, the voluminous factual record and the numerous legal arguments in this case, the Court's exercise of supplemental jurisdiction over Springle's pendent claims is clearly warranted. See *Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004)* (noting that when "the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair" (internal quotation marks omitted)). The Court will thus proceed to consider Springle's state and city law claims alleging that defendants subjected him to a hostile work environment on the basis of his race and unlawfully demoted him for retaliatory and discriminatory reasons. [8]

    8 Although defendants contend that *New York Public Authorities Law § 1266(8)* exempts NYCTA from the provisions of the New York City Human Rights Law ("CHRL") (D. Mem. 39-41), this Court has previously rejected [*23] NYCTA's claim of exemption from the anti-discrimination provisions of the CHRL. See *Bogdan v. New York City Transit Authority, 02 Civ. 9587 (GEL), 2005 U.S. Dist. LEXIS 9317, 2005 WL 1161812, at *6 (S.D.N.Y. May 17, 2005)*. Because no intervening Second Circuit or New York Court of Appeals decision has ruled otherwise, the Court in this case adheres to its prior holding. Since no party suggests that the state and city laws differ in any way relevant to this case, the survival of Springle's claims under the CHRL has no effect on the outcome in any event.

### A. Hostile Work Environment

Claims of hostile work environment under the New York State and City Human Rights Laws are analyzed under the same standards as Title VII claims. See *Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001)*; *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996)*. In order to survive summary judgment on a claim of hostile work environment, a plaintiff must produce evidence that his workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)* [*24] (internal quotation marks and citation omitted). The conduct alleged must be severe and pervasive enough to create an environment that "would reasonably be perceived, and is perceived, as hostile or abusive." *Id. at 22*; see *Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)* (noting that hostile environment "test has objective and subjective elements"). Accordingly, "a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." *Alfano, 294 F.3d at 374* (internal quotation marks omitted). In determining whether that threshold has been reached, "courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Id.* Where a plaintiff alleges a racially hostile work environment, "it is axiomatic that . . . plaintiff must demonstrate that the conduct occurred because of [his] race]." *Id.* (internal quotation marks omitted).

Springle offers eight incidents -- six involving Lavin that were cited in his complaints to OSS and EEO, and two [*25] involving Kennedy raised for the first time in this action -- to support his claim that defendants maintained a work environment that was hostile to him on the basis of his race: (1) his "marginal" rating in one category in his 2003 MPR; (2) his referral to core managerial training; (3) Lavin's decision to hold staff meetings in the morning which excluded those superintendents working the "p.m." shift; (4) Lavin's October 15 staffing memo implementing new procedures for time off and sick leave; (5) Lavin's habit of interrupting Springle using hand gestures and the phrase "time out"; (6) Lavin's carrying of Springle's reports to the bathroom on at least three unspecified occasions; (7) Kennedy's "repeatedly ask[ing] Mr. Springle what department he wanted to go to"; and (8) Kennedy's "advis[ing] Mr. Springle that he had to go because the department was not big enough to absorb him in a different capacity." (P. Mem. 20.) Defendants contend that these eight incidents taken together are insufficient as a matter of law to establish the existence of a racially hostile work environment.

In assessing Springle's hostile work environment claim, the Court is mindful of the Second Circuit's observation [*26] that

> [e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

*Alfano*, 294 F.3d at 377. None of the eight incidents cited by Springle have an "overtly [racial] tone," and although facially neutral incidents may be considered in evaluating a hostile work environment claim, there must be "some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory." *Id. at 377-78*. Springle fails to identify any such basis from which a reasonable fact-finder could infer discriminatory intent. Even if he could show racial motivation, moreover, the incidents cited by Springle are not "sufficiently frequent or severe to meet the high standard for hostile work environment claims." (D. Reply. 9-10.)

