1 of 1 DOCUMENT


Cited
As of: Apr 28, 2008

JOANNE PUGNI, Plaintiff, - against - READER'S DIGEST ASSOCIATION, INC., Defendant.

05 Civ. 8026 (CM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2007 U.S. Dist. LEXIS 26284*

April 5, 2007, Decided
April 9, 2007, Filed

**COUNSEL:** [*1] For Joanne Pugni, Plaintiff: Joseph P. Carey, LEAD ATTORNEY, Joseph P. Carey, P.C., Fishkill, NY.

For Reader's Digest Association, Inc., Defendant: Dawn Jamie Groman, McDermott, Will & Emery, LLP (NY), New York, NY.

**JUDGES:** Colleen McMahon, U.S.D.J.

**OPINION BY:** Colleen McMahon

**OPINION**

**DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

Plaintiff Joanne Pugni ("Pugni") is a former employee of QSP, Inc., ("QSP") a wholly-owned subsidiary of defendant, Reader's Digest. Plaintiff alleges that in or about July of 2003 her supervisor and friend Peter D'Urso ("D'Urso") began to engage in sexually harassing behavior toward her, including but not limited to frequently touching her arm, stroking her hair, insisting on sitting on the arm of her chair, commenting on her clothes and appearance, and discussing personal matters with her over her objection. Plaintiff's attempts to physically push D'Urso away or tell him to stop were unavailing. During this time, plaintiff purportedly made several complaints to her manager, Joe Nieto ("Nieto") who responded to her concerns by saying that plaintiff and D'Urso were friends and that was just the [*2] way D'Urso was. However, he also told her that he would sit down with Human Resources ("HR") to discuss the matter. Neither he nor the plaintiff did so, and HR did not become involved until it received a report in February 2004 that a co-worker saw D'Urso opening and inspecting plaintiff's gym bag while she was out of the office.

After the gym bag incident was brought to HR's attention, it conducted an investigation. D'Urso was reprimanded, removed as plaintiff's supervisor, relocated away from her office, and instructed to limit his contact with the plaintiff. Unfortunately, that did not resolve the problem. Over the ensuing months, plaintiff brought a series of complaints to HR of continuing harassment or suspected retaliation by D'Urso. In each case, HR responded by promptly investigating and taking appropriate remedial measures.

Nevertheless, in September 2004, it became apparent that D'Urso had taken advantage of Nieto's absence on vacation to intensify his unwelcome visits to plaintiff's office in violation of defendant's directive to limit his contact with the plaintiff, and had lied in denying that those visits had occurred during the course of one of HR's investigations. [*3] As a result, D'Urso was fired without severance in October of 2004.

At this time, plaintiff began reporting to a new supervisor Marcela Bobe ("Bobe"). Plaintiff apparently found Bobe difficult to work with, her workload heavy,

Case 1:07-cv-06418-CM-RLE    Document 24-4    Filed 04/28/2008    Page 2 of 17

Page 2
2007 U.S. Dist. LEXIS 26284, *

and the working conditions stressful. On June 10, 2005, plaintiff resigned her employment by hand delivering a letter to the Chief Executive Officer of Reader's Digest. In that letter, she claimed that she had been constructively discharged.

Having previously filed a Charge and an Amended Charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), plaintiff obtained a Right to Sue letter from the EEOC and instigated this action, claiming that she was subjected to a hostile work environment, retaliation and constructive discharge at Reader's Digest and seeking compensatory and punitive damages.

Defendant moves for summary judgment on all three claims. First, defendant argues that the undisputed evidence shows that plaintiff cannot make out a hostile work environment claim, and even if she could, the defendants can succeed on two affirmative defenses. Second, defendant contends that none of the instances of retaliation plaintiff recites [*4] involved an adverse employment action, and that even if it did, plaintiff can show no causal connection between the action and her complaints of sexual harassment. Finally, defendant argues that plaintiff has failed to exhaust her administrative remedies with respect to her constructive discharge claim, and in any case, has adduced no evidence that Reader's Digest deliberately made her working conditions objectively intolerable.

For the reasons set forth below, summary judgment for defendant is granted in part and denied in part with respect to plaintiff's hostile work environment claim, and granted with respect to plaintiff's retaliation and constructive discharge claims.

**Facts**

The court begins by noting that plaintiff has failed to comply with *Local Rule 56.1*. The purpose of the rule is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties. See *Monahan, 214 F.3d at 292; Watt, 2000 WL 193626, at *1 n.1, 2000 U.S. Dist. LEXIS 1611,*2 n.1.* To that end, the plaintiff's obligation under *Local Rule 56.1(b)* in responding [*5] to a defendant's statement under *Local Rule 56.1(a)* is clear:

> The papers opositing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party . . .

*Local Rule 56.1(c)* is equally clear in setting forth the consequences of the plaintiff's failure to comply with *Local Rule 56.1(b)*:

> Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.

In the present case, defendant, as the moving party, submitted a 150-paragraph statement of allegedly undisputed facts pursuant to *Rule 56.1(a)*. Plaintiff responded with a 32-paragraph statement -- purportedly setting forth disputed material facts to be tried -- which bears no relation to the numbered paragraphs in defendant's Rule 56.1 statement, repeatedly fails to cite to admissible evidence, and proffers a number of legal conclusions in the place of facts. Indeed, [*6] plaintiff's submission can hardly be deemed a response to defendant's statement since plaintiff neither admits nor denies a single fact asserted by the defendant. Defendant has filed a counter-statement in response to plaintiff's Rule 56.1 statement.

Based on plaintiff's failure to comply with *Rule 56.1*, defendant urges this court to deem each of the facts asserted in its Rule 56.1 statement admitted. For the reasons stated below, the court deems the facts asserted in defendant's Rule 56.1 statement admitted, but will independently review the record for evidence supporting claims that defendant's Rule 56.1 statement does not address.

A district court has broad discretion in determining whether to overlook a party's failure to comply with local court rules. *Holtz v. Rockefeller & Co., Inc. 258 F.3d 62, 73 (C.A.2 (N.Y.),2001)* Specifically, while a court "is not required to consider what the parties fail to point out" in their Local Rule 56.1 statements, it may in its discretion opt to review the record independently even where one of the parties has failed to file such a statement -- or, presumably, where the statement filed by a party fails to satisfy the dictates [*7] of *Rule 56.1. Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 292 (2d Cir.2000)* (internal citations and quotation marks omitted). Defendant's citation to cases in which courts have granted summary judgment on the basis of uncontroverted assertions in the moving party's Rule 56.1 statement does not end the matter. A district court may not grant summary judgment under *Fed. R. Civ. P. 56* unless it is satisfied that judgment for the moving party is "ap-

Case 1:07-cv-06418-CM-RLE    Document 24-4    Filed 04/28/2008    Page 3 of 17

Page 3
2007 U.S. Dist. LEXIS 26284, *

propriate" because "the . . . admissions on file . . . show that . . . the moving party is entitled to judgment as a matter of law."

Defendant's purportedly comprehensive Rule 56.1 statement artfully omits much of the offensive conduct by plaintiff's supervisor that served as the basis for her complaint of sex discrimination in violation of Title VII. (Cplt. P 8). In particular, Defendant's *Rule 56.1* does not address plaintiff's claims -- buttressed by her deposition testimony -- that D'Urso placed himself in close proximity to her while she was seated at her desk or standing in her office, or at off-site recreational events; sat on the arm of her office chair; stroked [*8] her hair and her arm with his hand; commented about plaintiff's clothes and weight; and ignored her entreaties to stop this behavior. (Pugni 18-23, 63-64, 67, Cplt. P 8). Notably, while defendant fails to speak to these allegations in its Rule 56.1 statement, it acknowledges them in its brief, where it argues at length that the alleged conduct (1) was not "unwelcome," (2) fails to rise to the egregious level required by the case law, and (3) was not based on the plaintiff's gender. (Def. Br. at 15-20) Defendant also omits from its Rule 56.1 statement any facts surrounding plaintiff's purported complaints about this behavior to Joe Nieto, her manager.

The court finds that it cannot rule on the propriety of summary judgment based solely on the universe of facts proferred by the defendant's Rule 56.1 statement. While the court is prepared to deem the facts contained therein admitted for the purposes of this motion, the court will independently review the record for evidence plaintiff has adduced in support of claims that defendant failed to address in its Rule 56.1 statement.

The following relevant facts are deemed undisputed, unless otherwise noted, based on the parties' Rule 56.1 [*9] statements (as limited by invocation of the Local Rule) and other materials submitted in connection with defendant's motion for summary judgment:

Reader's Digest and its EEO Policies and Training

Reader's Digest produces and distributes magazines, books, music, videos, and other related products (Campbell P 3). QSP is a wholly-owned subsidiary of Reader's Digest, whose business consists of helping children and adults raise funds for their schools and organizations through magazine drives and gift and food programs. (Id.) QSP's principal contact with its customers is through its field sales representatives, who are located throughout the country and receive commissions based on their sales. (Id.) Sales representatives' salary and commissions are calculated by accounting and finance personnel working out of Reader's Digest's headquarters in Pleasantville, New York (the "Home Office"). (Id.)

