UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FRANCESCO GALLO,

           Plaintiff,

-against-

ALITALIA – LINEE AEREE ITALIANE –
SOCIETA PER AZIONI, PIERANDREA GALLI,
and GIULIO LIBUTTI,

           Defendants.

Case No.  07 CV 06418 (CM)(RLE)

---

### DEFENDANTS' JOINT STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

Defendants Alitalia–Linee Aeree Italiane S.p.A. ("Alitalia"), Pierandrea Galli ("Galli") and Giulio Libutti ("Libutti"), by their attorneys, Vedder Price P.C., submit this Joint Statement of Uncontested Material Facts, pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, in support of their respective motions for summary judgment dismissing the Amended Complaint ("Am. Cplt.") by Francesco Gallo in the above captioned action as against each of them.

This Statement of Uncontested Material Facts contains citations to the record in which support for such facts is found. Copies of those portions of the record which are referenced herein are annexed to the accompanying Affirmation of Alan M. Koral, Esq. ("Koral Aff.").

**Background**

1.      Defendant Alitalia–Linee Aeree Italiane S.p.A. ("Alitalia") is an Italian corporation licensed to do business in New York. Alitalia is the national airline of Italy and is headquartered in Rome, Italy. Alitalia's principal New York office is at 350 Fifth Avenue, New York, New York (Am. Cplt., ¶ 3).

1

2.     At all relevant times, Plaintiff was a resident of New York, New York County. Plaintiff was born in 1947 and raised in Italy, but immigrated to the U.S. and has since become a naturalized U.S. citizen (Am. Cplt., ¶ 2).

3.     Plaintiff began his employment with Alitalia as an accountant in 1968 (Am. Cplt., ¶ 13). He rose in rank and eventually became General Manager for the Americas, a position he held until 2002, when he became Senior Vice President of Corporate Affairs for North America, reporting directly to Rome. As Senior Vice President for Corporate Affairs, Plaintiff oversaw the Vice President of Regulatory Affairs, the Vice President of Public Relations, the Human Resources Department and all legal matters affecting Alitalia in North America (Galli, 39:2-21; Koral Aff., Ex. 1).[1]

4.     In or about July of 2003, Galli was transferred to New York as Alitalia's Head of Sales for North and South America (Galli, 13:4-16; Koral Aff., Ex. 2) and Plaintiff began reporting to

---

[1] The deposition transcript of Francesco Cesari is referenced as "(Cesari, ____)." The deposition transcript of Marco D'Ilario is referenced as "(D'Ilario, ____)." The deposition transcript of Marco D'Ilario from the *Lorusso* matter is referenced herein as "(D'Ilario [Lorusso], ____)." The deposition transcript of Maurizio Di Domenico is referenced as "(Di Domenico, ____)." The deposition transcript of defendant Pierandrea Galli is referenced herein as "(Galli, ____)." The deposition transcript of Plaintiff Francesco Gallo for this case is referenced herein as "(Gallo, ____)." The deposition transcript of Francesco Gallo from his deposition in the case of *Ester Lorusso v. Alitalia Linee Aeree Italiane S.p.A.*, Case No. 07 CV 3583 (LBS)(RLE)(the "*Lorusso* matter")—consolidated with this case for discovery purposes—is referenced herein as "(Gallo [Lorusso], ____)." The deposition transcript of defendant Giulio Libutti is referenced as "(Libutti, ____)." The deposition transcript of Giulio Libutti from the *Lorusso* matter is referenced herein as "(Libutti [Lorusso], ____)." The deposition transcript of Andrea Porru is referenced as "(Porru, ____)." The deposition transcript of Andrea Porru from the *Lorusso* matter is referenced herein as "(Porru [Lorusso], ____)." The deposition transcript of Angela Ross is referenced herein as "(Ross, ____)." The deposition transcript of Angela Ross from the *Lorusso* matter is referenced herein as "(Ross [Lorusso], ____)." The transcript pages cited are attached to the Affirmation of Alan Koral ("Koral Aff.") behind exhibit tabs for each individual entry, as are documentary exhibits referenced herein.

him (*Id*). In or about July of 2004, Galli was promoted to Senior Vice President, Worldwide Sales and was transferred back to Rome. Plaintiff continued to report directly to Galli (*Id*.; Am. Cplt., ¶ 38).

