UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
FRANCESCO GALLO,

                        Plaintiff,

          -against-

                              Case # 07 CV 06418 (CM)(HP)


ALITALIA - LINEE AEREE ITALIANE –
SOCIETA PER AZIONI,
PIERANDREA GALLI, and
GIULO LIBUTTI,

          Defendants

-------------------------------------------------------------------X


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(b)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES

STANDARDS FOR GRANTING SUMMARY JUDGMENT                    1

ARGUMENT                                                    2

APPLICABLE LAW – The New York City Law States
That Each Act Of Any Discrimination/Harassment Or
Any Retaliation Is Actionable And That No
Faragher/Ellerth Defense Is Available                      3


The Questions Of Fact Raised On This Case Are Too
Numerous, Too Complicated, And Too Sharply
Controverted To Be Thus Disposed Of
 On A Summary Judgment Motion                               10


Defendants' Retaliated Against Plaintiff By Increasing
The Harassment And Terminating The Plaintiff's Employment   17


The Alleged Internal Audit Is A Pretext
For Unlawful Employment Practices                          18


In Addition To The New York City Law, Plaintiff Presented
Sufficient Evidence To Prove A Hostile Work Environment
Under The New York State Law                               20


Plaintiff Has Also Set Forth Viable Claims Under
Intentional Infliction Of Emotional Distress              21


Plaintiff Has A Viable Cause Of Action For Defamation     23

Plaintiff Has A Viable Cause Of Action Breach Of Contract                24

## TABLE OF AUTHORITIES

*Altman v. New York City Dept. of Educ.*  2007 WL 1290599,  (S.D.N.Y.,2007)        2

*Bickhardt v. Ratner*, 871 F.Supp. 613 (S.D.N.Y.1994)        1

*Bergmann v. Jacobs*, 157 N.Y.S.2d 50, 51-52 (N.Y.Sup.Ct.1956).        24

*Bonner v. Guccione,* 916 FSupp 271 [S.D.N.Y. 1996]        22

*Bourne v. Consolidated Edison*, Index No. 1783/2006
        (Sup. Ct. Kings Cty. March 8, 2008)        8

*Bhaduri v. Summit Sec. Servs.*, 2006 U.S. Dist. LEXIS 79830, (S.D.N.Y.2006)        2

*Burger v. New York Institute of Technology***,**  94 F.3d 830, 833 (2d Cir. 1996).        1

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986);        1

*Chertkova v. Connecticut General Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996)        1

*Collins v. Wilcox, Inc.,* 158 Misc2d 54 [Sup. Ct. 1992        22

*DeWitt v. Lieberman*, 48 F. Supp.2d 280, 293 (S.D.N.Y. 1999).        20

*Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987)        1

*Faragher v. City of Boca Raton*, 524 US 775 (1998)        4,5,6,7

*Farrugia v. North Shore University Hosp.*  13 Misc.3d 740, 748, 820 N.Y.S.2d 718,
724 (N.Y.Sup.,2006),        7,8,9

*Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 [1985]        21

*Forrest v. Jewish Guild for the Blind,* 3 NY3d 296 (2004),        4,5,6,7,9

*Gallo v. Prudential Residential Servs.*, L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)        1,2

*Guccione v. Hustler Magazine, Inc.* 632 F.Supp. 313 S.D.N.Y.,1986.        22,24

*Harris v Forklift Sys., Inc.,* 510 US 17, 21 (1993)        5,7,20,21

*Howell v. New York Post Co.,* 81 N.Y.2d 115 [1993]        21

*Imperial Diner, Inc. v. State Human Rights Appeal Bd.* (1980) 52 NY2d 72.                21

*Jordan v. Bates Adver. Holdings, Inc.,* 816 N.Y.S.2d 310 (N.Y.Sup.Ct.2006)              9

*Jordan v. Lewis,* 20 A.D.2d 773, 774, 247 N.Y.S.2d 650, 651 (1 st Dep't 1964).          24

*Matherson v. Marchello*, 100 A.D.2d 233, 473 N.Y.S.2d 998, 1004 (1984)                  24

*McIntyre v Manhattan Ford, Lincoln-Mercury, Inc.,* 175 Misc.2d 795 [1997]               22

*Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)                            20

*Miller v. Waters*, 853 N.Y.S.2d 183, 186 (N.Y.A.D. 3 Dept.,2008                         6

*Montana*, 869 F.2d at 103                                                               1

*Murphy v. American Home Prods. Corp*., 58 N.Y.2d 293, 303 [1983]                        21

*Nembhard v. Memorial Sloan Kettering Cancer Ctr.,* 1996 U.S. App. LEXIS 30738          18,19

*Ochei v. Coler/Goldwater Mem'l Hosp.,* 450 F.Supp.2d 275, 282-83 (S.D.N.Y.2006)        8,9

*O'Reilly v. Executone of Albany, Inc.*, 121 AD2d 772 [3rd Dept. 1986]                   22

*Ortiz-Moss v. New York City Department of Tran*s., 05 Civ. 4206 (SDNY. 4-7-2008)       8,9

*Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984).                                   2

*Polley v. FRB of New York*, 1994 U.S. LEXIS 11813 [S.D.N.Y.]                            22

*Pugliese v. Long Island R.R. Co.,* 2006 WL 2689600, 11-12 (E.D.N.Y. 2006)              7,8

*Rister v. City University of New York*, 2008 WL 1837389, 2 (N.Y.Ct.Cl.,2008)           6

*Rocha Vigil v. City of Las Cruces*, 119 F.3d 871, 873 (10th Cir. 1997)                  21

*SCS Communications, Inc. v. Herrick Co., Inc.*, 360 F.3d 329, 338 (2d Cir.2004).        1

*Selmanovic v. NYSE Group, Inc.,* 2007 WL 4563431, 4 (S.D.N.Y. 2007)                    7,8

*Snell v. Suffolk County*, 782 F.2d 1094, 1096 (2d Cir. 1986                             20

*Sorrenti v. City of New York* 17 Misc.3d 1102(A),
851 N.Y.S.2d 61 N.Y.Sup.2007.Aug 16, 2007)                                              9,17

*St. Mary's Honor Center,* 509 U.S. at 507-508                                          18,19

*Texas Dept. of Community Affairs v. Burdine,*
450 U.S. 248, 252-253, 67 L. Ed. 2d 207, 101 S. Ct.                          19


*United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)                   1


*Wachs v. Winter*, 569 F.Supp. 1438, 1443 (E.D.N.Y.1983);                   24



**STATUTES**

Fed.R.Civ.P. 56(c)                          1

New York State Executive Law §296                                          4,21

The Administrative Code of City of NY § 8-107 [1]                      4,6,8,21

## ARTICLES

Craig Gurian, *A Return to Eyes on the Prize:*
*Litigating Under the Restored New York City Human Rights Law*
 33 Fordham Urb. L. J. 255 (2006).                                          9

## **Standard For Granting Summary Judgment**

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co., Inc.,* 360 F.3d 329, 338 (2d Cir.2004). The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner,* 871 F.Supp. 613 (S.D.N.Y.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**The Second Circuit has cautioned district courts repeatedly that granting summary judgment to an employer rarely is appropriate in employment discrimination cases, which typically turn on the elusive factual question of the employer's intent. See** *Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996)* ("In prior cases, we have also emphasized that trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue."); *Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)* **("A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue.");** *Montana, 869 F.2d at 103* **(**"Summary judgment is ordinarily inappropriate where intent and state of mind are at issue.**"). This general proposition particularly holds true in discrimination cases like this one that are based on a reduction in force that was allegedly implemented in a discriminatory manner, as the inquiry in such cases is "highly fact specific."** *Burger v. New York Institute of Technology***,** 94 F.3d 830, 833 (2d Cir. 1996). In ruling on a summary judgment motion, the Court resolves all ambiguities and draws all inferences against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) ( *per curiam* ); *Donahue v.*

*Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). **"In employment discrimination cases where it is necessary to explore an employer's intent and motivation, summary judgment may not be appropriate."** *See generally Bhaduri v. Summit Sec. Servs.,* 2006 U.S. Dist. LEXIS 79830, at *11-12 (S.D.N.Y.2006), *citing Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984). Consequently, affidavits and deposition testimony must be scrutinized for circumstantial evidence, which if believed, would support a finding of discrimination. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994). Altman v. New York City Dept. of Educ. 2007 WL 1290599, (S.D.N.Y.,2007)


## ARGUMENT

Defendants' motion for summary judgment must be denied because there are numerous material issues of fact with respect to each of plaintiff's claims. For the reasons set forth herein, all of the arguments raised by the Defendants are completely devoid of merit. Plaintiff can show that there are numerous material issues of fact, which would permit a reasonable jury to find that Plaintiff was subjected to a discriminatory environment, was terminated because of his age and perceived sexual orientation, and in retaliation for opposing Defendants' unlawful discriminatory acts.

Firstly, we respectfully submit to the Court that the Defendants have not properly advised this Court as to the status of the existing law. It should be noted that this action is *not* founded upon Title VII of the Civil Rights Act of 1964. This action is one for violations of the Administrative Code of the City of New York  and the New York State Executive law. This action was removed by the Defendants to Federal Court. As seen herein, while the New York State law is to be interpreted in the same manner as Title VII, the New York City law has its own prescribed law and interpretations which provide for a much broader protection of employees from illegal discrimination and retaliation. As explained herein, the New York City law differs in that:

1)    When the harassment is committed by a supervisor, there is strict liability for the employer and no Farragher-Ellerth defense is available. An employee has no duty to complain when he is harassed by a supervisor (Plaintiff, nevertheless did complain on numerous occasions);

2)    In the context of retaliation or a discriminatory action, there is no requirement for a tangible employment action. Any manner of retaliation or discrimination is actionable (Nevertheless, Plaintiff was terminated in addition to other forms of retaliation); and

3)    The harassment need not be severe or pervasive (which, nevertheless, it was extremely severe and pervasive) – such matters only relate to damages.
      (please see below)

Thus, with respect to liability, we are not concerned with the severity or frequency of the harassment (even though it was severe and pervasive) and we are not concerned with whether or not Plaintiff complained to anyone (which, in fact, he did). These are only those issues that relate to damages.

### Applicable Law – The New York City Law States That Each Act Of Any Discrimination/Harassment Or Any Retaliation Is Actionable And That No Faragher/Ellerth Defense Is Available.

The Restoration Act states that "the [City] Council seeks to underscore that the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes." Restoration Act § 1. When the City Human Rights Law was enacted by the City Council in its current form in 1991 the Council published Local Law Memoranda of The City of New York in the 1991 Legislative Annual. (the "Memorandum," attached as Exhibit A herewith, at page 187). The Memorandum compared the new law with the old law. It states:

Liability of employers for acts of employees and agents.

| Current Law | New Law |
| --- | --- |
| No explicit coverage. | *Strict liability in employment context for acts of managers and supervisors* . . . Employer can mitigate liability for civil penalties and punitive damages by showing affirmative anti-discrimination steps it has taken. |

Section 8-107(13)(b)(1) is quite clear and has remained unchanged since 1991. It provides in pertinent part that an "employer *shall* be liable for . . . the conduct of an employee or agent which is in violation of subdivision one[1] . . . of this section only where: (1) The employee or agent exercised managerial or supervisory responsibility" As the Memorandum noted, by its terms, under the City Law an employer can only mitigate punitive damages[2]—not liability—by proving anti-discrimination steps:

> any or all of the factors listed above in addition to any other relevant factors shall be considered in mitigation of . . . *punitive damages* which may be imposed . . .

8-107(13)(e)[italics added]

The City Human Rights Law makes no distinction between *quid pro quo* and hostile work environment sexual harassment. If it is committed by a supervisor the employer is strictly liable.

Under the City Human Rights law there has never been a corollary to the affirmative defense[3] under Title VII created by the Supreme Court in *Faragher v. City of Boca Raton,* 524 US 775 (1998), which allows an employer to avoid liability. Nor is there any requirement in the statute that discrimination be "severe or pervasive" in order to be actionable.

In 2004 *Forrest v. Jewish Guild for the Blind,* 3 NY3d 296 (2004), the Court of Appeals held that "the human rights provisions of the New York City Administrative Code and the provisions of the Executive Law are nearly identical, thus the provisions of the New York City Administrative Code are analyzed according to the same federal standards." 3 NY3d at 391 n. 3.

---

[1] Subdivision One (8-107(1)) provides that "It shall be an unlawful discriminatory practice:
(a) For an employer or an employee or agent thereof, because of the actual or perceived . . . .gender . . of any person, to . . . discriminate against such person in compensation or in terms, conditions or privileges of employment."
[2] Subsection (e) also allows mitigation of civil penalties, however civil penalties may only be imposed by the Commission in an administrative proceeding—not in court.
[3] In the Decision this Court noted that under *Faragher* "[t]he affirmative defense comprises of two elements: that the employer exercised reasonable care to prevent and correct any sexually harassing behavior and that the Claimant employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm." This Court further noted that "a victim has a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of the statute. *Faragher* at 806."

The Court of Appeals held in *Forrest* that the City Human Rights Law should be construed under the standard federal set forth in *Faragher, supra,*[4] which held that an affirmative defense was available to supervisor sexual harassment, and *Harris v Forklift Sys., Inc.*, 510 US 17, 21 (1993), which required that such harassment be "severe or pervasive."[5]

*Forrest* prompted a vehement response by the City Counsel. The Restoration Act was passed specifically to overrule the court's holding in *Forrest* that the *Faragher* affirmative defense and the *Harris* "severe or pervasive" standard applied to the City Human Rights Law.[6]

Under "Construction," the Restoration Act states that "The provisions of this title shall be construed liberally . . . *regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed.*" Restoration Act § 7.

