Staff:    Jacqueline D. Sherman, Counsel
Sean Robin, Finance Analyst
Luisa Sanchez, Finanace Analyst



# THE COUNCIL
## REPORT OF THE GOVERNMENTAL AFFAIRS DIVISION
### MARCEL VAN OOYEN, LEGISLATIVE DIRECTOR

## COMMITTEE ON GENERAL WELFARE
### BILL DE BLASIO, CHAIR

**August 17, 2005**

**PROP. INT. NO. 22-A:**    By Council Members Brewer, The Speaker (Council Member Miller), Comrie, Jackson, Jennings, Koppell, Lopez, Martinez, Monserrate, Perkins, Quinn, Sanders Jr., Seabrook, Stewart, Vann, DeBlasio, Reyna, Moskowitz, Gonzalez, Rivera, James, Yassky, Gerson, Barron, Palma, Baez, Katz, Weprin, Clarke, Liu, Dilan, Reed, Sears, Boyland, Gentile, Recchia, Foster, Avella, Arroyo and The Public Advocate (Ms. Gotbaum)

**TITLE:**    To amend the administrative code of the city of New York, in relation to the human rights law.

The Committee on General Welfare, chaired by Council Member Bill de Blasio, will meet on Wednesday, August 17, 2005, at 10:45 a.m. to consider Prop. Int. 22-A, the "Local Civil Rights Restoration Act of 2005," a proposed local law that would amend New York City's human rights law.

1

Prop. Int. 22-A aims to ensure construction of the City's human rights law in line with the purposes of fundamental amendments to the law enacted in 1991. Speaking at the bill signing ceremony for Int. 465-A, the 1991 amendments to the City's human rights law, Mayor Dinkins stated: "[t]his bill gives us a human rights law that is the most progressive in the nation, and reaffirms New York's traditional leadership in civil rights."[1] Mayor Dinkins went on to explain: "there is no time in the modern civil rights era when vigorous local enforcement of anti-discrimination laws has been more important. Since 1980, the federal government has been steadily marching backward on civil rights issues"[2] and "it is the intention of the Council that judges interpreting the City's Human Rights Law are not bound by restrictive state and federal rulings and are to take seriously the requirement that this law be liberally and independently construed."[3]

Prop. Int. 22-A responds to concerns that construction of numerous provisions of the human rights law as amended in 1991 has narrowed the scope of the law's protections since its enactment by clarifying a number of its provisions and by again underscoring that protections afforded by New York City's human rights law are not to be limited by restrictive interpretations of similarly worded state and federal statutes.

Specifically, the bill would add "partnership status," defined as the status of being in a domestic partnership, as set forth in § 3-240(a) of the administrative code of the city of New York, to the list of categories protected from discrimination under the administrative code. Pending judicial reconsideration of the proper scope of protection from discrimination based on marital status, this provision will ensure that life partners

---

[1] Remarks by Mayor David N. Dinkins at public hearing on Local Laws, June 18, 1991, 1 (on file with Committee on General Welfare).
[2] Id.
[3] Id. at 2.

2

who have memorialized their relationship by becoming domestic partners (or are otherwise considered domestic partners under the Administrative Code) receive protection from all forms of discrimination addressed by the human rights law, just as married partners do.

Prop. Int. 22-A also would amend § 8-107 of the administrative code of the city of New York to clarify the standard to be applied in cases alleging retaliation prohibited by the human rights law. The amendment would make clear that the standard to be applied to retaliation claims under the City's human rights law differs from the standard currently applied by the Second Circuit in retaliation claims made pursuant to Title VII of the Civil Rights Act of 1964; it is in line with the standard set out in guidelines of the Equal Employment Opportunity Commission and applied to retaliation claims by federal courts in several other circuits.[4]

Further, Prop. Int. 22-A would amend § 8-109 of the administrative code of the city of New York to require the human rights commission to conduct a thorough investigation of every complaint filed under the human rights law. A 2003 report published by the Anti-Discrimination Center of Metro New York, Inc., based on an

---

[4] See EEOC Compliance Manual, Vol. 2, Section 8, Part D (issued July 31, 1998); See also, Ray v. Henderson, 217 F.3d 1234, 1241-1243 (9th Cir. 2000) (adopting EEOC interpretation of "adverse employment action" to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity" and further explaining that "[t]he EEOC test covers lateral transfers, unfavorable job references, and changes in work schedules. These changes are all reasonably likely to deter employees from engaging in protected activity. Nonetheless, it does not cover every offensive utterance by co-workers, because offensive statements by co-workers do not reasonably deter employees from engaging in protected activity." Id. at 1242-43) (internal quotations omitted); Hashimoto v. Dalton, 118 F.3d 671 (9th Cir. 1997) (dissemination of negative job reference can be actionable employment action); Hillig v. Rumsfeld, 381 F.3d 1028 (10th Cir. 2004); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453 (11th Cir. 1998); Wyatt v. City of Boston, 35 F.3d 13, 15-16 (1st Cir. 1994). Cf. Galabya v. New York City Bd. of Educ., 202 F.3d 636 (2nd Cir. 2000); Gurry v. Merck & Co., 2003 U.S. Dist. Lexis 6161 (SDNY) ("An employee experiences an adverse employment action when she endures a 'materially adverse change' in the terms and conditions of employment . . . Such actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." Id. at *15 (internal citations omitted).)

examination of approximately 100 case files from the human rights commission, provides a lengthy discussion of concerns regarding current human rights commission practices with respect to investigations of complaints filed under the human rights law.[5] In brief, the report found that the human rights commission did not adequately investigate allegations of conduct in violation of the human rights law in a significant number of cases. The proposed clarification of the human rights law to require a thorough investigation of every complaint[6] is consistent with the goal of ensuring that New York City does everything within its power to identify and root out discrimination.

