# Anti-Discrimination Center of Metro New York, Inc.

299 Broadway, Suite 1820 · New York, NY 10007
voice 212-346-7600 · fax 212-346-7667 · center@antibiaslaw.com · www.antibiaslaw.com

## Testimony of Craig Gurian
## Regarding Intro 22A, the Local Civil Rights Restoration Act
## Committee on General Welfare, April 14, 2005

Good afternoon, Mr. Chairman and members of the Committee. I'm the Executive Director of the Anti-Discrimination Center of Metro New York. We're pleased and proud to have drafted the Local Civil Rights Restoration Act in the first instance, and to have worked closely with Gale Brewer, the bill's chief sponsor, and with this Committee and its staff in the bill's development. We want to thank Council Member Brewer for her leadership in seeking to get this measure enacted, and to express our gratitude for the support of each member of the Committee.

As section one of Intro 22A points out, the City Human Rights Law "has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law." A principal cause of this failure has been judges who have assumed or wanted to assume that the City Human Rights Law could be interpreted simply by importing constructions of federal and state civil rights laws. They do this without bothering to look at whether the case they are relying upon had even asked the question, "What interpretation of the statute would best fulfill the broad purposes of the state or federal statute," and without independently asking the question, "What interpretation of the City Human Rights Law would best further the especially broad purposes of the City's Human Rights Law." A good recent illustration of this phenomenon is case restricting the ability *of people who have proved that they have been discriminated against* to be able to get attorney's fees (and therefore impairing the ability of victims of discrimination to get lawyers in the first place)

where the victim has not been awarded damages.[1] Another is the case that held that discrimination against unmarried couples somehow does not constitute intentional discrimination on the basis of marital status.[2] We have long had the problem of judges insisting that harassment having to be "severe or pervasive" before it is actionable, even though such a requirement unduly narrows the reach of the law.

It is important to note that *the problem occurs even where the language of particular provisions of our local statute differs from that of the state or federal law involved.* For example, the Council's attempt to strengthen the law in 1991 by proscribing discrimination or retaliation "in any manner" has been ignored; and a court has recently ignored the Council's language in making individual employees liable for their own discriminatory conduct.[3] Just this past fall, the Court of Appeals -- in a case holding, among other things, that an employer isn't liable under State Human Rights Law for a supervisory employee's racial slurs and harassment if the employer hasn't ratified or condoned that behavior, and that an employer has an affirmative defense to vicarious liability for supervisory harassment – seems to have forgotten that the specific language of Admin. Code §8-107(13) contemplates that employers are strictly liable for acts of employees who exercise supervisory or managerial authority.[4]

The problem only promises to get worse as the state and federal judiciary become less and

---

[1] *McGrath v. Toys "R" Us,* 3 N.Y.3d 421, 788 N.Y.S.2d 281 (N.Y. 2004).

[2] *Levin v. Yeshiva Univ.,* 96 N.Y.2d 484, 730 N.Y.S.2d 15 (N.Y. 2001) (note that the case did not purport to deal with the right of an unmarried individual to be free from discrimination in the terms and conditions of a rental or sale, whether that discrimination is intentional, or occurs as a result of disparate impact).

[3] *Priore v. New York Yankees,* 307 A.D.2d 67, 761 N.Y.S.2d 608 (1st Dept. 2003).

[4] *Forrest v. Jewish Guild for the Blind,* 3 N.Y.3d 295, 786 N.Y.S.2d 382 (N.Y. 2004).

less civil rights friendly. Until a 2001 Supreme Court decision,[5] it was clear that attorney's fees were available in cases where an organization acted as a "catalyst" to effect policy change (*e.g.,* forcing the implementation of a policy against sexual harassment).  Now, the federal rule is that fees are not available unless the change is brought about after trial or by consent decree (not simply by settlement of the case).  The rule gives defendants every incentive to delay, and makes the costs of bringing such cases prohibitive.