Springle himself testified that he did not think Kennedy was a "racist," nor had he ever heard Lavin make a racial remark. [*27] (Springle Dep. 42:4-7; 93:18-25.) See *Howley v. Town of Stratford*, 217 F.3d 141, 155-56 (2d Cir. 2000) (observing that where perpetrator had made sexually derogatory remarks, fact-finder could reasonably infer that facially sex-neutral incidents were sex-based). Defendants, moreover, have adduced compelling evidence demonstrating the absence of any racial motivation behind any of the eight cited incidents. Specifically, with regard to Springle's "marginal" rating in "team and interpersonal skills" in his 2003 MPR, various OSS supervisors recalled numerous instances in which Springle was abrasive and insubordinate and had difficulty getting along with others. [9] During the same evaluation period, moreover, Lavin also gave a "marginal" rating in one category to another superintendent, who was white. (Walter Decl. P7; D Rule 56.1 Stmt. PP65-70.) Springle does not dispute that his overall evaluation was favorable, and offers no evidence that would suggest that Lavin's limited criticism was influenced by Springle's race, or even that it was unwarranted.

> 9   For example, Kennedy recalled a "major project" involving the revision of flagging rules for subway tracks which required contacting other [*28] rail systems to obtain their flagging protocols. (Kennedy Dep. 38:20-25.) Leader reported to Kennedy that Springle had been told, but failed, to contact the other rail systems. (Id. at 39:2-10.) Similarly, Bromfield testified that on one occasion, he needed a copy of an investigative report to give to the OSS president. (Bromfield Dep. 62:19-22.) Bromfield called Leader for the report, who stated that he should see one of the superintendents in the Unit as the report was on a common computer drive that could be printed by any of the superintendents. (Id. at 63:2-5.) When Bromfield asked Springle to print the report, he refused, stating, "Joe Leader did it, Joe Leader should have it, I don't have it." (Id. at 63:6-8.) Bromfield then went to another superintendent, who printed the report off the computer drive. (Id. at 63:8-14.) Lavin also recalled a specific incident where "[Springle] said to me one time if you wanted to know about this derailment, you should have got off your ass and went yourself." (Lavin Dep. 61:3-5.) Springle himself acknowledged that during a discussion with Lavin regarding the October 15 staffing memo, he proposed bringing Lavin a bag of sewage to evidence the [*29] reason for his absence. (Springle Dep. 119:6-8.)

The record also establishes that Lavin referred Springle to core managerial training to improve his "team and interpersonal skills" in conjunction with Lavin's responsibility to develop a performance improvement plan for his direct reports. (D. Ex. I; D. Rule

56.1 Stmt. P72.) Lavin himself had attended the training course before Springle did, and all of the superintendents in the Unit, black and white alike, eventually attended the course. (Lavin Dep. 72:23-73:2; Springle Dep. 132:17-18.) In any event, while Lavin's criticism of Springle's interpersonal skills suggests that he may have believed that Springle in particular could benefit from the training, nothing in the record suggests that attendance at the course was a disciplinary action, or was in any way adverse to Springle. To the contrary, the universal participation of Unit supervisors in this training program suggests that attendance was at worst, a job responsibility, and at best, an opportunity.

With regard to Lavin's October 15 staffing memo and his decision to hold staff meetings in the morning, it is undisputed that these policies applied universally to all of the superintendents [*30] in the Unit and in no way singled out Springle or targeted black superintendents. Similarly, the unrefuted evidence establishes that Lavin used hand gestures and the expression "time out" with "everybody," not just Springle. (Lavin Dep. 104:20-23; Kennedy Dep. 44:21-24.) Springle points to no evidence that Lavin's language or gestures were abusive, vulgar, offensive, or racially charged.

Moreover, there were uncontroverted business rationales for both the staffing and meeting policies established by Lavin. The record does not support Springle's claim that he was excluded from meetings: attendance records show that he attended about as many staff meetings as his colleagues, and that the morning meetings excluded not black or white superintendents, but only whichever superintendent happened to be assigned, on a race-neutral rotating basis, to the "p.m." shift. The staffing memo, too, was reasonably predicated on Lavin's legitimate frustration with occasions on which no superintendent was available on a given day. There is simply no basis from which any reasonable employee, or any reasonable fact-finder, could find that these policies were either racially biased or abusive to anyone.