Reader's Digest attempts to provide its employees with a workplace free from discrimination and harassing conduct and, in connection therewith, maintains a "Harassment Free Workplace" policy (the "EEO Policy" or the "Policy"), which strictly prohibits all forms of discrimination, [*10] harassment, and retaliation. (Id). at P 4, Ex. A). The Policy contains the following complaint procedure:

> Reader's Digest strongly urges an individual to promptly report all incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position. Early reporting and intervention have proven to be the most effective method of resolving actual or perceived incidents of harassment. Individuals who believe they have experienced conduct that they believe is contrary to Reader's Digest policy or who have concerns about such matters should file their complaints with their manager, supervisors, or to a Human Resources representative. Individuals should not feel obligated to file their complaints with their manager first before bringing the matter to the attention of one of the other Reader's Digest designated representatives identified above. Management and supervisory staff will refer all complaints or known situations involving harassment to Human Resources.

(Id.) In addition, Reader's Digest maintains a Code of Conduct (the "Code"), which, among other things sets forth the Company's prohibition on discrimination, harassment and retaliation. [*11] (Id. at 5, Ex. B). To ensure that all employees have access to the EEO Policy and Code, each is maintained on Reader's Digest's intranet. (Id. at P 5). Reader's Digest's commitment to providing equal employment opportunities is monitored and enforced by its Human Resources Department ("HR"). (Id. at P 6.) HR and the Legal Department are consulted on termination and discipline decisions and are available to respond to and redress employee complaints regarding perceived harassment or discrimination (Id.)

Reader's Digest also provides its employees and managers with regular training regarding its EEO Policy and related issues, including the prohibition against discrimination, harassment and retaliation. (Id. at P 7). For example, from January 2003 to early 2004, Reader's Digest conducted a diversity training program at QSP entitled, "Valuing Diversity: Respect at Work" (the "Training Sessions"), which was rolled out over a number of months to senior management, field sales management,

Case 1:07-cv-06418-CM-RLE    Document 24-4    Filed 04/28/2008    Page 4 of 17

Page 4
2007 U.S. Dist. LEXIS 26284, *

sales representatives and employees working for or supporting QSP in the Home Office. (Id. at P 8). In or about December 2003 or January 2004, plaintiff attended one such Training [*12] Session conducted by Kim Van Orman ("Van Orman"), then Director of Human Resources supporting QSP, during which, according to her own testimony, plaintiff received training on the Policy and its complaint procedure. (Pugni at 46; Campbell at P 8; Van Orman at PP 2-3).

Plaintiff's Employment History

Reacher's Digest hired plaintiff on or about July 6, 1999 as an Administrative Assistant in QSP. (Pugni at 13; Campbell P 10, fn. 4). Thereafter, Reader's Digest promoted plaintiff on two occasions -- on or about April 22, 2000 to the position of Field Compensation Coordinator, Level 4, and on or about October 1, 2003 to the position of Field Compensation Coordinator, Level 5. (Pugni 13-15; Campbell P 10, fn 4). When plaintiff became a Field Compensation Coordinator, she began reporting to Peter D'Urso, a Senior Financial Analyst for QSP. Plaintiff and D'Urso were generally responsible for calculating and overseeing commission payments for QSP's sales representatives (totaling approximately 450 individuals). (Andrews P 3, fn.4; Campbell P 36).

D'Urso was in large part responsible for plaintiff's second promotion. (Pugni 21-22). D'Urso was also responsible for plaintiff's receipt [*13] of a Great Performer's Award in January 2003 and early February 2004. (Cohen Exs. G, H). A Great Performer's Award is a small cash gift or gift card, which is given to an employee who performs well on a particular project but is not related to an employee's overall job performance. (Nieto at 74-76, 86-87; 146-147).

Plaintiff's Relationship with D'Urso and the Pre-Incident Conduct [1]

> 1 It should be noted that the chronology of events in this case is organized around a particular instance of alleged misconduct in which D'Urso entered plaintiff's office while she was out and was seen opening and looking inside her gym bag, which contained her gym clothes. Hereinafter, this episode is referred to as the "Incident;" the events of which plaintiff complains that occurred prior to the Incident are collectively referred to as the "Pre-Incident Conduct;" and the events that occurred after the Incident are collectively referred to as the "Post-Incident Conduct."

From the time that plaintiff began working at Reader's [*14] Digest in 1999, she and D'Urso were friends. (Pugni at 15, 17; Nieto 144-45; Strickland 24). In the context of their friendship, D'Urso and plaintiff socialized outside the office, had lunch together and went out for drinks. (Pugni 15-16, 29-30). In 2002, plaintiff and D'Urso attended a business trip in Dallas, during which plaintiff spent two evenings with D'Urso and other coworkers at a bar. D'Urso -- who was apparently intoxicated -- insisted on sleeping on the couch in the hotel room that plaintiff shared with another female co-worker on both nights. (Pugni 28-31; Andrews Ex.A). Plaintiff testified that nothing further transpired between them, and she did not complain to anyone at Reader's Digest about D'Urso's behavior during the trip. (Pugni 28-31).

D'Urso and plaintiff regularly discussed intimate details of each other's lives, including family, careers and personal issues. (Pugni 17-18, 24-25; Nieto 145). Nieto, former Controller of QSP, testified that, prior to 2004, plaintiff and D'Urso referred to each other as "work husband" and "work wife." Lydia Strickland ("Strickland"), a co-worker, testified that Plaintiff and D'Urso's pre-2004 relationship was that of a bickering [*15] old married couple. (Strickland 25-26). D'Urso confided in plaintiff about his family and his relationship with his wife, and plaintiff shared her infertility problems with D'Urso and confided in him about her numerous miscarriages. (Pugni 24-25; Nieto 145). During this time period, D'Urso also socialized with plaintiff's husband, and plaintiff knew D'Urso's wife and children and visited D'Urso's home. (Pugni at 15-16, 34-35).

Plaintiff testified that at no point during their friendship or thereafter did D'Urso make any vulgar comments toward her or sexually proposition her. (Pugni 19-20). However, plaintiff testified that between June 2003 and February 2004, D'Urso made her "very uncomfortable." He repeatedly commented favorably on her clothes and weight; repeatedly touched her hair; repeatedly attempted to measure her bicep with a rubber band when she came back from the fitness center; repeatedly sat on the arm of her chair; became upset when she would not drive alone with him to an office outing; insisted on sitting next to her at office outings; was emotional in front of her; frequently insisted on discussing his personal problems with her; and would ignore her entreaties to him [*16] to stop this behavior and her attempts to physically push him away. (Pugni 18-23, 44, 63-64, 67; Cplt. P 8).

As an example of D'Urso's inappropriate behavior toward her, plaintiff testified about a specific incident that occured on February 11 [2] when D'Urso walked into the office and interrupted a business conversation among Sharon Wang ("Wang"), Strickland, Nieto, and plaintiff. (Pugni 49). When plaintiff responded to him, D'Urso allegedly said, "Now you're not going to get your Valentine's Day present," to which plaintiff testifies she answered: "We are not dating. I am not your girlfriend."

Nieto purportedly said, "I'm not getting involved," and walked out of the office. (Id.)

> 2 All dates are in 2004 unless otherwise indicated.

Plaintiff testified that she complained five to ten times to Nieto, her manager, about D'Urso's behavior during this period, and that on at least one occasion, she told Nieto that D'Urso was touching her. (Pugni 44, 51-52). Nieto allegedly responded to these complaints by stating [*17] that plaintiff and D'Urso were friends and that this (i.e. touchy-feely) was just the way D'Urso was. (Pugni 47-48). However, plaintiff also testified that Nieto told her on several occasions that "he was going to sit down with HR." (Pugni 41). Nieto denies that plaintiff ever complained to him that D'Urso was being inappropriate toward her during this time. (Nieto 144-45).

Between July of 2003 and February of 2004,, plaintiff never complained to HR about D'Urso's conduct. (Pugni 39). Indeed, the first time anyone in HR learned of any issues between Pugni and D'Urso was on February 17, after the gym bag incident. Plaintiff testified that she was aware of Reader's Digest's complaint procedure as contained in the EEO Policy and that she knew she had the option of bringing her complaints to HR if she was not satisfied with a response to a complaint made to a supervisor. (Pugni 44-45, 47; see also Van Orman P 3). However, she testified that she did not go to HR because (1) despite Nieto's unsatisfactory responses to her pre-Incident complaints, she "trusted he would do the right thing;" (2) she believed that HR would also dismiss her concerns since she and D'Urso were friends; and (3) [*18] she worked closely with HR and "they were not a well regarded department." (Id. at 47-48).

The Incident and Reader's Digest's Response

On the morning of Tuesday, February 17, 2004, plaintiff complained to Nieto that on Thursday, February 12, another QSP employee, Lori Novella ("Novella"), saw D'Urso in plaintiff's office while she was not there looking through her gym bag, which contained her gym clothes. (Pugni 67-68, Van Orman PP 4-5). Novella informed plaintiff of the Incident on February 13. (Pugni 67; Van Orman P 5).

Immediately after speaking to plaintiff, Nieto informed his supervisor, Will Price ("Price"), then the Chief Financial Officer ("CFO") of QSP, of the Incident, and together they contacted HR and spoke to Van Orman. (Nieto 33-35; Van Orman PP 4-5). After consulting with her supervisor, Lila Campbell, then Vice President of Human Resources for QSP ("Campbell"), and the Legal Department, Van Orman began investigating plaintiff's allegations by 10:00 a.m. that same day, contacting and questioning plaintiff, D'Urso and Novella. (Pugni 68-70; Campbell P 10; Van Orman P P 7-12, Exs. A-G). During plaintiff's recounting of the Incident to Van Orman, she stated [*19] that she and D'Urso had been friends in the past and that he had not previously done anything that she felt was inappropriate or made her feel uncomfortable. However, in view of this Incident, she no longer wanted to report to him. (Van Orman PP 7-8, Exs. A-B, G; Pugni 69-70). Plaintiff did not complain to Van Orman about any purported conduct by D'Urso that occurred prior to the Incident. (Pugni 68-70; Van Orman PP 7-10, Exs. A-B). Van Orman reassured plaintiff that, in accordance with the Policy, she would be protected from any retaliation as a result of her complaint. (Van Orman PP 9, Ex. B).