5. Throughout this period, Alitalia was in a financial crisis, and was fighting bankruptcy (Porru, 17:11-21; Koral Aff., Ex. 3). Worldwide cutbacks were implemented (*Id*).

6. During 2005, Alitalia's New York office decreased from 111 employees (down from 130 at the beginning of 2004) to 75 employees. By the end of 2006, it was down to 58 employees. By the end of 2007, Alitalia's New York office was down to just 48 employees (Interrogatory Response No. 1 to Plaintiff's Second Set of Interrogatories in the *Lorusso* matter; Koral Aff. Ex. 4).

7. During this period of shrinkage of the number of employees at Alitalia's New York office, three employees were hired in 2004; three were hired in 2005; nine were hired in 2006, of whom two were over 40 (47 and 48 years old); and seven were hired in 2007 (one of whom was 54 years of age (*Id*.).

**Severance Agreement and Release**

8. On September 15, 2005, Plaintiff and Alitalia signed an agreement ("Severance Agreement"), whereby, *inter alia*, Plaintiff ceased to be an employee and became a consultant; and whereby Plaintiff released all claims against Alitalia and, *inter alia*, its employees (Koral Aff., Ex. 5). Plaintiff's claims in this case are based entirely on events that occurred after September 15, 2005 (Am. Cplt., ¶¶ 20, 91).

9. Pursuant to the Severance Agreement, Plaintiff was also to receive a separation payment of $300,000; a $54,000 contribution to his pension plan; and three $200,000 payments (one every six months) for consulting services to be performed over the ensuing eighteen month period—until March 15, 2007 (Koral Aff., Ex. 5). The Severance Agreement also provided that, "[i]n his role as a consultant," Plaintiff was to receive a continuation of all benefits that Plaintiff had been receiving as an employee (*Id.*, ¶ 3).

10. Plaintiff has received all payments pursuant to his Severance Agreement, including all three $200,000 payments for his consulting services (Gallo, 193:4-6; Koral Aff., Ex. 6). Plaintiff also continues to be covered by Alitalia's health insurance, life insurance, accidental death insurance, short-term disability insurance policies and its dental plan (Gallo, 197:10-198:23; Koral Aff., Ex. 6), and Plaintiff testified that he received an additional $60,000 payment to cover other miscellaneous benefits—including car and cell phone expenses—that he was receiving before he signed the Severance Agreement (Gallo, 193:16-194:9; Koral Aff., Ex. 6)(Porru letter; Koral Aff., Ex. 7).[2]

11. Plaintiff's only basis for his contention that the amount for miscellaneous benefits was insufficient is that, when he was informed that he would be paid for these expenses, he did his own calculation—a calculation which he never wrote down and cannot even recall! (Gallo, 194:14-195:13; Koral Aff., Ex. 6).

---

[2] Alitalia had offered to pay Plaintiff a lump sum $60,000 to cover miscellaneous benefits up to age 65 (Koral Aff., Ex. 7), including car insurance for the company car Plaintiff had used while at Alitalia. Although Plaintiff kept the company car, he refused to take ownership of it. Alitalia deducted $13,000 from the payment to Plaintiff in order to continue paying for the car insurance (Koral Aff., Ex. 8 & 9).

12. Plaintiff alleges that he continued to perform as Senior vice president after he became a consultant (Am. Cplt, ¶ 16), although pursuant to the Severance Agreement, September 15, 2005 was Plaintiff's last day of employment (Koral. Aff., Ex. 5, ¶ 1).

13. Shortly after he became a consultant Plaintiff was instructed by Galli to report to defendant Libutti, the Senior Vice President of Sales for North America and Mexico. (Galli, 74:4-22; Koral Aff., Ex. 10).

**Plaintiff's Consultancy and the Termination of His Services**

14. In early 2006, Alitalia's internal audit department in Rome performed an audit of Alitalia's North American operations. That audit revealed significant and severe procedural accounting problems, lack of internal controls, inadequate documentation of agreements with service providers, poor record keeping and waste at Alitalia's New York office and several of its North American stations (Cimoli Memorandum and attachments, Koral Aff., Ex. 11).