The Committee on General Welfare Report was even more explicit in expressing the Council's intention to reverse restrictive precedents:

Speaking at the bill signing ceremony [in 1991] Mayor Dinkins stated:

> *Since 1980, the federal government has been steadily marching backward on civil rights issues" and "it is the intention of the Council that judges interpreting the City's Human Rights Law are not bound by restrictive state and federal rulings and are to take seriously the requirement that this law be liberally and independently construed.*

The Restoration Act responds to concerns that construction of numerous provisions of the human rights law as amended in 1991 has narrowed the scope of the law's protections.[7]

The Council's determination to overrule *Forrest* is also evident from the fact that when the full Council considered and passed the bill at its meeting of September 15, 2005 Council and

---

[4] 3 N.Y.3d at 309.
[5] 3 N.Y.3d at 310.
[6] As discussed in 33 Fordham Urb. L.J. 255, 260 (2006) A Return To Eyes on The Prize: Litigating Under The Restored New York City Human Rights Law, the Restoration Act was not only aimed at *Forrest,* it reversed other erroneous holdings as well.
[7] Comm. On Gen. Welfare, Report On Prop. Int. No. 22-A (Aug. 17, 2005) at 2, attached herewith as Exhibit B. [italics added]

Committee Member Annabel Palma brought the attention of her colleagues to the intent and

consequences of the legislation:

> There are many illustrations of cases, like . . . *Forrest* that have either failed to interpret the City Human Rights Law to fulfill its uniquely broad purposes, ignore the text of specific provisions of the law, or both.
>
> With [the Restoration Act] these cases and others like them, will no longer hinder the vindication of our civil rights.[8]

Also made a part of the legislative history was the report of the Anti-Discrimination Center

on which the Committee on General Welfare relied. Speaking of the need to overrule *Forrest* the

Report states that:

> *We have long had the problem of judges insisting that harassment having to be "severe or pervasive" before it is actionable,* even though such a requirement unduly narrows the reach of the law. . . . Just this past fall, *the Court of Appeals—in a case holding, among other things, that . . . an employer has an affirmative defense to vicarious liability for supervisory harassment—seems to have forgotten that the specific language of Admin. Code §8-107(13) contemplates that employers are strictly liable for acts of employees who exercise supervisory or managerial authority.*[9]

Simply put, the City Counsel has legislatively overruled the *Forrest* court's holdings that

federal law should be used to imply a *Faragher* affirmative defense, and a "severe or pervasive"

requirement,  in construing the City Human Rights Law.

It is hornbook law that because *Forrest* construes legislation, the legislative body has the

power to overrule such construction, and that it is proper to look to the legislative history of a

statute to discern such intention to overrule. See, e.g., *Rister v. City University of New York,*  2008

WL 1837389, 2 (N.Y.Ct.Cl.,2008)("Legislative Memorandum in Support would have stated that its

purpose was to overrule what the Attorney General understood to be the effect of the Court of

Appeals decision in *Lepkowski")*; *Miller v. Waters*, 853  N.Y.S.2d  183,  186 (N.Y.A.D.  3

Dept.,2008)("Tellingly, the sponsors of the amendment listed three specific Court of Appeals cases .

. . as having prompted the amendment. . . . the Sponsor's Memorandum and the Report of the

---

[8] Quoted in 33 Fordham Urb. L.J. 255, 260 (2006).
[9] Attached herewith as Exhibit C, at 2. See also A Return To Eyes on The Prize, 33 Fordham Urb. L.J. 255, 301 fn 299 (2006).

Advisory Committee explicitly state that it was not the intention of the Legislature to overrule" other cases, however).

Justice Acosta (now of the Appellate Division), when sitting in the New York County Supreme Court, recognized that *Forrest* is no longer good law.

In denying dismissal of the Claimant's sexual harassment claim in *Farrugia v. North Shore University Hosp.* 13 Misc.3d 740, 748, 820 N.Y.S.2d 718, 724 (N.Y.Sup.,2006), the court noted that "unwillingness to apply a more liberal standard in construing the City's Human Rights Law led to the passage of The Restoration Act in 2005," 820 N.Y.S.2d at 724, and that:

> Although under the Federal and New York State counterparts Claimant must also show that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, *see, e.g. Harris.* . . such a construct is inconsistent with the City's Human Rights Law. Under the City's law, liability should be determined by the existence of unequal treatment and questions of severity and frequency reserved for consideration of damages.

*Farrugia,* 820 N.Y.S.2d at 724-725. A court in the Southern District of New York reached the same conclusion, denying summary judgment in *Selmanovic v. NYSE Group, Inc.*, 2007 WL 4563431, 4 (S.D.N.Y. 2007):

> The Administrative Code's legislative history clearly contemplates that the New York City Human Rights Law be liberally and independently construed with the aim of making it the most progressive in the nation."). Thus, for example, while, "under the Federal and New York State counterparts [a] Claimant must also show that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment .... [u]nder the City's law, liability should be determined by the existence of unequal treatment and questions of severity and frequency reserved for consideration of damages."

Courts have also rejected the *Forrest* court's application of the *Faragher* affirmative defense to claims of supervisor sexual harassment under the City Human Rights Law since the passage of the Restoration Act. In denying summary judgment on Claimant's supervisor hostile work environment claims, the court in *Pugliese v. Long Island R.R. Co.*, 2006 WL 2689600, 11-12 (E.D.N.Y. 2006), held that because the City Human Rights Law "provides that an employer may be

liable for discriminatory conduct by an employee where [the] employee or agent exercised managerial or supervisory responsibility, . . *LIRR may be held vicariously liable for the actions of employee Greer because, as Pugliese's former manager, she exercised managerial or supervisory responsibility.* See § 8-107(13)(b)(1)"

The Court noted that "the amendments to the CHRL made by the Local Civil Rights Restorations Act (Local Law 85 of 2005) dictate that: [T]he provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes." *Pugliese,* 2006 WL 2689600 at 11-12.

Accord, *Bourne v. Consolidated Edison,* Index No. 1783/2006 (Sup. Ct. Kings Cty. March 8, 2008)(Court finds that Respondent's papers "did not make out a case for entitlement to dismissal under the City law, only discussing state and federal discrimination case law. Discussion of state and federal decisions are insufficient as a matter of law to state a claim for dismissal under the City law pursuant to the New York City Human Rights Law Restoration Act of 2005.")

§ 8-107(13)(b)(1) of the City Human Rights Law creates strict vicarious liability for all sexual harassment committed by a supervisor—without regard to whether the harassment is of the quid pro quo or hostile work environment variety.

As Magistrate Katz held in *Ortiz-Moss v. New York City Department of Trans.,* 05 Civ. 4206 (SDNY. 4-7-2008) (Katz, MJ.) in his Amended Decision:

> It appears that the 2005 amendment of the New York City Human Rights Law is, in certain respects, meant to be more protective than the parallel federal and state statutes. *See Farrugia v. North Shore Univ. Hosp.,* 13 Misc.3d 740, 747, 820 N.Y.S.2d 718, 724 (Sup.Ct., N.Y.Cty.2006); *Selmanovic v. NYSE Group, Inc.,* No. 06 Civ. 3046(DAB), 2007 WL 4563431, at *4 (S.D.N.Y. Dec. 21, 2007); *Ochei v. Coler/Goldwater Mem'l Hosp.,* 450 F.Supp.2d 275, 282-83 (S.D.N.Y.2006). Thus, several trial courts have concluded that once a Claimant shows that she belongs to a protected group, was subjected to unwelcome sexual harassment, and that the harassment complained of was based on her sex, *she is not required to demonstrate that the harassment was severe or pervasive.* "Under the City's law, liability should be determined by the existence of unequal treatment and questions of severity and frequency reserved for consideration of damages." *Farrugia,* 13 Misc.3d at 748-49, 820 N.Y.S.2d at 725; *accord Selmanovic,* 2007 WL 4563431, at *4.

*Ortiz-Moss v. New York City Dept. of Transp.* 2008 WL 1899950, 17 (S.D.N.Y.) 2008).