Section 7 of the bill would amend § 8-130 of the administrative code concerning construction of the human rights law. Prop. Int. 22-A expressly instructs decision makers assessing claims asserted under the City's human rights law to construe the human rights law independent of similarly worded provisions of state and federal law. A number of recent judicial decisions underscore the need to clarify the breadth of protections afforded by New York City's human rights law. For instance, in McGrath v. Toys "R" Us, Inc., 3 N.Y.3d 421 (2004), the Court of Appeals reasoned that broad statements regarding the intended liberal construction of the City's human rights law are insufficient to justify interpretation of the law to afford broader rights than are protected under comparably worded state or federal laws.[7] For this reason, Prop. Int. 22-A explicitly states that the

---

[5] See At the Crossroads: Is There Hope for Civil Rights Law Enforcement in New York, Anti-Discrimination Law Center of Metro New York, Inc., 6-10 (2003), at http://www.antibiaslaw.com/today/crossroads.pdf.

[6] While the steps required to complete a "thorough" investigation depend upon the facts presented by a particular complaint, in general investigations should include steps such as probing the reasons for a respondent's conduct and actively seeking out facts from witnesses.

[7] Specifically, the court explained that "[t]he attorney's fee provision [of the City's human rights law] is indistinguishable from provisions in comparable federal civil rights statutes . . . Where state and local provisions overlap with federal statutes, our approach to resolution of civil rights claims has been consistent with the federal courts in recognition of the fact that, whether enacted by Congress or the state

4

human rights law must be construed independently from both federal and New York State civil and human rights laws, including laws with comparably worded provisions. The bill further clarifies that interpretations of comparable federal and state laws may not be used to limit or restrict the provisions of this title from being construed more liberally than those laws to accomplish the purposes of the human rights law and provisions of the human rights law may not be construed less liberally than interpretations of comparably worded federal and state laws.[8]

Under the bill's provisions, a number of principles should guide decision makers when they analyze claims asserting violations of rights protected under the City's human rights law:  discrimination should not play a role in decisions made by employers, landlords and providers of public accommodations; traditional methods and principles of law enforcement ought to be applied in the civil rights context; and victims of discrimination suffer serious injuries, for which they ought to receive full compensation.

In addition to the clarifications regarding overall construction of the human rights law, Prop. Int. 22-A aims to encourage rigorous enforcement of the City's human rights law by amending § 8-502 to remove any doubt that attorney's fees may be awarded under the City's human rights law in circumstances that differ from those under which they are awarded under similarly worded federal law.  Specifically, it would ensure that a person who successfully effects policy change by filing a complaint under the human rights law may be eligible to receive reimbursement for costs and attorney's fees, notwithstanding

---

legislature or a local body, these statutes serve the same remedial purpose – they are all designed to combat discrimination."  McGrath, 3 N.Y.3d at 428-29.

[8] This bill does not require a decision maker to accept any particular argument being advanced by an advocate, but underscores the need for thoughtful, independent consideration of whether the proposed interpretation would fulfill the uniquely broad and remedial purposes of the City's human rights law.

recent changes to longstanding federal policy on a similar issue.[9] The bill would allow complainants to recover costs and attorney's fees in cases where the filing of a complaint serves as a catalyst for the change advocated in the complaint, but when the respondent makes the change before there is a final ruling on the merits of the complaint.[10] Further, the bill aims to enhance the human rights law's power to deter unlawful discriminatory acts by increasing the amount of civil penalties that may be awarded for violations of the law. Imposition of civil penalties sends a strong signal to those who discriminate that such acts cause serious injury, to both the persons directly involved and the social fabric of the City as a whole, which will not be tolerated. The bill would amend §8-126 to increase the maximum civil penalties that can be awarded to $125,000 in all cases and to $250,000 in cases involving willful, wanton or malicious acts.

The bill would take effect immediately upon enactment.

---

[9] See Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Res., 532 U.S. 598 (2001) (despite the longstanding approach of federal appellate courts nationwide, holding that the "catalyst theory," which allows for recovery of attorney's fees and costs under federal civil rights statutes, does not provide a basis for such recovery for attorney's fees where the change sought was effected in the absence of a consent decree or final judgment).

[10] The analysis of whether a plaintiff is entitled to recover costs and fees on a catalyst theory can be based on a three part analysis, which requires: (1) that the respondent provide at least some of the benefit sought by the lawsuit; (2) that the suit stated a genuine claim; and (3) that the suit was a substantial or significant cause of the act providing the relief. See. e.g., Buckhannon, 532 U.S. at 627-28 (Ginsburg, J. dissenting).