It used to be (as when the 1991 amendments to the City's Human Rights Law were enacted) that federal courts said that the obligation to obey the Fair Housing Act was "non-delegable."  Last year, the Supreme Court said that this is not the case.[6]  Now there is a new line of cases that would threaten to gut the protections of the Fair Housing Act.[7]  These would limit the applicability of the act to conduct that interferes with a person's ability to rent or purchase – and not to discriminatory conduct that occurs thereafter.  We obviously have to protect against having our City Human Rights Law automatically ratcheted down when state and federal civil rights laws are weakened.

This bill will not only be a tool for advocates to wield to interrupt judges from cutting back, it will be a tool to insure that judges thoughtfully consider new approaches from civil rights advocates that are consistent with the intent of the City Human Rights Law that discrimination "play no role" in decisions relating to housing, employment, and public accommodations.  For example, we believe that when a landlord selects immigrants as tenants because the landlord

---

[5] *Buckhannon Board and Care Home v. West Virginia Dept. of Health & Human Resources,* 532 U.S. 598, 121 S.Ct. 1835 (2001).

[6] *Meyer v. Holley,* 537 U.S. 280, 123 S.Ct. 824 (2003).

[7] *E.g., Halprin v. The Prairie Single Family Homes,* 388 F.3d 327 (7th Cir. 2004); *King v. Metcalf 56 Homes Assoc.,* 2004 U.S. Dist. Lexis 22726 (D. Kan. 2004).

3

believes that immigrants will be more vulnerable and less able to complain about lack of services and other overreaching, that "selection for exploitation" based on alienage or citizenship status constitutes illegal conduct because of protected class.

Among other areas that will be able to be addressed anew in view of the statute (and by way of illustration only) are: giving new life to the doctrine of "continuing violations," reversing the increasingly cramped construction of what constitutes an "adverse action," and recognizing that the City Human Rights law does not exclude damages in mixed motive cases.[8] We will be able to protect against the time when federal courts cut back on standing for testers and for fair housing organizations. We will be able to make sure that courts recognize that the City Human Rights Law does not (unlike the Fair Housing Act) require tenants with disabilities to pay for reasonable modifications to their apartments (reasonable modifications are part of what the local law calls reasonable accommodations").[9] Where a discriminator recklessly disregards the possibility that his conduct may cause harm, that discriminator ought to be subject to punitive damages – the current imported federal standard restricting these damages to circumstances where the reckless disregard is of the specific risk that the human rights law is being violated is unduly restrictive (it gives discriminators an incentive to plead ignorance of the law) and should be examined.

There is nothing unusual about the fact that statutory language does have to be construed. Judges frequently have to choose between and among competing interpretations or constructions urged by the parties. Indeed, there is an entire volume of state law devoted to general principles

---

[8] *See also* the issues raised by the cases cited earlier in my testimony, issues that will require re-examination under the bill.

[9] Under current law, of course, a housing provider is not required to pay for a modification is the housing provider can prove that do so would cause it "undue hardship."

of statutory construction.[10] In the civil rights area in general, and in the case of the City Human Rights Law in particular, judges, under the existing language of the law, are supposed to pick the interpretation that best further the purposes of the law. Unfortunately, judges have defaulted in this obligation and have merely been treating the City law as a carbon copy of other civil rights statutes. Thus, meritorious arguments of civil rights advocates do not get a hearing.

This bill does not oblige a judge to accept a particular argument that an advocate is advancing, but it does insist that the judges thoughtfully consider whether the interpretation being advanced, or a different one, would address the purposes of the City Human Rights law most robustly. In conducting that "liberal construction" analysis, the court must act with the following principles in mind: (a) maximize the coverage provided by the law; (b) make certain that discrimination plays no role in the various decisions made each day in New York City by employers, landlords, and providers of public accommodations; (c) strictly limit the zone in which discrimination may be practiced; (d) maximize the deterrent effect of the law, with the recognition that traditional methods and principles of law enforcement should be applicable in the civil rights context; (e) minimize and counteract evasion of the law, including attempts to feign ignorance of the requirements of the law, or otherwise to engage in diversionary legal tactics; (f) always compensate victims of discrimination fully; (g) maximize access to the courts; and (h) treat discrimination injuries as serious injuries both to the individual victim, and to New York City.