With [*31] regard to Springle's claim that Kennedy repeatedly asked him "what department he wanted to go to," Kennedy testified that she was simply trying to help Springle since she had heard from Walter that Springle was actively looking to transfer out of OSS. (Kennedy Dep. 59:11-18.) Springle himself testified that he had did not think Kennedy had any "problems with race," and that Bromfield had told him that Kennedy was merely trying to "help you move out of this group into someplace else where you'll be more happy." (Springle Dep. 41:25-42:3, 31:10-12.) Moreover, neither Springle's own testimony nor any other record evidence supports Springle's allegation, raised for the first time in his brief, that Kennedy advised him "that he had to go because the department was not big enough to absorb him in a different capacity." (P. Mem. 20.)

Finally, with regard to Springle's claim that Lavin carried his reports to the bathroom on at least three unspecified occasions, while reasonable people might differ about whether reading work-related documents on the toilet constitutes poor managerial (or hygienic) practice, nothing about the incidents is indicative of racial animus.

In sum, none of the eight [*32] incidents cited by Springle, taken singly or in combination, provides any basis from which a reasonable fact-finder could infer discriminatory intent, or could find that Springle's working conditions were objectively hostile. Accordingly, Springle's race-based hostile work environment claim must be dismissed.

B. Retaliatory Demotion

Springle asserts that defendants unlawfully retaliated against him by demoting him after he lodged a discrimination complaint against Lavin with OSS management and EEO. (P. Mem. 17-20.) Employment retaliation claims under the New York State and City Human Rights Laws are analyzed utilizing Title VII's burden-shifting framework:

> First, the plaintiff must make out a prima facie case of retaliation. Second, the defendant then has the burden of articulating a legitimate, non-retaliatory reason for the complained of action. Third, if the defendant meets its burden, plaintiff must adduce evidence sufficient to raise a fact issue as to whether [the employer]'s reason was merely a pretext for retaliation.

*Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768-69 (2d Cir. 1998) (alteration in original) (internal quotation marks and citations omitted); see *Farias*, 259 F.3d at 98. [*33] The Court need not reach the latter stages of this burden-shifting analysis because Springle has failed to satisfy his burden of establishing a prima facie case.

To establish a prima facie case of unlawful retaliation, a plaintiff must show, inter alia, that he participated in "a protected activity." *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004). [10] To satisfy this requirement, "the plaintiff need not establish that the conduct []he opposed was actually a violation of Title VII, but only that []he possessed a *good faith, reasonable belief* that the underlying employment practice was unlawful." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (emphasis added) (internal

Case 1:07-cv-06418-CM-RLE   Document 24-2   Filed 04/28/2008   Page 9 of 11

Page 9
2008 U.S. Dist. LEXIS 7875, *

quotation marks omitted); see *Quinn, 159 F.3d at 769*. The relevant inquiry, then, is (1) whether, considering the totality of the circumstances, there was an objective basis for plaintiff to believe that defendants had engaged in unlawful conduct, and (2) whether plaintiff himself subjectively believed that defendants had engaged in unlawful conduct. *Sanders v. Madison Square Garden, L.P., 101 Fair Empl. Prac. Cas. (BNA) 390, 2007 WL 2254698, at *17 (S.D.N.Y. Aug. 6, 2007)*; *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab., 275 F.3d 838, 845 n.1 (9th Cir. 2002)* [*34] (describing the protected activity test as having "both a subjective and an objective prong").

> 10  In addition to showing participation in a protected activity, a plaintiff, in order to establish a prima facie case of retaliation, must also show that the defendant was aware of the protected activity, that the plaintiff experienced an adverse employment action, and that a causal connection exists between the protected activity and the adverse employment action. See *Feingold, 366 F.3d at 156*.

The parties vigorously dispute whether Springle, in fact, held a subjective "good faith" belief that he had been discriminated against on the basis of his race. (See D. Mem. 29-32; P. Mem. 18.) Defendants suggest that Springle filed the OSS and EEO complaints, not to oppose any discriminatory action taken by Lavin, but rather, to "screw" Lavin and "to avoid discipline for indisputably inappropriate behavior" (e.g., offering to bring Lavin a bag of excrement in response to Lavin's October 15 staffing memo). (D. Mem. 30.) Springle, in turn, asserts that the issue of his intent is a fact-specific inquiry that cannot be resolved at the summary judgment stage. (P. Mem. 18.)