During Van Orman's meeting with D'Urso, he admitted that he went into plaintiff's office to return a file and that while doing so, he saw plaintiff's gym bag and opened it, but denied touching or taking anything in it. (Van Orman PP 12, Exs. E-F). D'Urso appeared remorseful about his conduct, and informed Van Orman that he had apologized to plaintiff. He also indicated to her that, prior to the Incident, he and plaintiff had been friends. (Id.)

Following the interviews, on February 17, Van Orman prepared a summary of her investigation and consulted with Campbell and the Legal Department. [*20] (Campbell PP 11; Van Orman PP 12-13, Ex. G). On that same day, Reader's Digest decided to immediately change plaintiff's reporting structure so that she would report to Nieto rather than D'Urso, and to relocate plaintiff's office away from D'Urso. (Pugni 72, 116; Nieto 37-39; Campbell P 11; Van Orman P 13). In addition, Reader's Digest recommended that plaintiff and D'Urso utilize the Employee Assistance Program to obtain counseling, and instructed D'Urso to: (i) limit his discussions about the Incident or plaintiff; and (ii) limit his contact with plaintiff except where professionally necessary and then to communicate with her only by e-mail whenever possible. (Pugni 76-78, 88-89, Campbell P 11; Van Orman P 13).

With respect to disciplining D'Urso, Reader's Digest concluded that his conduct, while inappropriate, was not sexual in nature and did not rise to the level of sexual harassment or placed plaintiff's safety in danger. (Campbell 12; Van Orman P 14). Reader's Digest believed that D'Urso's conduct was an isolated incident because no one, including the plaintiff, had ever complained to HR about any inappropriate conduct on his part. (Id.) For these reasons, Reader's Digest [*21] determined that the appropriate sanction for D'Urso was a formal written warning, which would be maintained in his personnel file and considered as part of his next performance evaluation. (Id.)

Case 1:07-cv-06418-CM-RLE    Document 24-4    Filed 04/28/2008    Page 6 of 17

Page 6
2007 U.S. Dist. LEXIS 26284, *

On February 26, Nieto and Van Orman met with plaintiff to explain the actions that Reader's Digest had taken in response to her complaint. (Pugni 76-78, 88-89, 116; Van Orman P 15, Exs. H-I). During this meeting, Van Orman confirmed that plaintiff was satisfied with Reader's Digest's response, was not concerned about her safety, and did not have a problem working with D'Urso under the changed reporting structure. (Van Orman P 15, Exs. H-I; see also Campbell P 13). Shortly thereafter, on March 2, Van Orman met with D'Urso to discuss the results of the investigation, issue him the written warning, reiterate the directives previously given to him regarding his communications with plaintiff and warn him that his failure to follow the directives would result in serious disciplinary action, up to and including termination. (Van Orman P 16, Ex. J; see also Campbell P 13).

Plaintiff's contemporaneous notes indicate that on April 1, Nieto asked plaintiff if D'Urso could "say hi" to her. She indicated [*22] that he could not. She said that she was "very happy with the way things were and happy with the new work she was being given and would like things to stay the way they are." (Cohen Ex. K).

Post-Incident Events and Reader's Digest's Responses

Following the Incident, each time plaintiff complained about D'Urso, or the Company otherwise learned of issues between them, the Company, through HR and/or Nieto, promptly investigated and took action to address the issues. Moreover, plaintiff testified that D'Urso never again touched her or sat on the arm of her chair following the Incident. (Pugni 19-20, 101-04). Instead, his visits to plaintiff's office after the Incident represented either attempts to apologize and mend their friendship or to discuss work-related matters. (Pugni 26-27; 76, 100-06; Nieto 36-37; 48-50, 95-96; Andrews P 24, Ex. J).

On April 8, D'Urso brought his young daughter (whom plaintiff knew from their past friendship) to the office and, during the visit, brought her to plaintiff's office to wave good-bye. This upset plaintiff. (Pugni 33-34, Andrews P 6). When Nieto learned of this incident, he consulted with Nancy Andrews, then Human Resources Manager responsible [*23] for supporting QSP ("Andrews"), and reprimanded D'Urso, telling him that he needed to accept that his friendship with plaintiff was over and reminding him that he was not to speak with anyone regarding plaintiff other than himself, Price or HR. (Nieto 59-60; Andrews P 6; Cohen Ex. I). In addition, Nieto, in consultation with Andrews, informed plaintiff of the actions he took in response to the incident. (Andrews P 6).

Thereafter, on April 22, Carolyn Roche ("Roche"), a QSP employee, reported to Nieto that she heard banging on the wall in plaintiff's office for which she believed D'Urso was responsible.[3] (Pugni 84; Nieto 63-64; Andrews P 7, fn. 9). On that same day, Nieto questioned D'Urso about the banging. D'Urso denied that he was the responsible party. (Nieto 63-64; Andrews P 7). Nevertheless, later that day, Andrews and Nieto decided to move D'Urso's office so that he would no longer share a wall with plaintiff's office. That move was accomplished within a few days of the issue being brought to Nieto's attention. (Pugni 84, 115; Nieto 152-53; Andrews P 7).

   3   Although plaintiff's office had been moved following the Incident to separate her from D'Urso, at this time his office shared a common back wall with plaintiff's. (Andrews P 7, fn. 8).

[*24] On May 21, plaintiff brought a complaint of alleged retaliation to Nieto, reporting to him that she had overheard D'Urso on a telephone call stating that her "days at Reader's Digest were numbered" and that she "screwed up a file." (Pugni 89-92; Nieto 67-68; Andrews PP 8-10; Campbell P 16, Ex. D). That same day, Nieto informed Andrews of plaintiff's complaint, and Andrews immediately reached out to plaintiff and left her a voicemail, which plaintiff did not return. (Id.) After plaintiff informed Nieto that she would not speak to HR, Andrews and Campbell went to plaintiff's office that same afternoon hoping to convince her to cooperate so that they could conduct a complete investigation. (Pugni 89-92; Andrews 10-11; Campbell PP 16-17, Ex. D). Plaintiff continued to refuse to provide them with information regarding her complaint, purportedly upon the advice of her attorney. (Id.) Indeed, plaintiff refused to participate in HR investigations of her complaints on numerous occasions after the Incident, each time allegedly on the advice of her attorney. (Pugni 89-92; Andrews PP 10-11, 23-24, Ex. J; Campbell PP 16-21, Exs. D-H; D'Emic P 10).

Notwithstanding plaintiff's refusal [*25] to provide Andrews and Campbell with information relating to her complaint, on May 21 -- the same day that plaintiff complained to Nieto -- both Andrews and Nieto spoke to D'Urso. D'Urso indicated that plaintiff had taken his comments out of context, and that during the phone call in question, he did not say anything about plaintiff's continued employment at QSP but, rather, was referring to a former QSP employee. (Id.) Campbell ultimately informed plaintiff by e-mail that HR believed that she had taken D'Urso's comments out of context and that the comments appeared neither discriminatory nor actionable. She reassured plaintiff that D'Urso was no longer her supervisor and did not have the authority to assess her performance or impact her future with QSP. (Pugni 91-92; 94-97; Campbell P 20, Ex. F). In addition, Campbell reminded plaintiff that per the EEO Policy, she was

Case 1:07-cv-06418-CM-RLE    Document 24-4    Filed 04/28/2008    Page 7 of 17

Page 7
2007 U.S. Dist. LEXIS 26284, *

protected from retaliation, and urged her to bring information to HR's attention if she felt that she was being retaliated against. (Andrews P 11; Campbell P 17, Ex. D).

On May 24, 2004, plaintiff filed an initial Charge with the Equal Employment Opportunity Commission (the "EEOC") wherein she asserted claims of [*26] sexual harassment and retaliation. (Cohen Ex. A).

In July, plaintiff brought a complaint directly to HR for the first time. She alleged that in retaliation for her filing a Charge of Discrimination with the EEOC, D'Urso was sabotaging her work by deliberately changing information that she was inputting into the UNIAPP Sytem (the "System"), a computer software system that is utilized in calculating commission payments for the QSP sales force. (Pugni 117-19; 188-89; Andrews P 12, Ex. C; Campbell P 22). On the same day that Andrews learned of plaintiff's complaint, Andrews spoke to plaintiff regarding her allegations, assured plaintiff that she would conduct a thorough investigation and reminded plaintiff that she was protected from retaliation. (Pugni 117-18; Andrews PP 13-14, Ex. E; Campbell P 22). Thereafter, Andrews spoke to D'Urso who denied plaintiff's allegations. Andrews also spoke to Nieto, who informed her that he had already contacted the Information Technology Department (the "IT Department"), which could not confirm plaintiff's allegations. Nevertheless, to remedy plaintiff's concerns, Nieto had assigned to D'Urso the sole responsibility going forward of inputting the necessary [*27] information into the System. (Nieto 69-72; Andrews P 15). After speaking with D'Urso and Nieto, Andrews herself contacted the IT Department, which confirmed that it was unable to track an individual user's activity within the System, making it impossible to confirm plaintiff's allegations. In early September, when the investigation was concluded, Andrews informed plaintiff of this fact. (Id., Ex. EE).