15. Based on the results of that audit, Alitalia's then-CEO, Giancarlo Cimoli, issued a brief memo to several of his direct reports noting the "deplorable and risky degradation" of Alitalia's North American operations and demanding a meeting with Gabriele Spazzadeschi (Alitalia's CFO) and Massimo Cestaro (Alitalia's Executive V.P. for Human Resources) "concerning the processes and the persons in order to reach an optimal degree of efficiency and correct management" (Cimoli Memorandum and attachments, Koral Aff., Ex. 11).

16. Thereafter, Messrs. Spazzadeschi and Cestaro made the decision to cease using Plaintiff's consulting services and not to renew his consulting contract when its eighteen-month term expired on March 15, 2007 (Galli, 146:5-12; Koral Aff., Ex. 12). They also decided to terminate

Alitalia's 43 year-old North American CFO, Marco Marchese, along with the station managers at Alitalia's Boston, Chicago and Toronto stations (Scippia/ Galli Memo; Koral Aff., Ex. 13)(Bruni e-mail chain; Koral Aff., Ex. 14).

17.   Messrs. Spazzadeschi and Cestaro are both based in Rome and Plaintiff never met or spoke with either of them (Gallo, 247:12-19; Koral Aff., Ex. 15).

18.   Neither Galli nor Libutti was involved in or consulted about the decision to terminate Plaintiff's consulting services (Galli, 148:16-20; Koral Aff., Ex. 12)(Libutti, 68:21-69:9; Koral Aff., Ex. 16).

19.   On May 8, 2006, Galli and Libutti met with Plaintiff and informed him that Alitalia would no longer use his consulting services and that his consulting agreement would not be renewed when it expired in March of 2007 (Galli, 146:15-147:17; Koral Aff., Ex. 12).  The meeting lasted about ten minutes (*Id*).

20.   On May 23, 2006, Alitalia sent Plaintiff a letter formalizing that decision (Koral Aff., Ex. 17).  Plaintiff was not replaced.  Plaintiff's duties were distributed to other existing employees (Libutti, 83:6-16; Koral Aff., Ex. 18).

**Plaintiff's Total Disability**

21.   On July 18, 2006, Plaintiff applied for long term disability ("LTD") payments from Alitalia's long term disability insurance provider, UNUM Provident—First UNUM Life Insurance Company ("UNUM")(Koral Aff., Ex. 19).  Plaintiff's doctor, Doctor John Caronna declared him "totally restricted" with a "permanent disability" as of May 30, 2006, due to Corticobasal Degeneration—a progressive disease of the neurological system (Koral Aff., Ex.

20). Plaintiff attested that he became totally disabled on May 28, 2006 (Notice of Claim; Koral Aff., Ex. 19) and has since testified that this was true (Gallo, 114:9-18; Koral Aff., Ex. 21). A second doctor, Dr. Stein, concurred shortly thereafter (Stein letter; Koral Aff., Ex. 22).

22. Plaintiff was diagnosed with this condition in or about May of 2006 (Gallo, 59:23-60:14; Koral Aff., Ex. 23). There is no known cure for Plaintiff's condition (Gallo, 91:21-92:6; Koral Aff., Ex. 24).

23. Doctor Caronna had been advising Plaintiff as early as 2005 to cut back on his work load (Caronna letter; Koral Aff., Ex. 25)(Gallo, 54:5-17; Koral Aff., Ex. 23).

24. Plaintiff was also unable to pursue a planned business venture due to his inability to work (Gallo, 241:7-242:12; Koral Aff., Ex. 26).

25. UNUM rejected Plaintiff's claim on the grounds that he was not an employee (June 11, 2007 letter; Koral Aff., Ex. 27)(Gallo, 199:16-21; Koral Aff., Ex. 28). Plaintiff intends to appeal the decision (Gallo, 198:24-199:15; Koral Aff., Ex. 28) and to bring a lawsuit against UNUM (Gallo, 24:20-24; Koral Aff., Ex. 29).

26. Alitalia continued to pay long term disability premiums on behalf of Plaintiff (Gallo, 199:16-21; Koral Aff., Ex. 28).

27. Plaintiff currently receives Social Security Administration disability benefits (Gallo, 27:4-6; Koral Aff., Ex. 29).

**Plaintiff's Age Discrimination Allegations**

28.     Plaintiff testified that Alitalia had a plan to fire him dating back to 2000 (Gallo, 112:4-113:11; Koral Aff., Ex. 21).