In *Ochei v. Coler/Goldwater Memorial Hosp.*, 450 F.Supp.2d 275, 282 - 283 (S.D.N.Y.,2006), relied on by Magistrate Katz for authority, the court noted that the Restoration Act is authority for the legislative overruling of *Forrest*:

> The Second Circuit and New York state courts traditionally have applied the same standards of liability for claims under the CHRL. . . *Forrest v. Jewish Guild for the Blind,* 309 A.D.2d 546, 765 N.Y.S.2d 326, 332-33 (N.Y.App.Div.2003) ("[T]he standard for recovery under [the SHRL] is in accord with the federal standards under [Title VII], and the human rights provisions of New York City's Administrative Code mirror the provisions of the Executive Law." (citations omitted)). However, this practice of parallel interpretation has been called into question by the New York City Council's passage of the Local Civil Rights Restoration Act, which amended several provisions of the CHRL and emphasized that the CHRL should be "construed independently from similar or identical provisions of New York state or federal statutes." N.Y.C. Local Law No. 85 of 2005, § 1 (Oct. 3, 2005).[FN1]

> > FN1. For an extensive analysis of the purposes of the Local Civil Rights Restoration Act, written by one of the Act's principal authors, see Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law,* 33 Fordham Urb. L.J. 255 (2006) (emphasizing the expansive intent of the CHRL and arguing that courts have failed to interpret it independently from Title VII and the SHRL, instead engaging in "rote parallelism").

> At least two New York state courts recently have held that the CHRL holds employers to a higher standard than Title VII and the SHRL, and should be "liberally and independently construed." *Jordan v. Bates Adver. Holdings, Inc.,* 11 Misc.3d 764, 770, 816 N.Y.S.2d 310 (N.Y.Sup.Ct.2006); *see also Farrugia v. N. Shore Univ. Hosp.,* 13 Misc.3d 740, 820 N.Y.S.2d 718, 724 (N.Y.Sup.Ct.2006) ("[T]he case law that has developed in interpreting both the [SHRL] and Title VII should merely serve as a base for the [CHRL], not as its ceiling." (quoting *Jordan,* 11 Misc.3d at 770-71, 816 N.Y.S.2d 310)).

Moreover, under the City's more expansive law, ***any*** manner of retaliation is sufficient. ("Thus, under the LCRRA, retaliatory conduct was not required to be materially adverse (e.g., termination without cause for engaging in protected activity). Rather, the City Council enacted a less restrictive standard to trigger a HRL violation in that it is now illegal to retaliate in any manner." *Sorrenti v. City of New York* 17 Misc.3d 1102(A), 851 N.Y.S.2d 61 N.Y.Sup.2007.Aug 16, 2007)

Thus, with respect to liability, we are not concerned with the severity or frequency of the harassment (although they are numerous and on-going); we are not concerned with whether or not

he complained to anyone (which he, in fact, did); and we are not concerned with whether there was an adverse employment action with respect to Plaintiff's retaliation claims (which, nevertheless, there was). These are only issues that relate to damages.

**RESPECTFULLY, THE QUESTIONS OF FACT RAISED IN THIS CASE ARE TOO NUMEROUS AND TOO SHARPLY CONTROVERTED TO BE THUS DISPOSED OF ON A SUMMARY JUDGMENT MOTION**

| <u>Plaintiff's Claims</u> | <u>Defendants' Claims</u> |
|---|---|
| Defendant Libutti told plaintiff that he was too old and that he should quit and that he was no "**young chicken**" and numerous other derogatory comments referring to his age. (See Ex. D Plaintiff's Affidavit ¶17) | Defendant Libutti **denied** telling plaintiff this  (See, Libutti deposition transcript pages 51, 52) <u>(Libutti's deposition portions are annexed as Ex. E)</u> |
| Defendant Libutti on a continual and almost daily basis, told plaintiff that he was an "**American Shit**" or telling plaintiff he should quit since Plaintiff was no longer Italian, and numerous other derogatory comments referring to his citizenship. See, Ex. D Plaintiff's Affidavit ¶ 21 and Plaintiff's Complaint ¶ 38 ) | Defendant Libutti **denied** making any derogatory comments, denied telling plaintiff that he was an "American Shit" (See Libutti deposition transcript Page 52.) |
| Defendant Libutti on a continual and almost daily basis, told plaintiff, comments like "**you must be very busy taking it in the ass**" and numerous other derogatory comments referring to his perceived sexual orientation.  See Ex. D Plaintiff's Affidavit ¶ 23 and Plaintiff's Complaint ¶ 25) | Defendant Libutti **denied** making comments like "you must be very busy taking it in the ass" and numerous other derogatory comments referring to plaintiff's perceived sexual orientation. (See Libutti deposition transcript Page 53.) |
| On or about December 2003, during a meeting held in New York, Mr. Francesco Mengozzi, the CEO of the Alitalia, directed Plaintiff to make sure, by the same year ending, to terminate at least 50% of Alitalia's North American Division employees, supervisors and managers who were over the age of 50 years, **and to replace these "older" workers with younger individuals, not older than** | Defendants **denied** directing plaintiff to terminate at least 50% of Alitalia's North American Division employees, supervisors and managers who were over the age of 50 years and to replace these 'older' workers with younger individuals, not older than "30/32" years of age" (See, Libutti Deposition Page 51) |

*"30/32 years of age*." (See Ex. D Plaintiff's Affidavit ¶ 25 and Plaintiff's Complaint ¶ 21)

Almost every single morning, Mr. Libutti would call Plaintiff into his office and, always closing his office's door, and ask Plaintiff questions related to the sexual orientation of various employees' male and female alike. (See Ex. D Plaintiff's Affidavit ¶ 28)

On or about the second week of December 2005, Mr. Libutti asked Plaintiff, "Franco, (Plaintiff's nickname for Francesco), *I would like to know from you, why do you always defend gays and lesbians? Why don't you want to fire them? Is it possible that you are one of them*?" (See Ex. D Plaintiff's Affidavit ¶ 29 and Plaintiff's Complaint ¶ 23)

On or about the end of December 2005, while Mr. Libutti was either on vacation, or out on business, during an initially work-related telephone conversation, Mr. Libutti told Plaintiff *"I'm having the greatest time on the beach, so much pussy available!! Even if my wife is here. I am making sure to get all my opportunities! Well I forgot that you don't care about pussy. . . How are all the queers (FROCI was the Italian word used which has a much worse connotation than Fag) at Alitalia? . . Since I'm not there, you must be very busy taking it in the ass. Try to be good. . . Think what would happen if your wife would find it out*!" See Ex. D Plaintiff's Affidavit ¶ 30 and Plaintiff's Complaint ¶ 25)

Upon Mr. Libutti's return to the office, making reference to the telephone conversation, Plaintiff related to him that he did not appreciate at all his conduct, and it was necessary to stop immediately. While leaving his office, Mr. Libutti

Defendant Libutti admitted calling plaintiff into his office but **denied** closing his office's door and asking Plaintiff questions related to the sexual orientation of various employees male and female alike (See, Defendant Libutti Deposition Transcript page 57)

Defendant Libutti **denied** asking Plaintiff, "Franco, I would like to know from you, why do you always defend gays and lesbians? Why don't you want to fire them? Is it possible that you are one of them?" (See, Defendants' Answer ¶ 23)

Defendant Libutti **denied** telling plaintiff I'm having the greatest time on the beach, so much pussy available!! Even if my wife is here. I making sure to get all my opportunities! Well I forgot that you don't care about pussy. . . How are all the queers (FROCI was the Italian word used which has a much worse connotation than Fag) at Alitalia? . . Since I'm not there, you must be very busy taking it in the ass. Try to be good. . . Think what would happen if your wife would find it out!" (See, Defendants' Answer ¶ 25)