It is not as though judges will be forbidden to consider decisions that have construed the provisions of similar state and federal law. The reasoning of these opinions – like the reasoning

---

[10] N.Y. McKinney's, Statutes (vol. 1) (1971).

contained in law review articles and other sources – can suggest *potential* interpretations and, in some situations, will be found to be persuasive by the judge hearing the City Human Rights Law claim. In addition, the construction provision of this bill guides judges that it will be a highly unlikely event that the a provision of City Human Rights Law would have been intended to have narrower coverage or a broader exemption than that provided under federal law (on the other hand, it will be commonplace for broader local coverage or narrower local exemptions to be found to be necessary to best further the purposes of the statute).

      In a certain way, the idea that there is a fixed body of "federal law" is a fallacy: in fact, prevailing federal law changes over time, and, at any one time, different circuits apply different standards on the same issue (*e.g.,* in the areas of retaliation and reasonable accommodation). Moreover, many federal decisions are not helpful to the interpretative process because those decisions themselves give no consideration to principles of liberal construction. In the end, regardless of federal interpretations, the primary task of judge hearing a City Human Rights Law claim is to find the interpretation for the City law that most robustly further the purposes of the City statute.

      Two other points in respect to the retaliation provision of the bill warrant brief mention. First, the plaintiff has had, and will continue to have, the burden of proving that the action that a covered entity has taken has been taken, in whole or in part, *because of* retaliation. The retaliation provision of this bill does not deal with covered entities who are in fact *innocent* of retaliatory conduct. Second, the bill allows covered entities to prove that the acts complained of were "no more than petty slights and trivial annoyances." In other words, the covered entity has

no liability where it is able to prove that no reasonable person would tend to be deterred from filing a complaint or otherwise opposing discrimination if he or she knew in advance that he or she might be facing the acts complained of. On the other hand, actions whereby covered entities, *with a retaliatory motive,* isolate, downgrade the ratings of, or laterally transfer individuals away from their customary location or position, or threaten those individuals with retaliatory conduct, are illustrations of actions that do tend to deter people from filing complaints or otherwise opposing discrimination.

In respect to marital status, the addition of "partnership status" is only an interim measure; the broader question will have to be revisited after the courts have re-examined their previous marital status rulings in light of each and all of the requirements of revised Section 8-130. Note that a ruling of the Human Rights Commission issued in 1977, just a few years after the marital status provision was enacted, *did find* that the law was intended to deal with discrimination against unmarried couples.[11]

Finally, this bill's requirement that investigations of the City Human Rights Commission

---

[11] The Commission considered a landlord's argument who "believed that unmarried persons planning to live together would be more likely to have financial difficulties culminating in the breaking of their lease than would married persons living together." *Mandel v. Reinhart,* 1977 WL 52818, at *7 (N.Y.C.Com.Hum.Rts., February 28, 1977). The Commission rejected the argument:
> It was subjective decisions of this very type, so clearly mired on preconceived stereotypical attitudes, which served to make finding housing so great a problem for unmarried people, and which was in large part responsible for the legislative enactment under which this Commission's jurisdiction has been involved in this case.

Id.

be "thorough" is modest and long overdue. This does not mean that the Commission must take the same steps in response to each complaint. The concept of a thorough investigation certainly includes in each case, however, the need for the Commission to be probing of the reasons for action (or inaction) that have been offered by respondents; an understanding on the part of the Commission's Law Enforcement Bureau that, in the investigative stage, it has an active role in ferreting out facts, not a passive role of judging facts that a complainant has been able to establish; and the idea that investigations require facts to be gathered from fact witnesses, not derived from position statements submitted by lawyers. One would also expect that the steps that have been taken will be well-documented (as required, for example, for investigations conducted pursuant to the Fair Housing Act).

\* \* \*

Every step to make civil rights protections broader, more vigorous, or more effective has always generated opposition. Just as opponents of raising the minimum wage always say that the sky is about to fall if workers are treated fairly, so too have opponents of civil rights bills said that chaos will reign if civil rights advocates are given more powerful tools to vindicate the rights of victims. In the minimum wage context, reason was able to overcome fear on the state level, even while action was stalled on the federal level. In the civil rights context, action is stalled on both the state and federal levels, and we must allow reason to overcome fear on the local level.