Although Springle's subjective [*35] intent may be an issue of fact that cannot be resolved at this stage of the litigation, his retaliation claim nevertheless must be dismissed because, even assuming *arguendo* that he genuinely believed that Lavin's actions were discriminatory, the record contains no basis for a rational finding that any such belief was "objectively reasonable." *De Los Santos v. City of New York, 482 F. Supp. 2d 346, 355 (S.D.N.Y. 2007.)* As discussed above, the six incidents Springle cited in his OSS and EEO complaints are all race-neutral on their face, and Springle fails to present any facts, circumstantial or otherwise, that come close to suggesting even a "semblance of [race]-orientated motivation" underlying those incidents. *Galdieri-Ambrosini, 136 F.3d at 292*. In contrast, defendants have presented overwhelming evidence that the actions taken by Lavin -- in giving Springle a "marginal" rating, referring him to core managerial training, issuing the October 15 staffing memo, holding staff meetings in the morning, using hand gestures and the expression "time out," and carrying his reports to the bathroom -- were either motivated by legitimate business reasons, or were simply reflections of Lavin's [*36] own managerial style, not racial animus. See supra at 18-21.

In short, not only were Springle's OSS and EEO complaints devoid of any legal merit, but "no reasonable person" in Springle's position "possibly could have [believed]" that the incidents alleged in the complaints were motivated by race or created an objectively hostile work environment. *Firestine v. Parkview Health System, Inc., 388 F.3d 229, 234 (7th Cir. 2004)*. Because "there [is] no basis for a rational finding" that Springle's belief that he was being discriminated against, "even if genuine[,] was reasonable," Springle's filing of those complaints did not constitute protected activity, and thus he cannot satisfy his burden of establishing a prima facie case. *Galdieri-Ambrosini, 136 F.3d at 292*. Accordingly, Springle's retaliation claim must be dismissed.

C. Discriminatory Demotion

Springle asserts that defendants subjected him to racially disparate treatment because both he and Lavin filed complaints with EEO that were dismissed for lack of "reasonable cause" (D. Exs. V, X), but only he was demoted as a result. (P. Mem. 13-17.) As with retaliation claims, disparate treatment claims under the New York State and City Human [*37] Rights Laws are analyzed utilizing Title VII's burden-shifting framework. See *Farias, 259 F.3d at 98*. First, a plaintiff must establish a prima facie case by showing "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold, 366 F.3d at 152*. A plaintiff may establish an inference of discrimination either through direct evidence, such as race-based derogatory comments, or indirect evidence, such as differential treatment of similarly situated employees outside of the protected class. See *Holtz v. Rockefeller & Co., 258 F.3d 62, 82 (2d Cir. 2001)*.

Meeting the burden of establishing a prima facie case "creates a presumption that the employer unlawfully discriminated." *James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000)* (internal quotation marks omitted). The burden then shifts to the employer, who must articulate a legitimate, non-discriminatory reason for its adverse employment action. *McDonnell Douglas Corp v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668*; *James, 233 F.3d at 154*. [*38] That burden "requires the defendant to produce admissible evidence showing 'reasons for its actions which, if believed by the

Case 1:07-cv-06418-CM-RLE   Document 24-2   Filed 04/28/2008   Page 10 of 11

Page 10
2008 U.S. Dist. LEXIS 7875, *

trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action,'" *Eatman v. United Parcel Serv., 194 F. Supp. 2d 256, 263 (S.D.N.Y. 2002)* (emphasis omitted), quoting *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)*. If the employer fails to present such a reason, plaintiff prevails.

Once the employer articulates a non-discriminatory reason, the presumption "drops out of the picture." *St. Mary's Honor Ctr., 509 U.S. at 511*. The plaintiff is then required to show that the proffered reason is a pretext for discrimination. *McDonnell Douglas, 411 U.S. at 804*. When the employer has proffered an explanation and the plaintiff has attempted to refute it, the Court must "examin[e] the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000)*, quoting *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*.

Defendants contend [*39] that Springle cannot establish a prima facie case of disparate treatment, nor rebut their proffered non-discriminatory rationale for his demotion, because Springle and Lavin were not similarly situated. (D. Reply Mem. 10-15.) In particular, defendants emphasize that "only [Springle] was determined [by EEO] to have knowingly filed a false report against Lavin" in violation of NYCTA rules, and that "EEO recommended that [OSS] take appropriate disciplinary action only against [Springle]." (Id. at 12.) Springle asserts, however, that the record contains sufficient ambiguity and conflicting evidence to raise an issue of material fact regarding whether defendants -- or more specifically, EEO and OSS management -- genuinely believed that Springle knowingly filed a false report, or whether their purported justification was simply a pretext to demote him based on discriminatory animus.