On August 19, 2004, plaintiff amended her EEOC Charge expanding the factual allegations of her harassment and retaliation claims ("Amended Charge"). (Cohen Ex. B).

In late August, following Nieto's return from vacation, plaintiff informed him that D'Urso had visited her office a number of times while he was away. (Pugni 104-06). Prior to this time, D'Urso had not been coming into plaintiff's office with any frequency, and each time Nieto had received reports that D'Urso had been in plaintiff's office (attempting to remedy their friendship by seeking forgiveness or trying to engage in conversation), Nieto would reprimand D'Urso and warn him that he would be terminated if he did not stay away from plaintiff. (Nieto 48-52, 58, 150-51). Plaintiff testified that this approach had been [*28] working to limit D'Urso's visits prior to Nieto's vacation in August. (Pugni 178-79).

Although she had been invited to contact HR about her complaints, during Nieto's vacation, plaintiff did not complain to HR or QSP management about D'Urso's visits, nor did she contact Nieto on vacation to inform him of them. (Pugni 104-06; Andrews P 18; Campbell P 23; D'Emic PP 6-7). After speaking to plaintiff upon his return, Nieto informed Andrews and his supervisor, Sue D'Emic ("D'Emic"), then North American Controller, Accounting Resource Center,[4] of the complaint. On that same day, Andrews and D'Emic met with plaintiff, and she reiterated her complaint regarding D'Urso's visits. (Pugni 108; Nieto 106-08, 150; Andrews P 19; Campbell P 24; D'Emic PP 6-7). D'Emic offered to transfer plaintiff to another comparable position within the ARC (located on another floor), but plaintiff indicated that she did not want another job. (D'Emic P 7). D'Emic and Andrews also spoke to D'Urso, who denied going into plaintiff's office more than a couple of times during Nieto's vacation. He claimed that the visits were work-related and that the plaintiff had also visited his office during this period. (Andrews [*29] P 20; Campbell P 24; D'Emic P 8). D'Urso was instructed not to visit plaintiff's office and to resume e-mail communication with her when necessary. (Id.)

    4 The Accounting Resource Center (the "ARC") consolidates the accounting functions for certain of Reader's Digest's divisions within North America. (D'Emic 1, fn. 1). The accounting functions for QSP were absorbed into the ARC in or about June 2004. (Id.)

Thereafter, on September 14, plaintiff complained to Campbell that despite having repeatedly been instructed otherwise, D'Urso continued to visit her office. (Pugni 201-03; Andrews P 21; Campbell P 25, Ex. I). A further investigation ensued (during which D'Urso again denied the allegations), and on September 15, plaintiff indicated for the first time that she had a log (the "Log") that listed all of the times that D'Urso visited her office between August 16 (the first day of Nieto's vacation) and September 14. However, plaintiff did not supply the Log to HR until September 17, indicating that she [*30] would not turn it over until her lawyer consented. (Pugni 109-12; Andrews P 21-24, Exs. H-J; Campbell PP 25-27; D'Emic PP 9-10).

The next day, Nieto, D'Emic and Andrews confronted D'Urso with news of the Log. For the first time, D'Urso admitted that he had, in fact, visited plaintiff's office on almost all of the occasions listed therein. (Andrews P 24, Ex. K; Campbell P 28; D'Emic P 11). Following D'Urso's admission, Reader's Digest determined that he had lied and blatantly disobeyed the directive

regarding contact with plaintiff, warranting his immediate termination. (Nieto 107-08; Andrews PP 24-25, Ex. K; Campbell P 28; D'Emic P 12). D'Urso's employment was terminated effective October 5. (Andrews P 26, Ex. L). D'Urso received $ 25,000 in consideration for signing a non-compete agreement. (Campbell P 36).

Prior to informing D'Urso of his termination, QSP finance management and HR determined that they needed to find a replacement employee who could take over D'Urso's job duties immediately after his departure. (Andrews P 26; Campbell P 29; D'Emic P 13). Marcella Bobe ("Bobe"), who had been working as a project manager in the ARC was chosen as Compensation Analyst Manager, in which [*31] capacity she was responsible for D'Urso's job functions. (Id.). Significantly, Bobe was not aware of the specifics of any issues between D'Urso and Pugni, was not involved in addressing any of those issues, and was not aware of the reason for D'Urso's termination. (Bobe P 3). Plaintiff's Resignation

When Bobe became Compensation Analyst Manager in October, plaintiff ceased reporting to Nieto and began reporting to Bobe. (Pugni 10-11; Bobe P 1, fn. 3). Plaintiff worked closely with Bobe and generally was responsible for gathering and analyzing data regarding the sales representatives, which Bobe would then use to calculate commission payments due to these employees. (Pugni 10-11; Bobe P 4). Because Bobe did not have experience in performing such job functions and did not receive training from D'Urso before his departure, Bobe relied heavily on plaintiff to guide her through the compensation process. (Bobe P 4).

Soon after plaintiff and Bobe began working together, Bobe noted deficiencies in plaintiff's performance. She found that plaintiff was not thorough and her work contained inaccuracies. (Id. at P 5). In part because of plaintiff's tendency to make mistakes, and in [*32] part because she was new to her position, Bobe tended to supervise plaintiff closely. (Id.)

Plaintiff frequently complained to Bobe about her workload and the stressful conditions under which they worked, and often threatened to quit. (Id. at P 6). In response, in or about December, Bobe told plaintiff that, while she understood that their jobs were stressful, plaintiff's threats to quit were unacceptable, and plaintiff had to decide either to stay and be positive or to resign. (Id.)

In an effort to motivate plaintiff, Bobe told her that, if she improved her attitude and performance deficiencies Bobe would make sure that her next evaluation (in August 2005) reflected the improvement, and that she would recommend to Jeffrey Pachter ("Pachter"), then the CFO of QSP, that plaintiff receive a promotion and a corresponding pay increase. (Id.). Following this conversation, plaintiff's attitude improved somewhat. However, her thoroughness and accuracy continued to be an issue for Bobe. (Id. at P 7).

Although plaintiff periodically complained about the daily grind and everyday stresses of her position, she never complained to Bobe or HR about the manner in which she [*33] was treated during the time that she and Bobe worked together. (Bobe P 7; Campbell PP 30-31).

On June 13, 2005, plaintiff did not report to work and did not call Bobe about her absence. (Bobe P 8). Instead, Bobe heard from another QSP employee that plaintiff did not plan to return to work. (Id.) Subsequently, on or about June 14, 2005, Reader's Digest confirmed that plaintiff had, in fact, resigned her employment on June 10, 2005. She hand delivered a letter to Tom Ryder ("Ryder"), the Chief Executive Officer of Reader's Digest (to whom she had not previously complained), in which she claimed that she had been constructively discharged. (Pugni 217; Bobe P 8; Campbell P 31; Cohen Exs. E, F).

Plaintiff's abrupt resignation, which occurred two weeks prior to the end of Reader's Digest's fiscal year, created a hardship for QSP, as there was a significant amount of work for plaintiff to complete prior to year-end. (Bobe P 8, fn. 7). On June 15, 2005, Campbell sent a letter to plaintiff asking her to reconsider her decision. (Campbell P 32, Ex. J). Plaintiff never responded to Campbell's letter, and Reader's Digest later learned that plaintiff resigned within a few days after obtaining [*34] a job offer at another company, MBIA Investment Management Corp. ("MBIA"). (Pugni 5-6, 9; Campbell P 32).

Plaintiff testified that she resigned from QSP because Bobe had a "very volatile personality" and was generally difficult to work with, prompting other area managers to bring their work to plaintiff instead. (Pugni 11, 218). Because plaintiff resigned in early June 2005 -- prior to the time when performance evaluations are completed -- Bobe never had the opportunity to prepare an evaluation for plaintiff or to determine whether to recommend to Pachter that she receive a promotion and a corresponding pay increase. (Bobe P 6, fn. 5).

On June 22, 2005, almost two weeks after she resigned from Reader's Digest, plaintiff obtained a Right to Sue Letter from the EEOC with respect to her Amended Charge. (Cohen Ex. C P 20, Ex. 6).

Additional Facts

In his August 2004 performance evaluation for the plaintiff, Nieto criticized certain aspects of her performance. (Nieto 79-83; D'Emic P 5, Ex. A). This evaluation (which covered the period from July 1, 2003 through June 30, 2004) was Nieto's first opportunity to review plaintiff's performance as a direct report. The review

Case 1:07-cv-06418-CM-RLE   Document 24-4   Filed 04/28/2008   Page 9 of 17

Page 9
2007 U.S. Dist. LEXIS 26284, *

reflected [*35] his dissatisfaction with her limited skill set and his belief that she did not grasp the intricacies of her position after having worked at QSP for more than five years. (Nieto 79-83; D'Emic P 5, Ex. A). Nieto indicated in the August 2004 Evaluation that plaintiff failed to meet the position's requirements in four areas, but also noted that a previous lack of adequate supervision by D'Urso was partially responsible for the plaintiff's performance shortfall. (D'Emic P 5, Ex. A). The August 2004 Evaluation had no impact on plaintiff's compensation or duties. (Pugni 223-24; Nieto 153; Bobe P 6, Campbell P 10, fn. 4).