29.     Plaintiff has repeatedly testified that Alitalia has had a long term systematic scheme to fire its old employees in favor of younger replacements (Gallo, 214:12-215:15; 221:17-21; Koral Aff., Ex. 30)(Gallo [Lorusso], 162:19-21; Koral Aff., Ex. 31).  This alleged scheme dates at least as far back as 2002 (Am. Cplt., ¶ 94).  Plaintiff alleges that, in December of 2005, he was instructed to fire Angela Ross, Ester Lorusso, Betty Santella, Gabriele Mariotti, Concetta Corso and Marilyn Abbott because they refused to accept an offer to participate in the ERP (Am. Cplt, ¶ 44).

30.     Plaintiff testified that Libutti directed him to fire individuals—based on their ages, sexual orientation and disabilities—from a list he had created (Gallo, 165:20-166:20; 170:18-21; Koral Aff., Ex. 32).  Upon questioning, Plaintiff could not name any employee who was terminated for being homosexual (Gallo, 168:25-169:11; Koral Aff., Ex. 32)—although he had some vague recollection that "some people in Reservation office" were fired for being homosexual, and that Plaintiff *approved those firings himself* (Gallo, 169:9-19; Koral Aff., Ex. 32).

31.     Plaintiff knew of only two employees whom he alleges were terminated for impermissible reasons, whom he could not name (Gallo, 170:4-10; Koral Aff., Ex. 32).  Plaintiff testified that Libutti wanted Anna Mariani terminated because she was a "Miniata" ("whore" in Italian)(Gallo, 175:11-20; Koral Aff., Ex. 32) and another because she refused to do personal work for her superiors (Gallo, 177:19-178:16; Koral Aff., Ex. 32).

32. In March of 2004, Plaintiff arranged for Alitalia to offer a voluntary early retirement program ("ERP") which offered enhanced severance to New York Sales Division employees who were 55 or over and had at least 15 years of service with Alitalia (Ross, 37:7-12; Koral Aff., Ex. 33). In August of 2004, Alitalia offered another ERP, also including other departments in the New York office. In September of 2005, Alitalia had yet another ERP, this time for employees 50 or older with 15 years of service (Ross, 37:14-16; 39:17-19; Koral Aff., Ex. 33).

33. Plaintiff testified that "quite a few" employees were *not* fired after rejecting an offer of an ERP (Gallo, [Lorusso], 177:19-178:12; Koral Aff., Ex. 34). Ms. Ross remains employed (Ross 10:7-10; Koral Aff., Ex. 35)(Gallo, 174:22-175:10; Koral Aff., Ex. 32); Ms. Lorusso was never eligible for an ERP because she was too young (Gallo, 174:19-21; Koral Aff., Ex. 32); Mr. Mariotti resigned (Gallo, 163:7-12; Koral Aff., Ex. 32); Ms. Abbott was not fired and remains employed (Gallo [Lorusso], 177:19-178:10; Koral Aff., Ex. 34); Ms. Santella was also too young for an ERP, and she and Ms. Corso also remain employed at Alitalia. Plaintiff also concedes that Linda Lopez refused the ERP but was never fired (Gallo [Lorusso], 178:6-8; Koral Aff., Ex. 34). In fact, at least 17 eligible employees who refused to accept any ERP and were not subsequently fired (*see* Ross, 37:20-38:17; Koral Aff., Ex. 33)(Ross [Lorusso], 14:7-13; Koral Aff., Ex. 36)(ERP spreadsheet; Koral Aff., Ex. 37)(departure spreadsheet; Koral Aff., Ex. 38).

**Allegedly Harassing Comments**

34. Plaintiff testified that Libutti made negative comments about his age—such as being called "old man" (Gallo, 299:16-17; Koral Aff., Ex. 39) or no "young chicken" (Amended Complaint, ¶ 22)—"several times" during the relevant HRL time period (Gallo, 299:2-20; Koral Aff., Ex. 39).

9

35.     Plaintiff testified that Mr. Libutti made allegedly disparaging comments about Plaintiff's (perceived) homosexuality "two or three times" during the relevant HRL time period (Gallo, 299:23-300:2; Koral Aff., Ex. 39).

36.     Libutti never believed Plaintiff was homosexual (Libutti, 21:8-16; Koral Aff., Ex. 40).

37.     Plaintiff testified that, during the relevant HRL time period, Mr. Libutti made comments about Plaintiff's disabilities—such as that Plaintiff could have been treated along side another employee who, like Plaintiff, had been institutionalized—between ten and twenty times (Gallo, 301:25-303:22; Koral Aff., Ex. 39).