Defendant Libutti **denied** grabbing plaintiff's arm forcefully and yelling Plaintiff: "sit down on this fucking chair, and listen to me carefully, or I will break your ass........oh no, no you might like that very much, but listen to me once and for all: as you should know by now, I am a real

grabbed Plaintiff's arm, forcefully closed the office's door and yelled: "*sit down on this fucking chair, and listen to me carefully, or **I will break your ass.........oh no, no you might like that very much**, but listen to me once and for all: as you should know by now, I am a real and convinced fascist, like your friend Mazzucco, I hate with all my passion gays, lesbians, Jews, and all these fucking Americans attorneys, that protect them. **Now I understand why you negated your Italian citizenship and became one of them. Do you think that I don't know that you rushed to become an American, in order to fuck my strategy**?*" See Ex. D Plaintiff's Affidavit ¶ 31)

and convinced fascist, like your friend Mazzucco, I hate with all my passion gays, lesbians, Jews, and all these fucking Americans attorneys, that protect them. Now I understand why you negated your Italian citizenship and became one of them. Do you think that I don't know that you rushed to become an American, in order to fuck my strategy (See Libutti Deposition Transcript page 60)

On the following day, during a telephone conversation with Mr. Galli in Rome Plaintiff informed Mr. Galli that his working conditions with Mr. Libutti were unbearable and that Libutti's objective was to force Plaintiff to quit the company. Mr Galli replied that he was very busy at that particular time, but promised Plaintiff that he would talk to Libutti. After not even 20 minutes, Mr. Galli called Plaintiff back and said: "*Franco, I spoke to Giulio (Mr. Libutti) and I can assure you, that it is all in your imagination, Giulio loves you, and he needs your professionalism and capabilities to solve the company's problems. **Is it possible that with your health conditions, you are making this up?**"* (See Ex. D Plaintiff's Affidavit ¶ 32 and Plaintiff's Complaint ¶ 27)

Defendant Galli **denied** calling Plaintiff back and telling plaintiff: "Franco, I spoke to Giulio (Mr. Libutti) and I can assure you, that it is all in your imagination, Giulio loves you, and he needs your professionalism and capabilities to solve the company's problems. Is it possible that with your health conditions, you are making this up?" (See Defendants' Answer ¶ 27)

Two days later, Mr. Libutti called Plaintiff for coffee as usual, and said to Plaintiff: "*Franco, remember, that you must do what I tell you to do, I am the Boss here, and if you think that Mr. Galli is your friend, you are fucking wrong, how can you be so fucking stupid, don't you understand? **I had an order from him, before I came to work in the States to make sure to fire you**.. . . Franco, remember, again I am the boss*

Defendant Libutti **denied** telling Plaintiff "Franco, remember, that you must do what I tell you to do, I am the Boss here, and if you think that Mr. Galli is your friend, you are fucking wrong, how can you be so fucking stupid, don't you understand? I had an order from him, before I came to work in the States to make sure to fire you.. . . Franco, remember, again I am the boss here, and as you can see I talk to you only

*here, and as you can see I talk to you only on a one-on-one basis. It will always be my word against yours.*" Mr. Libutti then took a pad out of a folder and told Plaintiff, "*Franco, it is your responsibility to find a way at zero cost to the company, to fire the following people: Angela Ross, Esther Lo Russo, Betty Santella, Gabriele Mariotti, Concetta Corso, Marylin Abbott etc and all others that didn't accept the retirement package. It is also your responsibility, to select and hire two new employees, a manager in the HR Department will replace Angela Ross, and a vice president, that will replace Orlando D'oro, and will report to you. . .* **Do also remember that I don't give a shit . . about your adoptive country, all new employees must be young, no more then 30 years old, no gays, no lesbians, and no blacks**." (See Ex. D Plaintiff's Affidavit ¶ 33 and Plaintiff's Complaint ¶ 28)

Plaintiff greatly opposed this discriminatory practice and told Defendant Libutti so. (See Ex. D Plaintiff's Affidavit ¶ 34 and Plaintiff's Complaint ¶ 29)

In response to Plaintiff's complaints, Defendant Libutti, stated that he was all over the world and never faced with all these complications. He continued with negative remarks about this country, and he was sure, that "*as the Roman Empire came to an end, soon the United States of America would also follow the same destiny.*" (See Ex. D Plaintiff's Affidavit ¶35 and Plaintiff's Complaint ¶ 30)

Defendant Libutti asked Plaintiff to follow him to his office, closed his office's door, and then slammed Plaintiff against the door, grabbing Plaintiff's arms and pushing him again toward the other wall, near the window. Plaintiff was terrified, especially looking at Libutti's face which was red and seeing how extremely angry he

on a one-on-one basis. It will always be my word against yours." Mr. Libutti then took a pad out of a folder and told Plaintiff, "Franco, it is your responsibility to find a way at zero cost to the company, to fire the following people: Angela Ross, Esther Lo Russo, Betty Santella, Gabriele Mariotti, Concetta Corso, Marylin Abbott etc and all others that didn't accept the retirement package. It is also your responsibility, to select and hire two new employees, a manager in the HR Department will replace Angela Ross, and a vice president, that will replace Orlando D'oro, and will report to you. . . Do also remember that I don't give a shit . . about your adoptive country, all new employees must be young, no more then 30 years old, no gays, no lesbians, and no blacks." (See, Libutti Deposition transcript pages 51 and 52 and Defendants' Answer ¶ 28)

Defendant Libutti **denied** having any such discriminatory practice. (See, Defendant Libutti deposition transcript page 51, 52)

Defendant Libutti **denied** telling Plaintiff that he was all over the world and never faced with all these complications. Denied telling plaintiff he was sure, that "*as the Roman Empire came to an end, soon the United States of America would also follow the same destiny.*" (See Defendants' Answer ¶ 30)

Defendant Libutti **denied** slamming plaintiff against the door, grabbing plaintiff's arm and pushing him again toward the other wall, near the window. Defendant Libutti further denied telling plaintiff "You will be free to go, only after you have listened to me" *(See, Defendant Libutti Deposition transcript page 60 and*