Preliminarily, defendants present considerable evidence pointing to EEO investigator Damas's good faith, including the fact that Damas himself is African-American, that he has extensive training in human relations and anti-discrimination law and impressive educational credentials, that at the time he investigated [*40] Springle's complaint, he had been an EEO investigator for five years, and that neither he nor anyone else at EEO had ever before accused a complainant of fabrication. (See D. Mem. 27, 33.) Springle himself, moreover, testified that he had no reason to think that Kennedy, who made the ultimate determination regarding his demotion, was a "racist" or had any "problems with race." (Springle Dep. 31:10-12, 42:4-7.) Despite this considerable evidence of good faith on the part of both EEO and OSS management, Springle correctly argues that the record contains sufficient conflicting evidence on a critical issue of material fact -- i.e., Paez's statements regarding Springle's purported "race card" statements -- that summary judgment must be denied on Springle's claim of disparate treatment.

According to Damas, the sole basis for EEO's conclusion that Springle knowingly filed a false report was Paez's statement to Damas that Springle had told him that he was going to "screw" Lavin by playing the "racial card." (Damas Dep. 128:11-20; see Paez Dep. 22:8-19.) The record, however, reflects considerable disagreement about what Paez actually said, and how whatever he said could reasonably be interpreted. [*41] In a separate written statement to OSS director Bromfield, Paez wrote that it was *he* who "told Mr. Springle *not* to play the 'race card.'" (Preston Decl. Ex. G.) Although Paez also wrote that "it was obvious to [him] that [Lavin] was preparing" to play the race card (id.), nowhere in his memorandum does Paez state that Springle himself used the "race card" terminology. Despite this apparent inconsistency between Paez's oral and written statements, Bromfield did not show Paez's memorandum to Walter or to Vice President Kennedy, the two OSS supervisors charged with making the step one and step two determinations regarding Springle's disciplinary charges.

In EEO's investigatory report, moreover, Damas wrote that "[Paez] understood Springle's race card comment to mean that Springle intended to file a false complaint," and that Paez "told Springle that making a false charge of race discrimination is something Springle should not do." (D. Ex. X, at 3.) At his deposition, however, Paez directly contradicts Damas's account of the interview, stating that he "had no idea that [Springle] . . . was going to go ahead and file a false claim," and that he never told Springle "not to file a false EEO [*42] complaint." (Paez Dep. 25:6-8, 28:5-8.) Indeed, Paez specifically testified that Springle "never said that he was going to file a false . . . claim." (Id. at 28:24-29:2.)

As a result, although considerable evidence supports defendants' contention that EEO and OSS management acted in good faith in demoting Springle based on a genuine belief that he had knowingly filed a false claim, numerous inconsistencies in the record regarding Paez's account of his conversation with Springle create jury questions with regard to, inter alia: (1) exactly what Paez told Damas; (2) if Damas misreported or exaggerated Paez's comments, whether Damas was simply mistaken or was distorting Paez's testimony to build a pretextual case against Springle; and (3) whether OSS's decision to demote Springle was based on a genuine belief that Springle had knowingly filed a false complaint, or whether OSS management merely used the statements attributed to Paez in the EEO report, which they may have had reason to believe were unreliable, to mask a

discriminatory demotion. A jury may very well conclude that OSS management demoted Springle, and took no action against Lavin, based on a genuine belief that Springle had [*43] deliberately filed a charge he knew to be false, but that Lavin's charge, though ultimately unsubstantiated, was made in good faith. But in light of the significant discrepancies in the record on a critical issue of material fact, this is an issue for a jury to resolve. Defendants' motion for summary judgment on Springle's disparate treatment claim must therefore be denied.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is denied with respect to plaintiff's disparate treatment claim against NYCTA under the New York State and City Human Rights Laws, and granted as to all other claims.

SO ORDERED.

Dated: New York, New York

February 1, 2008

GERARD E. LYNCH

United States District Judge