Before Nieto gave plaintiff the evaluation, it was reviewed by D'Emic and Andrews to ensure that it was fair and accurate. (Andrews P 17; D'Emic P 5). D'Urso was not consulted, nor did he have any say in the performance evaluation that plaintiff received in August 2004. (Nieto 91-92; Andrews P 17, fn. 14). Bobe found that Nieto's August 2004 evaluation largely reflected the same issues she had with plaintiff's performance. (Bobe P 6, fn. 4). Furthermore, plaintiff testified that Nieto never acted against her because of her complaints about D'Urso. (Pugni 120-21).

Nieto [*36] also reviewed D'Urso's performance in 2004. In his August 2004 review, Nieto found, among other things, that D'Urso did not meet a number of technical requirements for his position and criticized his management skills based on his failure to address plaintiff's deficiencies. (Nieto 79-83; D'Emic, Ex. B).

It is also noteworthy that plaintiff's testimony and that of other co-workers shows that D'Urso was a very emotional person who cried not only in front of the plaintiff but also other Reader's Digest employees. (Pugni 26-28, 116; Strickland at 28-30; Cohen Ex. L). D'Urso cried to Nieto in March 2003 and to another co-worker, Strickland, about the Incident and about plaintiff's refusal following the Incident to acknowledge D'Urso and his daughter. (Pugni 26-27, 116; Nieto 21-23, 58-60, 116; Strickland 14, 17, 31). Furthermore, Nieto received complaints about D'Urso's emotional behavior from both male and female employees. (Nieto 58-60; 130-31).

Plaintiff brought this action on September 15, 2005 claiming that she was subjected to a hostile work environment, retaliation, and constructive discharge at Reader's Digest and seeking compensatory and punitive damages.

### Standard of Review

[*37] Under *Federal Rule of Civil Procedure 56(c)*, a court will grant summary judgment if the evidence offered shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*; see also *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. Summary judgment for the moving party is appropriate "where the nonmovant's evidence is merely colorable, conclusory, speculative, or not significantly probative." *Travelers Ins. Co. v. Broadway W. Street Assoc's., 164 F.R.D. 154, 160 (S.D.N.Y. 1995)* (citing *Anderson, 477 U.S. at 248, 106 S. Ct. at 2510*). Before a district court grants summary judgment, however, "the record must clearly establish both 'the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.'" *Pangburn v. Culbertson, 200 F.3d 65, 69 (2d Cir. 1999)* (citing *Ramsey v. Coughlin, 94 F.3d 71, 74 (2d Cir. 1996))*. [*38] Summary judgment is improper if there is any evidence in the record that would allow a reasonable fact-finder to find in favor of the non-moving party. On a motion for summary judgment, the court views the record in the light most favorable to the non-moving party and resolves all ambiguities and draws all reasonable inferences against the moving party. See *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962)*; *Donahue v. Windsor Locks Bd. of Fire Commn'rs, 834 F.2d 54, 57 (2d Cir. 1987)*.

### Discussion

A. Hostile Work Environment

Title VII provides that "It shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex . . ." *42 U.S.C. § 2000e-2(a)*. The phrase "terms, conditions, or privileges of employment" is broad enough to render actionable an employer's requirement that an employee work in a discriminatory, hostile or abusive environment. *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986)*; [*39] *Gregory v. Daly, 243 F.3d 687, 691 (2d. Cir. 2001)*. In order to prevail on a hostile work environment claim, a plaintiff must establish two elements: 1) a hostile work environment; and 2) a specific basis for imputing the conduct that created the hostile environment to the employer. See *Distasio v. Perkin Elmer Corp., 157 F.3d 55, 62 (2d. Cir. 1998)*; *Gallagher v. Delaney, 139 F.3d 338, 347-48 (2d Cir. 1998)*.

With respect to the first element, the plaintiff must show that her workplace was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Oncale v. Sundowner Offshore Servs. Inc.,*

*523 U.S. 75, 78, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993))*. The test has both an objective and subjective component: "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004)* [*40] (quoting *Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999))*. Moreover, the conduct of which plaintiff complains "must be sufficiently continuous and concerted in order to be deemed pervasive." *Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004)*. "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support" a hostile work environment claim. *Petrosino, 385 F.3d at 223*.

In determining whether the alleged harassment is of "such quality or quantity" as to meet the "severe and pervasive" standard, courts consider the totality of the circumstances, including such factors as the frequency of the conduct, its severity, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. *Harris v. Forklift Sys., Inc, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*; see also *Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999) (per curiam)*. Finally, while the harassment complained of need not take the form of sexual [*41] advances or explicitly sexual conduct in order to be actionable under Title VII, the plaintiff is required to establish that the conduct was based on her gender. *Galdieri-Ambrosini v. National Realty & Development Corp, 136 F.3d 276 (2d Cir. 1998)*.

The plaintiff is also required to show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Howley v. Town of Stratford, 217 F.3d 141, 153-54 (2d. Cir. 2000)*. Where, as here, the actionable hostile environment is created by a supervisor with immediate (or successively higher) authority over the employee, the employer is vicariously liable for the wrongful conduct. See *Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*; *Burlington Industries, Inc. v. Ellerth 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)* However, when no tangible employment action is taken against the employee, the employer may establish an affirmative defense to liability or damages by showing that (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably [*42] failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Id. [5]

---

[5] Plaintiff's hostile work environment claim under the HRL is analyzed under the same legal standards as those applicable to Title VII claims. See *Quinn v. Green Tree Credit Corp ., 159 F.3d 759, 765 (2d Cir.1998)*; *Ponticelli v. Zurich Am. Ins. Group, 16 F. Supp. 2d 414, 427-28 (S.D.N.Y.1998)*.

Defendant argues that it is entitled to summary judgment on Pugni's claim of hostile work environment sex discrimination because 1) the plaintiff has failed to set forth any disputed material facts on the basis of which a reasonable jury could conclude that she was subjected to a hostile work environment; 2) defendant has established the elements of the Faragher/Ellerth affirmative defense; and 3) defendant's prompt remedial actions upon learning of the alleged harassment provide a complete defense. For the following reasons, the court disagrees and [*43] denies summary judgment on plaintiff's hostile work environment claim with respect to the Pre-Incident Conduct and the Incident itself. The court grants summary judgment to defendant with respect to any hostile work environment claim predicated on D'Urso's contact with the plaintiff after the Incident.

### 1. The Pre-Incident Conduct

*a. A reasonable jury could conclude that D'Urso's Pre-Incident Conduct was unwelcome and subjected plaintiff to an objectively hostile work environment based on her gender.*

Plaintiff has testified that, although he never sexually propositioned her, between June 2003 and February 2004, D'Urso made her "very uncomfortable;" repeatedly commented favorably on her clothes and weight; repeatedly touched her hair; repeatedly attempted to measure her bicep with a rubber band when she came back from the fitness center; repeatedly sat on the arm of her chair; became upset when she would not drive alone with him to an office outing; insisted on sitting next to her at office outings; was emotional in front of her; frequently insisted on discussing his personal problems with her; and would ignore her entreaties to him to stop this behavior and her [*44] attempts to physically push him away. (Pugni 18-23, 44, 63-64, 67; Cplt. P 8).

Defendant argues that because the plaintiff and D'Urso were friends, the plaintiff cannot show that this Pre-Incident Conduct was unwelcome. *Trotta v. Mobil Oil Corp., 788 F. Supp. 1336, 1348 (S.D.N.Y. 1992)*. However, the notion that any behavior no matter how offensive is permissible between friends is utterly unsustainable. Moreover, in the present case, plaintiff has testified that she physically pushed D'Urso away repeatedly; that she asked him to leave her alone; that she stopped

discussing any personal issues with him, told him that she did not care to listen to his, and considered the friendship "one-sided;" and that she complained to Nieto about D'Urso's behavior on five to ten separate occasions. (Pugni at 23, 44, 51-52.) This is strong evidence of the unwelcome nature of D'Urso's attentions.

At trial, defendant can certainly impeach the plaintiff with evidence of her closeness with D'Urso or her failure to complain of the Pre-Incident Conduct in her interview with Van Orman after the Incident. The jury can then weigh the evidence and make the credibility determinations that are [*45] required. At this stage, it suffices that a reasonable jury could conclude on the basis of the evidence presented that at some point during this period D'Urso overstepped the boundaries of his friendship with the plaintiff, and his conduct became offensive and unwelcome.

The defendant further contends that none of the conduct of which plaintiff complains was related to her gender or sufficiently severe or pervasive to create an objectively hostile work environment. For the reasons stated below, the court concludes that this close case presents the kind of difficult line drawing that is best left for a jury. See *Gallagher v. Delaney*, 139 F.3d 338, 347-48 (2d. Cir. 1998)(abrogated on unrelated grounds).

The Supreme Court has recognized the difficulty in precisely defining what will or will not, in the virtually infinite number of varying circumstances, constitute harassment:

> That inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target . . . The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which [*46] are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context [are required].

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998). And federal judges must remain aware that their institutional position may not provide the optimal vantage point from which to assess the ever-changing landscape of workplace norms. As the Second Circuit has eloquently instructed:
> Today, while gender relations in the workplace are rapidly evolving, and views of what is appropriate behavior are diverse and shifting, a jury made up of a cross-section of our heterogenous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment and retaliation.

*Gallagher*, 139 F.3d at 342. Given the ambiguous and contested nature of plaintiff's relationship with D'Urso, this court must resist the temptation to conclude that only one interpretation of the facts is sustainable to the exclusion of all others.