38.     Plaintiff testified that he saw Galli "three or four times" during the relevant time period (Gallo, 292:9-13; Koral Aff., Ex. 39). On one or two occasions, Plaintiff alleges that Galli made disparaging comments about how Alitalia's office is "a bunch of frocci,[3] bunch of lesbian" (Gallo, 293:5-17; Koral Aff., Ex. 39).

39.     Galli allegedly made Plaintiff feel that he "was old enough to leave and that was (sic) a good thing for [Plaintiff] to leave Alitalia" (Gallo, 293:18-294:4; Koral Aff., Ex. 39).

40.     Galli allegedly made perhaps two comments to the effect that Plaintiff's alleged harassment problems with Libutti were imagined by Plaintiff because he had been a psychiatric patient (Gallo, 296:15-297:7; Koral Aff., Ex. 39).

41.     Galli and Libutti have denied subjecting Plaintiff to any such language (Galli, 153:24-154:16; Koral Aff., Ex. 41)(Libutti, 52:4-53:5; Koral Aff., Ex. 42).

---

[3] "Frocio" is an Italian word used to describe homosexuals. "Froci" is its plural form.

42. Under vigorous questioning, Plaintiff has not elicited a single instance of any other employee having ever heard such comments from either Galli or Libutti. *E.g.*, (Porru, 24:3-11; Koral Aff., Ex. 43)(Ross, 14:22-16:7, 36:11-22; Koral Aff., Ex. 44)(Lopez, 7:13-8:2; Koral Aff., Ex. 45)(DiDomenico, 17:19-18:23; Koral Aff., Ex. 46)(Cesari, 11:14-19; Koral Aff., Ex. 47)(D'Ilario, 27:25-28:18 Koral Aff., Ex. 48).

**Retaliation**

43. Plaintiff alleged two physical confrontations with Libutti (Am. Cplt., ¶¶ 42, 47) which Libutti has denied (Libutti, 60:3-6; Koral Aff., Ex. 49), and there is no evidence in the record to support these allegations. In one of those alleged incidents, Plaintiff alleges that Libutti said that he is a Fascist who hates "gays, lesbians, Jews and all these fucking American attorneys" (Am. Cplt., ¶ 42).

44. Plaintiff concedes that he probably used vulgar language in the workplace from time to time—such as "did he stick it up your ass as usual"—with Mr. D'Ilario, and perhaps other coworkers (Gallo [Lorusso], 172:12-25; Koral Aff., Ex. 50).

45. During the relevant HRL time period, Plaintiff did not complain to anyone at Alitalia about Galli (Gallo, 304:19-21; Koral Aff., Ex. 39).

46. Plaintiff testified that he complained about Libutti's alleged remarks on two occasions to Galli (Gallo, 303:23-304:15; Koral Aff., Ex. 39).

47. Galli acknowledges that Plaintiff complained to him once, in 2003, that he had heard rumors that Libutti had problems with him. Libutti assured Galli that he had no problem with Plaintiff, which Galli reported to Plaintiff (Galli, 62:18-63:21; Koral Aff., Ex. 51).

48. Plaintiff testified that he "probably" complained about Libutti's remarks to Alitalia's General Counsel, Leopoldo Conforti (Gallo, 304:22-304:7; Koral Aff., Ex. 39). Plaintiff also testified that he never told Mr. Conforti that Libutti made any comments about his perceived homosexuality (Gallo, 147:15-148:4; Koral Aff., Ex. 52).

49. Mr. Conforti denies ever having knowledge that either Galli or Libutti made derogatory remarks about "gays, older workers or women" (Conforti Response No. 14, Special Interrogatories; Koral Aff., Ex. 53).

50. Plaintiff testified that he protested alleged discriminatory treatment on behalf of other employees (Gallo, 166:23-168:12; Koral Aff., Ex. 32).

**Defamation**

51. On June 5, 2006, an attorney for Dursun Oksuz, a 35 year old male Alitalia employee, sent a letter to Mr. Conforti, which accused a "senior corporate official" of having sexually harassed Mr. Oksuz (Corenthal Letter; Koral Aff., Ex. 54).