| | |
|---|---|
| was.(Alitalia's office is located at the Empire State Building on the 37th floor) Plaintiff did his best to free his body from Libutti's hands, and Plaintiff told Libutti that it was his firm request, to leave his office. Libutti stated, inter alia, in return: "*You will be free to go, only after you have listened to me. . . .* " and Libutti continued to berate Plaintiff.  (See Ex. D Plaintiff's Affidavit ¶ 36 and Plaintiff's Complaint ¶ 31) | Defendants' Answer ¶ 31) |
| Plaintiff informed Libutti that he was tired of his conduct and his accusations, his hostility towards him, and his harassment and discriminatory actions. At this point, Libutti stated: "*You don't scare me. Nor you or any other Gay, Old, American shit, son of bitch like you*." (See Ex. D Plaintiff's Affidavit ¶ 43 and Plaintiff's Complaint ¶ 38) | Defendant Libutti **denied** telling plaintiff " You don't scare me. Nor you or any other Gay, Old, American shit, son of bitch like you." (See, Defendant Libutti Deposition Transcript page 52 *and* Defendants' Answer ¶ 38) |
| On or about May 12, 2006, two managers of Alitalia from Rome were in New York on a business trip. They visited Libutti in his office. Libutti told these two officers of the company that *Francesco Gallo (Plaintiff) was fired by him and Galli because he is gay, and that it was necessary to "clean up" Alitalia, and that the majority of Alitalia's North American employees were "Gays and Lesbians."* (See Ex. D Plaintiff's Affidavit ¶ 49 and Plaintiff's Complaint ¶ 45) | Defendant Libutti **denied** telling that that Francesco Gallo (Plaintiff) was fired by him and Galli **because he is gay**, and that it was necessary to **"clean up"** Alitalia, and that the majority of Alitalia's North American employees were **"Gays and Lesbians."** (See, Defendant Libutti's Deposition Transcript page 69 and Defendants' Answer ¶ 45) |
| In September of 2002, Defendants' CEO, Mr. Mengozzi told Plaintiff "It is time that we understand that this company needs young people. . .People who have new visions. People over 50 should make space for younger people." (See Ex. D Plaintiff's Affidavit ¶ 70 and Plaintiff's Complaint ¶ 78) | Defendants deny that Mr. Mengozzi ever said this. (Defendants' Answer ¶ 78) |
| On or about December of 2003, Mr. Mengozzi during a visit in the office, with Mr.Zanichelli., P.R. Executive S.V.P., | |

14

| | |
|---|---|
| Mr.D'angelo, H.R. V.P., and Mr. Antonio Pola. Director Administration during a meeting with Plaintiff, Mr. Wulf and Mr. Mengozzi started attacking Plaintiff, in a very brutal and humiliating way, accusing plaintiff of not having terminated the "old" employees; that Plaintiff was not the right guy to do what he ordered. (See Ex. D Plaintiff's Affidavit ¶ 78 and Plaintiff's Complaint ¶ 86) | Defendants deny that Mr. Mengozzi ever said this. (Defendants' Answer ¶ 86) |
| Since the very first day and on a daily basis, Mr. Gallli playing the friend's role, started and continued to tell Plaintiff on a daily basis to resign, from Alitalia; that Plaintiff was not a young guy anymore; and that would have been just stupid to continue to work, considering that in the past he was in a psychiatric ward. (See Ex. D Plaintiff's Affidavit ¶ 86 and Plaintiff's Complaint ¶ 94) | Defendants deny that Mr. Galli ever said this. (Defendants' Answer ¶ 94) |
| During Mr. Galli's stay in New York, while in the office, Plaintiff noticed very frequently Mr. Galli looking at him and with a maliciously smile, was keeping moving his penis inside his pocket. After about 20 times that such  an event took place, since this all was making Plaintiff very uncomfortable, Plaintiff decided to confront Mr. Galli and told him that I wouldn't  accept any longer his genital game maneuverings, and that if he was in the urge to touch himself he should go to the men's room and play as long as he wanted. Mr. Galli smiling and getting closer to Plaintiff with his right arm, on Plaintiff's shoulder said: "Franco I know that you may want to play with it, you could come to the bathroom with me, but I have one condition, you must shave your beard first" Plaintiff felt disgusted, and asked him to leave Plaintiff's office immediately. (See  Ex.  D  Plaintiff's Affidavit ¶ 87 and Plaintiff's Complaint ¶ 95) | Defendants deny that Mr. Galli ever did this. (Defendants' Answer ¶ 95) |
| | |

(Plaintiff's complaint is attached to Defendant's motion as Defendants' Exhibit 1)

**Also annexed hereto are relevant portions (Annexed hereto as Ex. F) of another Alitalia employee, Andrea Sciarresi's deposition as a non-party witness in our companion case of *Lorusso v. Alitalia*, where he states with regard to Libutti, "He wanted to make a reorganization plan in order to fire the old people in the company and replace them with young people. Q. That's what Mr. Libutti told you? A. Yes." (Sciarresi Deposition page 9) Libutti did not want to hire Alton Watt because he was black and thought he was gay. (Sciarresi Deposition page 13); Libutti was tired of the rigid antidiscrimination laws of the United States. (Sciarresi Deposition page 16, 17) The reorganization plan was simply to have a firing of the old people in the company, especially in the higher positions and to replace them with new managers. (Sciarresi Deposition page 19) Libutti told Sciarresi that he did not like the idea of having women in high positions. (Sciarresi Deposition page 23).**

**Also annexed hereto is an Affidavit from Gabrielle Mariotti (Annexed hereto as Ex. G), wherein he states that Libutti wanted to fire Angela Ross, but Gallo would not let him do it. (Mariotti Affidavit paragraph 3). Mariotto states that Libutti asked him to fire Marilyn Abbot because she was too old, black and female. (Mariotti Affidavit paragraph 6). Mariotti also testified that Galli told him to speak to Gallo "and convince him to retire: his time has come, he's old, he should go now." (Mariotti Affidavit paragraph 7). Mariotti further testifies that Libutti frequently refers to gays as "frocio" or Italian for "Fag" or even worse. (Mariotti Affidavit paragraph 11). Please see the rest of Mariotti's Affidavit for further details of Libutti's discriminatory conduct.**

## **DEFENDANTS RETALIATED AGAINST PLAINTIFF BY INCREASING THE HARASSMENT AND TERMINATING THE PLAINTIFF'S EMPLOYMENT**

Plaintiff has clearly demonstrated that Defendants have retaliated against him by yelling at him, physically assaulting him, calling him a homosexual, etc. and ultimately firing him because of his opposition to Defendants' policy and orders to fire the older workers, the gays, and the blacks. (see above). Moreover, under the City's more expansive law, *any* manner of retaliation is sufficient. ("Thus, under the LCRRA, retaliatory conduct was not required to be materially adverse (e.g., termination without cause for engaging in protected activity). Rather, the City Council enacted a less restrictive standard to trigger a HRL violation in that it is now illegal to retaliate in any manner." *Sorrenti v. City of New York* 17 Misc.3d 1102(A), 851 N.Y.S.2d 61 N.Y.Sup.2007.Aug 16, 2007)

The following Alitalia employees have also made discrimination or retaliation complaints based on one or more of the same bases as Plaintiff's complaints since June 2004: 1) Kenneth Futterman; 2) Anna Mariani; 3) Linda Rylott-Rooney; 4) Gabrielle Mariotti; 5) Ester Lou Russo; 6) Krushhed Palkiwala; 7) Tim O'Neill; 8) Andrea Sciaresi. In fact, Ester Lorusso Gabriele Mariotti and Linda Rylotte-Rooney all have pending Discrimination cases against Alitalia for age or sexual orientation discrimination.

The following people are some of the many employees victimized by Alitalia's Unlawful pattern of discrimination based on race and sexual orientation: 1) Tina Milovich; 2) Merylin Abbott; 3) Cecyl Tamayo; 4) Michele Gasparro; 5) Carmine Tedesco; 6) George Bartalik; 7) Anna Mariani; 8) Anna Martori; 9) Stephanie Diclemente; 10)Angela Ross 11) Orlando D'Oro; 12)Kathy L. Moriarity-Myers; 13) Marie Zazzi; 14) Betty Santella; and 15) Concetta Corso. (See Plaintiff's deposition testimony in Ester Lorusso v. Alitalia p. 114-126) (Annexed hereto as Ex. I)

**(i)**     **Plaintiff Established Discriminatory Termination by the Defendants**

In *Nembhard v. Memorial Sloan Kettering Cancer Ctr., 1996 U.S. App. LEXIS 30738*  the court found that comments by appellee's manager were evidence of a discriminatory employment decision, and that appellee had successfully established a prima facie case of discrimination. A rational juror could also have found that appellee proved by a preponderance of the evidence that appellant's reasons for firing her were pretextual. In light of such pretext, age-related statements, and harsh treatment of appellee, who had been a veteran employee with a stellar employment record, the court also held that appellee had met her ultimate burden of proving discrimination.