In concluding that the Pre-Incident Conduct could [*47] be found to represent actionable harassment, the court is particularly influenced by the evidence that plaintiff has adduced of D'Urso's repeated insistence on placing himself in uncomfortably close physical proximity to the plaintiff, his frequent unwanted touching during this time period, and the escalation of his "one-sided" attempts to maintain an intimate friendship with the plaintiff to a frequency and intensity that made them "unbearable.". (Pugni at 23). See *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597 (2d Cir. 2006). D'Urso's behavior may not fall on the most objectionable end of the infinitely varied spectrum of inappropriate workplace behavior. And reasonable jurors may well disagree about the key issues of whether these incidents were sufficiently severe or pervasive to negatively alter the working conditions of a *reasonable* employee and whether they were motivated by the plaintiff's gender or D'Urso's admittedly long and intimate friendship with the plaintiff. But the very potential for such disagreement renders summary judgment inappropriate. *Richardson v. New York State Dep't of Corrections*, 180 F.3d 426, 439 (2d. Cir. 1999) [*48] (abrogated on unrelated grounds).

*b. Material issues of disputed fact preclude summary judgment for defendant on the Faragher/Ellerth affirmative defense with respect to D'Urso's Pre-Incident Conduct.*

Defendant argues that, even if D'Urso's Pre-Incident Conduct is actionable, it should not be held vicariously liable for D'Urso's conduct as a supervisor, because it is undisputed that Reader's Digest had precautions in place to prevent harassing conduct, including a complaint procedure, and that plaintiff unreasonably failed to utilize that procedure. (Def. Br. at 20-21). While defendant is correct that the Faragher/Ellerth defense is available under the present circumstances, defendant is not entitled to summary judgment on that issue.

The Faragher/Ellerth defense is available when the perpetrator of the alleged harassment exercised supervisory authority over the complainant but no tangible em-

Case 1:07-cv-06418-CM-RLE   Document 24-4   Filed 04/28/2008   Page 12 of 17

Page 12
2007 U.S. Dist. LEXIS 26284, *

ployment action was taken against her. The court agrees that plaintiff has not pointed to any tangible employment action taken against her. Plaintiff does not allege that D'Urso subjected her to an adverse employment action while he was her supervisor, and it is undisputed [*49] that he was partly responsible for her second promotion and responsible for her receiving Great Performer's Awards. Although Nieto criticized plaintiff's performance in her August 2004 performance evaluation, that evaluation had no impact on plaintiff's compensation or duties, and her new manager, Bobe, informed plaintiff that she would recommend her for a promotion at the end of the next review cycle in August 2005 if plaintiff's attitude and performance were to improve. (Pugni 223-224; Nieto 153; Bobe P 6; Campbell P 10, fn. 4). Moreover, a negative evaluation by itself is not a tangible employment action. See e.g. *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004). Finally, it is well-established that a constructive discharge, even if established by the plaintiff, does not amount to a tangible employment action in the context of a Faragher/Ellerth defense. See *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 294-95 (2d Cir. 1999).

To prevail in its assertion of this defense at the summary judgment stage, however, defendant must adduce undisputed evidence that a) the employer exercised reasonable care to prevent and [*50] correct promptly any sexually harassing behavior, and b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. This the defendant has not done.

In determining whether an employer has established the first prong of its affirmative defense, the existence of an anti-harassment policy with complaint procedures is an important, although not dispositive, consideration. See *Caridad*, 191 F.3d at 295 (2d Cir.1999), cert. denied, 529 U.S. 1107, 146 L. Ed. 2d 791, 120 S. Ct. 1959. (2000). The employee can rebut the employer's proof of an existing anti-harassment policy by showing that the policy is not effective. See, e.g., *Faragher*, 524 U.S. at 808, 118 S. Ct. 2275 (holding that an employer that has not disseminated its policy to its employees could not have exercised reasonable care to prevent harassment); *Mills v. George R. Funaro & Co.*, No. 99 Civ. 4816, 2001 U.S. Dist. LEXIS 396, 2001 WL 50893, at *11 (S.D.N.Y. Jan. 19, 2001)(denying summary judgment because, inter [*51] alia, the fact that the plaintiff's complaints to an office manager did not result in any investigation raised a genuine issue of fact as to whether employer's policy had force.)

In the present case, plaintiff has testified that she repeatedly complained of D'Urso's Pre-Incident Conduct -- including his touching the plaintiff -- to Nieto, a manager, and the latter took no corrective action. Although Nieto denies receiving such complaints, plaintiff's testimony, if credited by the jury, could establish that she made complaints of sexual harassment to a manager that went unredressed for months. If Nieto indeed received complaints from the plaintiff, he clearly failed to report any of them to HR, whose staff did not learn of any issues between D'Urso and plaintiff until after the Incident. Yet Nieto's alleged silence in the face of plaintiff's complaints violated defendant's own EEO policy, which states that "Management and supervisory staff members will refer all complaints or known situations involving harassment to Human Resources." His lack of diligence is perhaps unsurprising since he testified that he did not remember whether he ever saw the Reader's Digest anti-harassment policy [*52] at his orientation, whether he ever had occasion to read the Policy during his employment, and whether it was ever discussed at management meetings. (Nieto at 124). Indeed, he testified that his knowledge of what actions may constitute sexual harassment came from training he received with his previous employer. Id. On the basis of these facts, the court concludes that plaintiff has raised a genuine issue as to the effectiveness of Reader's Digest's Policy in addressing complaints of sexual harassment.

The second prong of the *Faragher*/Ellerth defense requires the employer to show that the employee unreasonably failed to take advantage of its sexual harassment complaint procedures. See *Ellerth*, 524 U.S. at 765. In analyzing whether an employee acted unreasonably in failing to avail herself of an employer's internal complaint procedures, the Second Circuit has employed a burden-shifting analysis. The employer has the initial burden of demonstrating that an employee has failed to avail herself of any complaint procedure provided by the employer. See *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246; *Ellerth*, 524 U.S. at 765. Defendant [*53] has not carried that initial burden here.

Viewed in the light most favorable to the plaintiff, the evidence shows that plaintiff availed herself of one of her options under Reader's Digest's EEO Policy by complaining repeatedly to her manager, Nieto, of D'Urso's harassing behavior prior to the Incident, including some instances of unwanted touching. The case law does not require a plaintiff to exhaust the employer's internal remedies, only to take some steps reasonably to apprise the employer of her complaints. Plaintiff was entitled under Reader's Digest EEO Policy to choose to complain her manager instead of HR. Moreover, the Policy assured plaintiff that a manager is required, among other things, to take immediate action when he or she observes harassment even though no complaint has been or may be made; to listen to, advise, and immediately respond to

Case 1:07-cv-06418-CM-RLE  Document 24-4  Filed 04/28/2008  Page 13 of 17

Page 13
2007 U.S. Dist. LEXIS 26284, *

employees with complaints; and to refer all complaints or known situations involving harassment to HR. Finally, plaintiff has testified that, while Nieto appeared dismissive of her complaints, he also repeatedly told her that he would sit down with HR. On these facts, the court cannot say that plaintiff's actions were unreasonable [*54] as a matter of law.

As indicated above, Nieto denies that plaintiff ever complained to him of D'Urso's Pre-Incident Conduct, and a reasonable jury could certainly believe him. But credibility determinations are not appropriate at the summary judgment stage. Plaintiff's testimony regarding her complaints to Nieto creates a material issue of disputed fact with respect to the second prong of the Faragher/Ellerth defense and thereby precludes a grant of summary judgment on plaintiff's hostile work environment claim under Title VII based on D'Urso's Pre-Incident Conduct.

The New York Court of Appeals has not yet decided whether the Faragher/Ellerth defense is applicable to claims of sexual harassment under state law. See *Vitale v. Rosina Food Products Inc.*, 283 A.D.2d 141, 727 N.Y.S.2d 215, 2001 WL 633635, at *3 (4th Dep't 2001) (refusing to decide whether Faragher/Ellerth defense applies to claims under the HRL). Courts within this Circuit, therefore, have been left with little guidance. See *Ponticelli v. Zurich American Ins. Group*, 16 F. Supp. 2d 414, 432-33 (S.D.N.Y. 1998) (refusing to apply Faragher/Ellerth defense to HRL claims); *Hecht v. GAF Corp.*, 1999 U.S. Dist. LEXIS 5946, 1999 WL 249711, at *2 (S.D.N.Y. Apr. 28, 1999) [*55] (applying Faragher/Ellerth standard of employer liability to HRL claim). Some courts have continued to apply the pre-Faragher/Ellerth HRL standard, under which an employer is not liable for an employee's discriminatory acts unless the employer became a party to it "by encouraging, condoning, or approving it." *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (citation omitted).

Given the unsettled state of the law, this court will apply the pre-Faragher/Ellerth standard to the plaintiff's HRL claim. Under that standard, Reader's Digest would remain liable for D'Urso's Pre-Incident Conduct. The state courts have made clear that an employer's calculated inaction in response to discriminatory conduct can establish condonation of the offense and therefore liability. *State Div. of Human Rights on Complaint of Greene v. St. Elizabeth's Hospital*, 66 N.Y.2d 684, 487 N.E.2d 268, 269, 496 N.Y.S.2d 411 (NY 1985). In other words, an employer can condone actionionable conduct through a "knowing, after-the-fact forgiveness or acceptance of an offense." Id. Since plaintiff has testified that she complained repeatedly to a manager of D'Urso's [*56] inappropriate behavior, including his unwanted touching, and that manager failed to take any steps to address her concerns, a reasonable jury could conclude that Reader's Digest condoned D'Urso's Pre-Incident Conduct.