52. On June 7, 2006, Alitalia's counsel responded to Mr. Oksuz's counsel by letter, suggesting a telephone call to learn the details of Mr. Oksuz's allegations (Koral Letter; Koral Aff., Ex. 55).

53. That conversation subsequently occurred, and Alitalia's counsel learned that Mr. Oksuz was accusing Plaintiff of having seduced and thereafter engaged in frequent anal intercourse with Mr. Oksuz (and a third Alitalia employee), of sexually harassing him at work and of abusing his authority by giving Mr. Oksuz a big promotion so that he would not leave Alitalia and their sexual relations could continue. (Koral Aff., ¶ 58).

54. On June 14, 2006, Mr. Oksuz's counsel sent Alitalia's counsel a letter attaching copies of what were purported to be instant messages and e-mails between Mr. Oksuz and Plaintiff (and Mr. Ferrara) containing explicit romantic and sexual expressions, *e.g.*, "I dear (sic) with me the smell of your body, even if it is just by my hand, It was just great to be with you,,,,,,even if… have gold dreams and remember I.L.Y. a big kiss" (Corenthal Letter with attachments; Koral Aff., Ex. 56).

55. Soon thereafter, at Libutti's urging, Plaintiff met with Alitalia's counsel (Libutti, 71:14-21; Koral Aff., Ex. 57), who discussed Mr. Oksuz's allegations against him and gave him a copy of the June 14th letter (Gallo, 257:3-258:11; Koral Aff., Ex. 58).

56. When Gallo began telling his wife about the allegations, he discovered that she knew about the allegations before he did because Libutti had already told her about them, (Gallo, 69:18-25; Koral Aff., Ex. 59). Plaintiff testified that Libutti told Plaintiff's wife that Plaintiff had been accused by Mr. Oksuz of having had an ongoing homosexual affair with Mr. Oksuz (Gallo, 69:18-70:4; Koral Aff., Ex. 59).

57. On June 16, 2006, Mr. Oksuz filed a charge with the New York State Division of Human Rights alleging substantively the same allegations his attorney had communicated to Alitalia's counsel in their telephone call—that Plaintiff had engaged in frequent anal and oral intercourse with Mr. Oksuz and Mr. Ferrara, of having touched and kissed Mr. Oksuz in the workplace, and further alleging that, as part of Plaintiff's abuse of his authority, Plaintiff arranged for Mr. Oksuz to receive a promotion from Cashier to Vice President of Regulatory Affairs, with a significant pay increase, in order to continue having sex with Mr. Oksuz (Koral Aff., Ex. 60).

58. Mr. Oksuz was promoted from Cashier to Vice President of Regulatory Affairs on March 1, 2006, with a monthly salary increase from $3,000 to $5,000 (letters; Koral Aff., Ex. 61).

59. Plaintiff had considered Mr. Oksuz a friend (Gallo, 272:22-273:3; Koral Aff., Ex. 62).

60. On June 20, 2006, feeling suicidal, Plaintiff met with a psychiatrist who insisted that he immediately check into the Payne Whitney Clinic (Gallo, 37:15-18; 43:3-5; 80:14-25; Koral Aff., Ex. 63), where he received treatment for about ten days, after which Plaintiff regularly met with another psychiatrist—Dr. Stein—and participated daily in an outpatient clinic (Gallo, 62:14-20; Koral Aff., Ex. 59).

61. During his psychiatric treatment, Plaintiff reported that his marriage was "purely an arrangement" since 2002 (Gallo, 66:16-24; Koral Aff., Ex. 59), and that he had sought a separation (Gallo, 66:10-13; Koral Aff., Ex. 59). Plaintiff's further testified that, in August of 2005, he physically assaulted his wife, for which she obtained a protective order that required him to move away from home and not to speak to his children (Gallo, 262:22-264:5; Koral Aff., Ex. 64).

Dated: New York, New York  
      April 28, 2008

VEDDER PRICE P.C.

By: /s/ Alan M. Koral  
    Alan M. Koral (AK 1503)  
    Charles S. Caranicas (CC 9244)

Attorneys for Defendants  
*Alitalia Linee Aeree Italiane S.p.A.,*  
*Pierandrea Galli* and *Giulio Libutti*

1633 Broadway – 47th Floor  
New York, New York 10019-7513  
(212) 407-7700