In the case at bar, plaintiff is a veteran employee with a near-unblemished employment record. Plaintiff has devoted 38 years of his life to the Defendant Company with proven contributions. Neither of the individual defendants question plaintiff's skills and contributions to the Defendant Company. In fact, during their depositions, both did admit that Plaintiff was a great asset to Alitalia (see Galli Deposition p.39-40 (Annexed hereto as Ex. J) ; Libutti Deposition p.48; (Annexed hereto as Ex. E)

**The Alleged Internal Audit is a Pretext for**
**Unlawful Employment Practices**

As an initial matter, in attempting to satisfy his burden, the plaintiff -- once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision -- must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination see *St. Mary's Honor Center*, 509 U.S. at 507-508. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination "by showing that the employer's proffered explanation

is unworthy of credence." *Texas Dept. of Community Affairs* v. *Burdine,* 450 U.S. 248, 252-253, 67 L. Ed. 2d 207, 101 S. Ct. . Moreover, although the presumption of discrimination "drops out of the picture" once the defendant meets its burden of production, *St. Mary's Honor Center*, *supra*, at 511, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case "and inferences properly drawn there from . . . on the issue of whether the defendant's explanation is pretextual," *Burdine*, *supra*, at 255, n. 10.

In  *Nembhard v. Memorial Sloan Kettering Cancer Ctr., 1996 U.S. App. LEXIS 30738*  the Court held that although the employer met its burden of producing evidence sufficient to rebut the employees' prima facie case, **the evidence was based on the employer's records. Therefore, the evidence was subject to submission to the jury**. The employer's motion for summary judgment was denied.

Defendants never mentioned that Plaintiff was fired because of the alleged internal audit from early 2006. The alleged internal audit in early 2006 is a pretext. Even if the alleged audit report is taken as true and accurate, it only reveals the incompetence of the individual defendants who were Plaintiff's supervisors at the time of the audit, and they were not fired. Defendants do not allege a single negative internal audit report up until early 2006 when Mr. Galli and Mr. Libutti took over. Plaintiff had been working for Alitalia since 1968, received constant promotions and appreciation letters from his superiors during his 38 years of service to Alitalia. All of those letters were in Plaintiff's personnel file that Defendants allegedly lost. The audit reveals the degradation at Alitalia's North American Operations only after the Individual defendants were promoted to be my superiors. Moreover, the items contained in the audit were not part of Plaintiff's responsibilities. Rather, they were the responsibility of Mr. Libutti, Mr. Galli, Mr. Cesari and Mr. Marco Marchese. Plaintiff was even consulted by the Auditing Director, Luigi Travaglione on ways Alitalia could improve their conditions.  (See, Plaintiff's Affidavit ¶ 107-111) While it is possibly understandable

that the CFO would be terminated in response to such an audit, Plaintiff's superiors who were managing Alitalia – North America should also have been fired, not Plaintiff. Moreover, Defendants do not present any Affidavits from anyone with personal knowledge of the subject audit or the alleged reasons for terminating Plaintiff. Moreover, Defendants do not present any Affidavits from anyone with personal knowledge of the subject audit or the alleged reasons for terminating Plaintiff, only hearsay through Mr. Galli. The only testimony is Mr. Galli's statement that *he was told that* Mr. Gallo was fired because Alitalia wanted to "clean up" North America and because of an audit from 2004 (not 2006 which is when the subject audit covered – In 2006, Plaintiff was not in charge – It is apparent that Defendants' "script" and credibility break down at this juncture – Defendant Galli was evidently trying to show that Plaintiff was fired because of an audit from when he (Gallo) was in charge. However, the facts conflict with his testimony. (Please see Galli's deposition page 149 Annexed hereto as Ex. I)

### In Addition To The New York City Law, Plaintiff Presented Sufficient Evidence To Prove A Hostile Work Environment Under The New York State Law

When determining whether a hostile work environment exists, the standards under Title VII and the NYHRL are identical. See DeWitt v. Lieberman, 48 F. Supp.2d 280, 293 (S.D.N.Y. 1999). Title VII requires employers to provide an atmosphere free of discriminatory abuse or hostility. See Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986); Snell v. Suffolk County, 782 F.2d 1094, 1096 (2d Cir. 1986). In order to establish a hostile work environment claim, a plaintiff must first demonstrate that the workplace was permeated with "discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). Additionally, a plaintiff must establish both that there existed "an objectively hostile or abusive work environment - - an environment that a reasonable person would find hostile or abusive," and that the plaintiff

20

"subjectively [perceived] the environment to be abusive." <u>Harris, 510 U.S. at 21.</u> Finally, in determining whether an environment is hostile, the Court must consider the totality of the circumstances. See <u>Harris, 510 U.S. at 23.</u> **Moreover, such violations may occur as the result of even a single incident of egregious conduct.** <u>Imperial Diner, Inc. v. State Human Rights Appeal Bd</u>. (1980) 52 NY2d 72, 436 NYS2d 231, 417 NE2d 525. (emphasis added). See also *Rocha Vigil v. City of Las Cruces*, 119 F.3d 871, 873 (10th Cir. 1997) (Lucero, J., dissenting) ("If sufficiently severe, harassment is actionable under Title VII -- regardless of its pervasiveness or frequency.").

Defendants are also liable under the State law as well as the City law for the acts of Plaintiff's supervisor. Where acts of discrimination are perpetrated by a high-level managerial employee, the employer may be liable for hostile work environment even without any showing of condonation or acquiescence. <u>McKinney's Executive Law § 296, subd. 1(a)</u>; <u>New York City Administrative Code, § 8-107</u>, subd. 1(a).

In the instant case, we certainly have the element of condonation and acquiescence in that the harassment continued because it was Defendants' policy and; but we also have the fact that since LIBUTTI and GALLI were high-level managerial employees, which means we don't even need the condonation and acquiescence elements.

### Plaintiff Has Also Set Forth Viable Claims Under Intentional Infliction Of Emotional Distress

An intentional infliction of emotional distress claim must rest upon allegations that a defendant's behavior was "extreme and outrageous" to such extent that the action was "atrocious and intolerable in a civilized society" [<u>Freihofer v. Hearst Corp., 65 N.Y.2d 135, 143</u> [1985]; <u>Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 303</u> [1983]; <u>Howell v. New York Post Co., 81 N.Y.2d 115</u> [1993]].