### 2. The Incident

On the morning of Thursday, February 17, 2004, plaintiff complained to Nieto that another QSP employee had seen D'Urso opening plaintiff's gym bag and looking through it while she was out of her office. Nieto reported the gym bag incident to his superiors and then to HR and thereby catalyzed the first of defendant's investigations into plaintiff's complaints of sexual harassment. Although the event marked a turning point in defendant's involvement in and responsiveness to the issues between plaintiff and D'Urso, it is not analytically distinct from the Pre-Incident Conduct. Indeed, in deciding whether the plaintiff has a viable hostile work environment claim, this court is required to assess the totality of the circumstances rather than determine whether any individual incident constitutes actionable harassment. Thus, under Title VII, defendant's liability for the Incident -- which occurred while D'Urso was still plaintiff's supervisor and [*57] followed directly on the heels of the prior forms of harassment alleged by the plaintiff -- is identical to its liability for the Pre-Incident Conduct.

The fact that defendant took prompt investigative and remedial action in response to the Incident -- and the undisputed evidence shows that it did -- does not absolve defendant of liability for the Incident. Because D'Urso remained plaintiff's supervisor at the time of the Incident, defendant is vicariously liable for his conduct unless it can satisfy both prongs of the Faragher/Ellerth defense by showing that a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise Thus, under Faragher/Ellerth, prompt corrective action by the employer is a necessary but not a sufficient condition to successfully asserting an affirmative defense.

In the present case, a reasonable jury could find that defendant failed to exercise reasonable care to prevent the Incident from occurring. Indeed, if plaintiff's testimony is credited, [*58] it seems that Nieto's failure to report plaintiff's multiple complaints to HR -- as he was required to do under Reader's Digest's Policy -- enabled D'Urso to continue to engage in harassing behavior through and including his intrusion into plaintiff's gym bag. A reasonable jury could also find, based on the evidence presented, that plaintiff reasonably availed herself of Reader's Digest's internal procedures by complaining to Nieto about the Incident and by participating in the ensuing investigation of that complaint.

Because the Incident is part of parcel of the course of harassing behavior that comprises plaintiff's hostile work environment claim under Title VII and because the defendant has failed to establish the elements a Faragher/Ellerth affirmative defense, summary judgment is denied on plaintiff's hostile work environment claim with respect to the Incident.

As indicated above, this court analyzes plaintiff's state law sex discrimination claim under the pre-Faragher/Ellerth standard. Under that standard, defendant will not be held liable for any actionable conduct unless it became a party to it "by encouraging, condoning, or approving it." *DeWitt, 48 F. Supp. 2d at 293.* [*59] The undisputed evidence shows that defendant conducted a reasonable investigation and took prompt corrective action in response to the Incident. In contrast to the Title VII standard, defendant's prompt remedial action is a sufficient defense against liability for the Incident under the HRL. *Father Belle Community Ctr. v. New York State Div. of Human Rights on Complaint of King, 221 A.D.2d 44, 642 N.Y.S.2d 739, 746 (1996).*

**3. Defendant's prompt remedial measures after the Incident do not provide a complete defense against liability for any hostile work environment created by the Pre-Incident Conduct and the Incident.**

Defendant contends that its prompt remedial action once HR learned of plaintiff's complaints is a complete defense to her sexual harassment claim. (Def. Br. at 24-25). See *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996).* Defendant's argument is based on a misinterpretation of the applicable law.

Van Zant and the other cases defendant relies on concern an employer's liability for harassment perpetrated by a co-worker, not a supervisor. Under those circumstances, an employer is liable for harassing [*60] conduct if it "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995).* By contrast, the employer's knowledge of the sexual harassment complaints is irrelevant where the employee's complaint concerns harassment perpetrated by a supervisor. In such cases, the employer is vicariously liable for the hostile work environment created by a supervisor regardless of whether the employer knew or should have known of the actionable conduct unless it can establish both prongs of the Faragher/Ellerth affirmative defense.

The Pre-Incident Conduct and the Incident took place while D'Urso was plaintiff's supervisor. Reader's Digest is, therefore, vicariously liable for the Pre-Incident Conduct and the Incident unless it can establish both elements of the Faragher/Ellerth defense, which -- for the reasons explained above -- is an issue that will have to abide a trial. Summary judgment for defendant is therefore inappropriate with respect to any hostile work environment claim predicated on the Pre-Incident Conduct and the Incident, notwithstanding [*61] the undisputedly prompt remedial actions that defendant took to deal with the Incident and the complaints that followed once HR became apprised of them.

For the foregoing reasons, defendant's claim for summary judgment on plaintiff's hostile work environment claim is denied with respect to the Pre-Incident Conduct and the Incident itself.

**4. The Post-Incident Conduct**

Finally, defendant argues that none of D'Urso's contact with the plaintiff after the Incident can support a hostile work environment claim, because it was based, not on the plaintiff's gender, but rather on the natural attendant consequences of the loss of her friendship, and because it was not sufficiently severe or pervasive to constitute harassment.

It is undisputed that D'Urso's in-person communications with the plaintiff after the Incident were limited to seeking her forgiveness and attempting to revive their friendship as well as work-related activities. The court rejects defendant's contention that D'Urso's Post-Incident Conduct was unrelated to gender as a matter of law, but finds that defendant's prompt remedial actions provide a complete defense to any otherwise actionable harassment that occurred [*62] after the Incident.

Defendant relies on *Kahn v. Objective Solutions, Int'l, 86 F. Supp. 2d 377, 381-82 (S.D.N.Y. 2000)* for the proposition that a hostile work environment claim cannot be predicated on conduct that follows the termination of an intimate or emotional relationship. The factual setting in Kahn, however, is readily distinguishable from the present case. In Kahn, the parties had been involved in a consensual romantic relationship in the workplace, which broke down and resulted in one party's terminating the other and making an offensive comment to her. The court held that these actions, which followed the termination of a consensual office affair, "may constitute unfair and certainly unchivalrous behavior, but not discrimination because of gender." *Id. at 382.* Pugni and D'Urso, by contrast, were not involved in a consensual romantic relationship in the workplace. They were, at best, friends. At worst, a reasonable jury could conclude based on the plaintiff's testimony that even this friendship was becoming increasingly "one-sided" in the months leading up to the Incident, and that some of D'Urso's purportedly friendly advances constituted [*63] actionable gender discrimination. D'Urso has no license under Kahn -- which dealt only with the termination of a consensual

Case 1:07-cv-06418-CM-RLE   Document 24-4   Filed 04/28/2008   Page 15 of 17

Page 15
2007 U.S. Dist. LEXIS 26284, *

romantic relationship -- to make repeated attempts to resume with the plaintiff the very contact she alleges constituted unwelcome sexual harassment.

Whether any offensive contact between D'Urso and the plaintiff following the Incident could be found by a reasonable jury to be sufficiently severe or pervasive to constitute actionable harassment presents a close question. Because Reader's Digest is entitled to summary judgment dismissing this aspect of plaintiff's claim, however, this court need not decide whether plaintiff's subjective belief that defendant was continuing to harass her was objectively reasonable.

Since D'Urso ceased to be plaintiff's supervisor immediately after the Incident, Reader's Digest will be liable for his Post-Incident Conduct only if it "provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Murray, 57 F.3d 243, 249*. The court finds, based on the uncontroverted evidence in the record, that beginning on February 17, 2004, the day that HR became involved in this case, Reader's [*64] Digest took prompt and appropriate investigative and remedial action in response to all of plaintiff's complaints, including *inter alia* immediately changing plaintiff's reporting structure after the Incident; enjoining D'Urso from communicating with the plaintiff in person or contacting her about matters unrelated to work; and repeatedly relocating the parties' offices to put greater distance between them. Therefore, even if D'Urso's Post-Incident Conduct could constitute actionable harassment, Reader's Digest incurs no liability for it. The courts grants summary judgment to defendant on any hostile work environment claim predicated on D'Urso's Post-Incident Conduct.

B. Retaliation

*Section 704 of Title VII* prohibits an employer from "discriminat[ing] against any of its employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge ... or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3(a)*. To establish a prima facie case of retaliation, a plaintiff must show that: (1) she was engaged [*65] in a protected activity; (2) her employer was aware of that activity; (3) she suffered a materially adverse action; and (4) there was a causal connection between the protected activity and the adverse employment action. See *Burlington Northern & Santa Fe Ry. v. White, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)*.[6]

> 6 The same standards apply to plaintiff's retaliation claims under the HRL. See *Torres v. Pisano, 116 F.3d 625, 629 n. 1 (2d Cir.1997)*.

There is no question that in the present case, plaintiff engaged in the protected activity of complaining about purported sexual harassment, and that defendant was aware of her complaints at the time of the alleged instances of retaliation. With respect to the third prong, in her complaint, plaintiff alleged that she was subjected to the following materially adverse actions: a) threats by D'Urso that her days at Reader's Digest "were numbered;" b) D'Urso's sabotaging her work by changing information that she purportedly had inputted [*66] into the System; c) the August 2004 Evaluation; and d) Bobe's failure to "negate" the August 2004 Evaluation and to promote her. (Pugni 89-92; Cplt. P 13). In her brief on this motion, plaintiff additionally alleges that (i) Reader's Digest's removal of the task of inputting data into the System from plaintiff's responsibilities; and (ii) Reader's Digest's "disparate treatment of Ms. Pugni regarding the $ 25,000 non-compete payment to D'Urso" were also materially adverse actions. (Pl. Br. at 11).