**A claim of harassment, such as the one before this court, based on a pattern of abusive conduct has been held to give rise to a claim of intentional infliction of emotional distress where the alleged conduct goes far beyond the bounds of decency** (see, Polley v. FRB of New York, 1994 U.S. LEXIS 11813 [S.D.N.Y.], citing, *Collins v. Wilcox, Inc.*, 158 Misc2d 54 [Sup. Ct. 1992]; see also, *O'Reilly v. Executone of Albany*, Inc., 121 AD2d 772 [3rd Dept. 1986]; *Bonner v. Guccione*, 916 FSupp 271 [S.D.N.Y. 1996]). **In *Collins v. Wilcox Incorporate*, supra, where the harassment continued over and over again, the Court found Defendants could be liable for Intentional Infliction of Emotional Distress. The court stated that: "Although each individual act . . is probably not actionable, except as to a specific claim of sexual harassment ..., when aggravated over time, the continuous nature of the conduct may make it sufficiently outrageous that a jury could reasonably find in plaintiff's favor on the emotional distress allegation (Id)."**

In our case at hand, plaintiff was subjected to harassment on an almost daily basis; suffered at the hands of Defendants. Moreover, it was not merely the content of the words or the conduct that was so extreme, but the fact that plaintiff's protests against such conduct went unheeded. (see *McIntyre v Manhattan Ford, Lincoln-Mercury, Inc.*, 175 Misc.2d 795 [1997], *lv dismissed* 256 A.D.2d 269 [1998], *lv denied* 94 N.Y.2d 753 [1999] ).

Defendants' allegations that Plaintiff's emotional distress is "multitudinous" since he had been diagnosed with a progressive neurological disease and had a troubled marriage is irrelevant, improper and does not change the fact that any person in plaintiff's position would have been severely distressed by the Defendants unlawful acts that exceed the boundaries of decency in a civilized society. Moreover, his health suffered and his marriage was troubled *because of* the problems he was forced to endure at work.

## Plaintiff Has A Viable Cause Of Action For Defamation

Defendants' arguments as to the merits of Plaintiff's Defamation claim are without merit. As an initial matter Plaintiff's claim for defamation is not only based on the Defendant Libutti's communications to Plaintiff's wife ***accusing plaintiff of being homosexual, but also committing adultery***. Defendants arguments that "in New York in the 21st Century, with openly homosexual individuals in prominent positions in the world politics, entertainment, business and other areas, an accusation of homosexuality does not meet the standard in _Foster_ 87 N.Y. 2D 744" is mere speculation since the Court's holding in _Foster_, _supra_ has not been overruled. Neither the courts nor the legislature of New York have indicated otherwise.

**An imputation of sexual immorality is defamatory per se, as to both men and women.** _See, Rejent v. Liberation Publications, Inc.,_ 197 A.D.2d 240, 611 N.Y.S.2d 866 (1st Dep't 1994). Unlike other oral charges imputing unchastity to a man, ***an oral charge imputing homosexuality to a man may constitute slander per se***, _such as where the statement, "you are both queers," is made by the defendant in the presence of the plaintiff's wife and other persons_. See _Nowark v. Maguire_, 22 A.D.2d 901, 255 N.Y.S.2d 318 (2d Dep't 1964).

Contrary to Defendants' submission, the correct holding in _Ward v. Klein_ 10 Misc.3d 648, 653, 809 N.Y.S.2d 828, 832 - 833 (N.Y.Sup.,2005) is as follows:

" The Court recognizes defendants' argument that changing social mores could affect how certain sexual conduct is viewed by the community, and that what was defamatory _per se_ at one time may no longer be the case. _See, e.g., Hayes v. Smith,_ 832 P.2d 1022 (Colo.Ct.App.1991)(accusations of homosexuality are no longer slanderous _per se_). Although consensual sexual relations between unmarried persons are certainly viewed differently than they once were, defendants do not cite to any legal authority or social science data to support their argument that allegations of unchastity, when combined with claims of promiscuity and casual sexual encounters such as those here, can no longer support a finding of defamation _per se._ The Court has found no case in this State, or elsewhere, that stands for so broad a proposition, and absent appellate authority, this Court is constrained from reaching the conclusion urged by defendants. Thus, the Court denies defendants' motion to dismiss the first two causes of action sounding in defamation."

Defendants' arguments find no support from the applicable New York authorities. Therefore, until either the courts or legislature of New York indicate otherwise, the consequence of this holding, critical to this action, is that plaintiff is not even required to prove special damages, *i.e.* actual damage to his reputation, in order to maintain this action. *See Matherson, supra,* 473 N.Y.S.2d at 1000- 01; *Wachs v. Winter,* 569 F.Supp. 1438, 1443 (E.D.N.Y.1983); See also *Guccione v. Hustler Magazine, Inc.* 632 F.Supp. 313 S.D.N.Y.,1986.

New York Courts have held that "**It is axiomatic that some types of statements are considered so damaging to a person's reputation that they are considered slander or libel per se and a plaintiff need not prove special damages to set forth a valid cause of action. One such type of statement is that which charges a person with the crime of adultery**. *Jordan v. Lewis,* 20 A.D.2d 773, 774, 247 N.Y.S.2d 650, 651 (1 st Dep't 1964). *Matherson v. Marchello,* 100 A.D.2d 233, 473 N.Y.S.2d 998, 1004 (1984); *Bergmann v. Jacobs,* 157 N.Y.S.2d 50, 51-52 (N.Y.Sup.Ct.1956).

Defendants claim as to plaintiff's claim barred by the applicable statute of limitations is devoid of merit in that plaintiff commenced this action within the applicable statute of limitations. Plaintiff stated in his affidavit that it was June 20, 2006 that Libutti called his wife and that this action was commenced within 1 year of that date. (Plaintiff's Affidavit paragraphs 54, 55 )

### Plaintiff Has A Viable Cause Of Action For Breach Of Contract

Plaintiff set forth a viable cause of action for breach of contract against the all defendants and must be awarded the opportunity to present the material questions of facts to the trier of fact.

Plaintiff and Defendants had an agreement dated September 15, 2005. Under said agreement, defendants were to provide Plaintiff with a "continuation of all employee benefits to which Employee is currently entitled and in which he is currently participating, or payment necessary to privately purchase their equivalents, up to age sixty-five (65) . (401-K; Social Security;

Medicare)." Defendants stopped paying for numerous employee benefits to which Plaintiff was entitled at the time of the agreement; namely, Defendants stopped paying for his automotive expenses such as garage fees, gas, tolls; defendants stopped paying for Plaintiff's Health Insurance; Defendants stopped contributing towards Plaintiff's 401(k) plan; Defendants failed to give Plaintiff a gold Rolex watch to which he was entitled; Defendants cancelled the Supplemental Pension Plan; Defendants failed to continue paying for plaintiff's cell phone. Also, when the Italian Vice-Prime Minister was visiting New York City from Italy, Defendants told Plaintiff to pay for said politician's entertainment expenses; to pay for a limousine to take him around New York; to pay for various meals and entertainment. However, despite said promise to repay, Defendants failed to repay plaintiff for same. Defendants Breached said agreements. (See Plaintiff's Amended Complaint # 159-163). Moreover, as per the section 3 of the alleged "Consultancy Agreement", if the agreement is cancelled, the parties will have the opportunity to negotiate towards a new agreement. Plaintiff was never given the opportunity to negotiate towards a new agreement. (See, annexed copy of the Agreement attached to Defendants' Motion as #5; see also Plaintiff's Affidavit ¶ 105)

In light of the fact that Plaintiff has set forth numerous allegations of discrimination and retaliation, Defendants' motion should be dismissed in its entirety, along with such other and further relief as to this Court seem just and proper.

Dated:        New York, NY
              June 27, 2008

                              AKIN & SMITH, LLC

                       By: _____

                              Derek T. Smith (DS 1747)

                       Attorneys for Plaintiff
                       305 Broadway, Suite 1101
                       New York, NY 10007
                       (212) 587-0760

25