In White, the Supreme Court changed the prevailing standard that governs retaliation actions under Title VII by expanding the notion of an adverse employment action. The Court held that the anti-retaliation provision of Title VII, unlike its substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment. *126 S. Ct. at 2412-13*. Rather, to prevail on a claim for retaliation under Title VII, "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. [*67] " *Id. at 2415* (internal quotation marks omitted).

The Court noted, however, that the standard of material adversity is intended to "separate significant from trivial harms." *Id. at 2415*. The Court additionally explained that that the "standard for judging harm must be objective" because such a standard is "judicially administrable." Id. Finally, whether a particular action is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's postition, considering all the circumstances." *Id. at 2417* (internal quotation marks omitted).

Under this standard, it is clear that D'Urso's alleged "threat" that plaintiff's days at Reader's Digest are numbered did not constitute a materially adverse action. The alleged threat, assuming it happened, was never carried out. See *Thomas v. iStar Fin. Inc., 438 F. Supp. 2d 348, 2006 U.S. Dist. LEXIS 46938, at *41 (S.D.N.Y. July 7, 2006)* (post-White ruling that threats that plaintiff's job was in jeopardy made in the form of hearsay comments to third parties are not a materially adverse action).

Case 1:07-cv-06418-CM-RLE   Document 24-4   Filed 04/28/2008   Page 16 of 17

Page 16
2007 U.S. Dist. LEXIS 26284, *

Plaintiff's [*68] contention that D'Urso sabotaged her work by making changes to the data she entered into the System does not rise to the level of a materially adverse action. There is no evidence that D'Urso's alleged sabotage had any impact whatsoever on plaintiff's employment with Reader's Digest (Nieto 71-73; Andrews P 15), so it cannot constitute a materially adverse action. The more interesting question is whether Reader's Digest's response to plaintiff's complaint about possible sabotage -- removing the task of inputting data into the System from plaintiff and giving that clerical task exclusively to D'Urso -- constitutes a materially adverse action.

The White Court cautioned that "reassignment of job duties is not automatically actionable." Instead, this court is obliged to consider the change in plaintiff's job duties from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances. *126 S. Ct. at 2417.*

It appears from the evidence in the record that inputting data into the System was a purely clerical task. And it is undisputed that defendant reassigned this task exclusively to D'Urso in response to plaintiff's concerns that he was [*69] sabotaging her work by changing the data she entered into the System. Certainly if the court were a trier of fact, taking a relatively menial task from an employee and forcing her former supervisor to perform that activity would not constitute a "materially adverse action" -- at least, not for plaintiff. However, I will leave the matter to a jury.

The August 2004 Evaluation does not rise to the level of a materially adverse employment action, because it is undisputed that the evaluation had no impact on plaintiff's compensation or duties. (Nieto 153; Campbell 10, fn. 4). See *Jackson v. City Univ. of N.Y., 2006 U.S. Dist. LEXIS 43338, at *3 (S.D.N.Y. June 26, 2006)* (granting post-White summary judgment for employer on a retaliation claim based on negative evaluations received where there is no record of negative consequences resulting therefrom).

Nor does Bobe's purported failure to "negate" Nieto's August 2004 Evaluation, or to recommend plaintiff for a promotion if plaintiff improved her job performance, constitute a materially adverse action. Plaintiff testified that Bobe promised to work on getting her a promotion and a pay increase at the end of the next [*70] evaluation cycle. But plaintiff resigned prior to the end of the evaluation period in August 2005, so Bobe did not have the chance to reevaluate plaintiff's performance or recommend her for a promotion.

Finally, there are disputed issues of fact concerning whether Reader's Digest retaliated against the plaintiff by not paying her severance or offering her a non-competition agreement, while paying her harasser, D'Urso, $ 25,000 in "non-severance" (allegedly in consideration for his signing a one-year non-compete agreement). The defendant explains that this difference in treatment was due to D'Urso's greater institutional knowledge and connections to defendant's sales force and with former employees working for a competitor. (Campbell Aff. P 36). A reasonable jury could certainly credit this explanation. Yet a reasonable jury could also conclude that the disparate treatment was motivated by more illicit considerations, such as a desire to placate D'Urso and to retaliate against the plaintiff for her series of complaints.

Accordingly, defendant's motion for summary judgment on her retaliation claim is granted in part and denied in part.

C. Constructive Discharge

Plaintiff [*71] also claims that following her complaints of sexual harassment, her work environment became so intolerable that defendant forced her to resign and therefore constructively discharged her. (Cplt P 21-22).

As a preliminary matter, defendant argues that the court should not consider plaintiff's constructive discharge claim because she failed to exhaust her administrative remedies under Title VII. See *42 U.S.C. §§ 2000e-5(e) and (f) and 12117(a); Gomes v. Avco Corp., 964 F.2d 1330, 1332-33 (2d Cir.1992); Kirkland v. Bianco, 595 F. Supp. 797, 799 (S.D.N.Y.1984).* In particular, defendant argues that plaintiff's claim of constructive discharge should be dismissed because she never raised the issue with the EEOC even though the purported discharge occurred two weeks before the completion of the EEOC's investigation of plaintiff's claims and its issuance of a Right to Sue Letter.

It is undisputed that the plaintiff never addressed her constructive discharge claim before the EEOC. This court may consider such a claim, however, if it is "reasonably related" to the claims that are contained in her EEOC charges of discrimination. *Butts v. City of New York Dep't of Hous. Pres. and Dev., 990 F.2d 1397, 1401 (2d Cir. 1993),* [*72] superseded by statute on other grounds as stated in *Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998).* Although the precise nature of plaintiff's allegations that she was constructively discharged is unclear, it appears that the gravamen of her claim is that Reader's Digest created an environment that was intolerable to her because of and through its responses to her claims of sexual harassment. As a result, the court finds that her constructive discharge claim is reasonably related to the allegations of a hostile work environment contained in her initial Charge and the

Amended Charge before the EEOC. Upon consideration of her claim, the court nevertheless concludes that it is completely without merit.

In order to maintain a claim for constructive discharge, plaintiff must show that Reader's Digest deliberately made her working conditions so intolerable that she was forced into an involuntary resignation. See *Spence v. Maryland Cas. Co., 995 F.2d 1147, 1155 (2d Cir.1993)*. Thus, plaintiff must demonstrate that defendant created working conditions that were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled [*73] to resign." *Stetson v. NYNEX Serv. Co., 995 F.2d 355, 361 (2d Cir.1993)*. The most common constructive discharge cases involve scenarios where the employee is threatened with firing unless she resigns. See *Dean v. Westchester County Dist. Attorney's Office, 119 F. Supp. 2d 424, 430-31 (S.D.N.Y.2000)*; *Doria v. Cramer Rosenthal McGlynn, Inc., 942 F. Supp. 937, 947 (S.D.N.Y.1996)*. The Second Circuit has stated that the mere dissatisfaction with work assignments, unfair criticism, or working conditions that can be categorized as unpleasant, do not constitute a constructive discharge. See *Spence, 995 F.2d at 1156*; *Stetson, 995 F.2d at 360*. Moreover, the work conditions must be objectively intolerable; the employee's subjective perceptions are not determinative. See *Nobler v. Beth Israel Med. Ctr., 702 F. Supp. 1023, 1030 (S.D.N.Y.1988)*.

Plaintiff has adduced no evidence that as a result of her complaints or for any other reason, Reader's Digest deliberately created work conditions that a reasonable person would find intolerable. It is clear that plaintiff was dissatisfied with Reader's [*74] Digest's numerous responses to her complaints and that she perceived them as unfairly favoring her alleged harasser and intentionally ostracizing her. In light of the entire record, however, plaintiff's subjective perception of the situation is clearly unreasonable. First, a reasonable person would not feel that Reader's Digest's prompt and diligent attempts to respond to her complaints in the period following the Incident created an intolerable working environment. Second, even if plaintiff's working conditions were actually intolerable, she has failed to adduce any evidence that Reader's Digest deliberately made them so in order to force her to resign. The Second Circuit has clearly stated that deliberate conduct requires more than mere negligence or ineffectiveness. See *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000)*. Viewing the evidence in the light most favorable to the plaintiff, it may be possible to construe HR's responses to plaintiff's numerous post-Incident complaints as insufficiently prompt, punitive toward D'Urso, or reassuring to the plaintiff. But there is not an iota of evidence that would establish that Reader's Digest [*75] deliberately bungled any of its remedial efforts.

Third, plaintiff explicitly testified that she ultimately resigned because her new supervisor, Bobe, had a volatile personality and was difficult to work with. (Pugni 11, 218). Defendants have adduced uncontroverted evidence that Bobe was not aware of any specifics concerning the issues between D'Urso and the plaintiff, had played no part in Reader's Digest's responses to plaintiff's complaints of sexual harassment, and did not know the reason for D'Urso's termination. (Bobe P 3). Plaintiff has offered no evidence whatsoever that Bobe deliberately created an intolerable working environment in retaliation for plaintiff's complaints or for any other reason.

Accordingly, the court grants summary judgment to defendant on plaintiff's constructive discharge claim.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted in part and denied in part.

This constitutes the decision and order of the Court.

Dated: April 5, 2007

Colleen McMahon

U.S.D.J.