UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 07 CV 06418 (CM)(HP)

---------------------------------------------X

FRANCESCO GALLO,

Plaintiff,

-against-

ALITALIA- LINEE AEREE ITALIANE – SOCIETA PER AZIONI, PIERANDREA GALLI, and GIULIO LIBUTTI,

Defendants

---------------------------------------------X

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

I, NUNZIA FATICA GALLO, do hereby state and declare under the penalties of perjury as follows:

1. I am over the age of 18 and reside in the State of New York.
2. I am the wife of Francesco Gallo.
3. On June 20, 2006, I received a telephone call from Mr. Giulio Libutti, Mr. Libutti told me that my husband was an homosexual and that he had an intimate relationship with Mr. Oskuz.
4. During the same conversation Mr. Libutti told me that he was very sorry for me, that he wanted to help me and that he was not asking my husband to repay the amount that Alitalia had to pay Mr. Oksuz for his claims.

5. Mr. Libutti told me to convince my husband to not sue Mr. Libutti and Alitalia.

6. Mr. Libutti also told me that if my husband would sue Alitalia, he would ruin my husband's reputation in the world.

7. The defamatory statements were false.

8. Coincidentally after that conversation, many people had called me and offered me their support.

NUNZIA FATICA GALLO

JULY 2, 2008

Sworn to and subscribed before

me this 2 day of June 2008

Notary Public

YASMIN ISHMAEL
Notary Public, State of New York
No. 01IS6152854
Qualified in Queens County
Commission Expires Sept. 25, 2010

07/02/2008

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------x

FRANCESCO GALLO,

Plaintiff,

-against-

ALITALIA-LINEE AEREE ITALIANE-SOCIETA PER AZIONI, PIERANDREA GALLI, and GIULIO LIBUTTI,

Defendants.

--------------------------------------x

August 15, 2008
9:30 a.m.

Deposition of NUNZIA FATICA GALLO, a non-party witness, held at the offices of Vedder Price, P.C., 1633 Broadway, New York, New York 10019, before Michael Catania, a Shorthand Reporter and Notary Public of the State of New York.

Nunzia Fatica Gallo

privilege.

MR. KORAL: As to when you were engaged?

MR. DeTOFFOL: Attorney-client privilege.

MR. KORAL: We may have to call the magistrate on this. Are you serious that you think that this is privileged, to ask her when you were engaged?

MR. KOCIAN: Why don't we table that and move on.

MR. KORAL: Yes, we will. I would like to see if counsel would like to reconsider the objection.

MR. DeTOFFOL: Where are you going with this? I'm asking the question.

MR. KOCIAN: I do not see how this is relevant to today's proceeding. I join in the objection.

MR. KORAL: You are instructing the witness not to answer this question?

MR. DeTOFFOL: I am raising the privilege.

MR. KORAL: The answer is that you



Nunzia Fatica Gallo

are instructing her not to answer.

MR. DeTOFFOL: Yes.

BY MR. KORAL:

Q. How long have you known Mr. DeToffol?

MR. DeTOFFOL: I object again. Do not answer.

Q. Have you been represented by any other attorney in connection with this lawsuit, ever?

MR. DeTOFFOL: Do you understand the question?

A. No, I am not being represented by anyone else.

Q. Mr. DeToffol is the only attorney who has represented you?

A. Yes.

THE WITNESS: Can I speak with you?

Q. Specifically Mr. Derrick Smith and the law firm of Akin & Smith have never represented you?

A. No.

Q. Have you discussed this case with Mr. Derrick Smith at any time?



Nunzia Fatica Gallo

A. No.

Q. Have you ever met Derrick Smith?

A. Yes.

Q. How many times?

A. Once.

Q. Could you tell me when that was?

A. I met him briefly in and out yesterday.

Q. That was the first time you met Derrick Smith?

A. Yes.

Q. Had you ever spoken do Derrick Smith before?

A. No.

Q. Had you ever spoken to anybody from his office before?

A. No.

Q. Okay.

A. You mean your office?

Q. No, his office, the firm of Akin & Smith, or any attorney associated with them or any paralegal associated with that firm.

A. No.

Q. Are you presently employed?



Nunzia Fatica Gallo

A. Yes, I am.

Q. Where are you employed?

A. I am employed at Boriken Neighborhood Health Center, associated with Mount Sinai Hospital. I am associate professor at The Hospital for Special Surgery.

Q. Do you see patients at The Hospital for Special Surgery?

A. And Cornell Medical Center.

Q. How long have you been employed at Boriken Neighborhood Health Center?

A. One month.

Q. Prior to that where were you employed?

A. Cornell University, at The Hospital for Special Surgery, for 25 years. I was trained there, and I became an attending.

Q. Do you have a private practice apart from your appointments at Cornell, Boriken, and The Hospital for Special Surgery?

A. It is a faculty practice with the institutions.

Q. So that you see private patients?

A. Yes, I do. But within the

Nunzia Fatica Gallo

MR. DeTOFFOL: Sir, I will object to this being outside the scope.

MR. KORAL: She was served Friday, and your representing that she was served Tuesday is incorrect.

A. 21 years of age, 18, 18, 15.

Q. Two of these are boys, sons?

A. Okay. Alessandro, 21 years of age. Nicoletta Gallo is a girl; she was born July 10th, 1990. Massilliano Gallo, he was born July 10th, 1990. Clara Gallo, she was born August 25th, 1992.

MR. DeTOFFOL: Note that we are not objecting to not receiving or maintaining that we never received the subpoena.

MR. KORAL: I understand that. You said that you did not receive it until Tuesday.

MR. DeTOFFOL: That is not an issue here.

MR. KORAL: That is correct. I'm going to mark as Nunzia --

THE WITNESS: You can put both last names. Whatever you like.

Nunzia Fatica Gallo

MR. KORAL: Mark the subpoena under the name of Nunzia Fatica Gallo as Nunzia Fatica Gallo Exhibit No. 1.

(Nunzia Fatica Gallo Exhibit 1, subpoena, marked for identification, as of this date.)

BY MR. KORAL:

Q. Have you looked at this exhibit?

A. Yes, I did.

Q. Is that your signature on the second page?

A. Yes, it is.

Q. Do you remember when you signed it?

A. July 2nd, 2008.

Q. Where were you when you signed it?

A. I was in front of a notary public.

Q. Where were you when you signed it?

A. 57th Street at First Avenue.

Q. Was this in a lawyer's office?

A. It was a Citibank. I am a client there, and they told me that I could use their notary.

Q. Had you ever met someone called Yasmin Ishmael before?

Nunzia Fatica Gallo

A. No, I didn't. No.

Q. Did you prepare this document by yourself?

MR. DeTOFFOL: I will object to form. What do you mean by prepare?

Q. Did you type this?

A. Yes, I did.

Q. By yourself?

A. Yes.

Q. You typed the caption on the top of it?

A. I have a computer. I did it at home.

Q. Did anybody help you prepare it?

A. No.

Q. Did your husband advise you about anything, any form that it should take and what it should look like?

A. No.

Q. Nobody else did?

A. No.

Q. Have you ever signed an affidavit before?

A. No.

Nunzia Fatica Gallo

Q. Have you ever written an affidavit before?

A. No.

Q. How did you know what an affidavit should look like?

A. I saw an affidavit before, and I copied.

Q. What affidavit did you see before?

A. I saw this one, but I typed this myself.

Q. You said that you saw an affidavit before?

A. I saw this affidavit before.

Q. You saw an earlier version of it?

A. Yes. I typed it myself.

Q. How did you come to see this earlier version of this affidavit?

A. My husband gave it to me.

Q. Your husband gave it to you?

A. Yes.

Q. When did he do that?

A. A month -- two or three weeks before. I don't recall.

Q. Two or three weeks prior to

Nunzia Fatica Gallo
July 2nd, 2008?
A. Yes.
Q. What did he say when he gave it to you?
A. He said if you agree, you can sign it. But I changed it; I worded it myself.
Q. I think that I understand you. You said that your husband gave you an affidavit and said he would like to have you sign this --
A. No; he give it to me. I don't recall exactly what he said.
Q. Generally what did he say?
A. He said this is what you said because it is true that this happened. And if you feel that this is true, then you can sign it.
I said can I have this? And he said yes. I made my own affidavit with my own computer.
Q. Did you make any changes to what was in the affidavit your husband gave you?
A. Yes, I made some changes.
Q. Can you --

Nunzia Fatica Gallo
A. I made some changes.
Q. You made some changes?
A. Yes.
Q. You said -- do you have an original copy?
A. No, I don't.
Q. Looking through the paragraphs of this affidavit numbered one through eight, can you show me which paragraphs you made changes to?
A. I think my name was spelled wrong. I think that this said that the relationship with Mr. Oskuz was a gay relationship, and I changed it to intimate. Intimate felt better to me. Essentially everything was the same.
Q. Those are the only two changes you remember, the spelling of your name and changing the word gay to intimate?
A. Correct.
Q. Did you discuss making those changes with your husband?
A. Not at all.
Q. Why did it take you two or three weeks to make those two changes?

Nunzia Fatica Gallo
A. I just was busy with the Regents examinations and I didn't think -- I didn't know there was a deadline.
To be honest, my husband never told me that there was a deadline. He never pressed me. He said whatever you feel like doing, and very nice that way.
I didn't even know there was a deadline. I thought I could take three years to do it. I didn't know there was a deadline. I didn't know. Was there a deadline?
Q. I'm not answering questions.
A. Okay. He said if you feel --
MR. DeTOFFOL: Okay. You answered the question. He will ask you another question.
Q. Did you ask your husband why he wanted you to sign an affidavit?
A. No.
Q. Do you understand why he wanted you to sign an affidavit now?
MR. DeTOFFOL: I object to that question.
MR. KORAL: Okay.

Nunzia Fatica Gallo
Q. You can answer.
MR. DeTOFFOL: Can you read it back.
(Question read back by the reporter.)
MR. DeTOFFOL: That's a compound question. I'm objecting to form.
MR. KOCIAN: I join in the objection.
Q. You can answer.
MR. DeTOFFOL: I mean you can try to answer it, if you understand the question. And if you don't, then say you don't understand the question.
A. I don't understand the question.
Q. Sitting here today, do you understand why your husband gave you an affidavit to sign?
MR. DeTOFFOL: What do you mean by understand? That's my problem.
MR. KORAL: You can have the problem, and you can keep reminding the witness.
A. I don't understand.

Nunzia Fatica Gallo

you have an ID? And I gave them my driver's license and sign, sign. That's all.

Q. And then she gave it back to you?

A. Yes.

Q. Nobody else was there?

A. I didn't know that there was supposed to be anybody else.

Q. I didn't say that there was supposed to be anybody else. I am asking you if there was anybody else there.

A. No.

Q. What did you do with this affidavit after you had it signed at the Citibank at 57th Street?

A. I was late at work because the bank opens at nine, and I'm supposed to be at work at eight. I waited for the bank to open, and I went to work.

And in the evening I went home and left it on table for my husband on the -- what do you call it? Working table.

Q. You did not speak to him about it?

A. I said I signed it. I saw him later and I said I signed it.

Nunzia Fatica Gallo

Q. Your husband testified that the two of you don't communicate except about absolutely essential things.

A. Correct.

Q. How long has that been true?

MR. DeTOFFOL: Counsel, I'm going to object to it because I think that's outside the scope. She testified at length about the interaction with respect to being present with it and delivering it.

MR. KORAL: He is not instructing you not to answer.

MR. DeTOFFOL: I am.

MR. KORAL: We will take that up with the magistrate. You don't have to say anything further.

Q. Did you make a copy of it before you left it on your husband's work table?

A. No.

Q. Is your husband's work table in a common area of the house, or in a room that is just his?

A. I put it in a folder. I did not

Nunzia Fatica Gallo

make a copy and I left it under a piece like this, a piece of folder or book. I said it is under -- I don't know what the word is in English. It is on your scritorio or your working table. What to you call this? Under your working desk, sorry.

Q. You did not tell any of your children about this?

A. No.

Q. You left it there on July 2nd, the same day you signed it and had it notarized?

A. July 2nd was a weekday, right?

MR. KORAL: July 4th was a Friday, and --

MR. DeTOFFOL: Just do it from your memory.

A. It was in the evening, a weekday. Maybe it was a Friday.

Q. You left it the same day?

A. I left it the same day.

Q. Did you tell your husband that you had left it on his work table?

A. I already told you that I told him that it was on the table. I told you a few

Nunzia Fatica Gallo

minutes ago that I advised him that it was on the table.

Q. Did you ever discuss the affidavit with him again?

A. No.

Q. You never asked him what he did with it?

A. No.

Q. Did you ever see it again until the last week or so?

A. No.

Q. Did you ask him for a copy when you realized you were going to be deposed about it?

A. No.

Q. Is he in New York right now?

MR. DeTOFFOL: Objection. Don't answer.

MR. KOCIAN: I join in the objection.

MR. KORAL: You are instructing her not to answer?

MR. DeTOFFOL: Yes; scope.

MR. KORAL: Scope, is that what you

Nunzia Fatica Gallo

said?

MR. DeTOFFOL: I'm going to keep my objections limited in accordance with the federal rules. I am limiting the objection.

I will just say scope from here forward when I object to your question being outside the scope of the mandates for this deposition.

MR. KORAL: And you can say privilege if you wish.

BY MR. KORAL:

Q. Let's take a look at this affidavit. In paragraph three you state that on June 20th, 2006, you received a telephone call from Mr. Giulio Libutti.

How do you remember that it was exactly on June 20th that you received a telephone call from Mr. Giulio Libutti?

A. I recall -- I could be wrong by a day or two, but my husband has been in the hospital many times in the last six years, and I remember that the day after or so he went to the hospital.

Nunzia Fatica Gallo

He went to New York Presbyterian, Payne-Whitney, Weil Medical College on 525 East 68th Street, Payne-Whitney psychiatric unit, inpatient unit.

I know that it was around that time.

Q. Did you take him to the hospital on the day that he went to Payne-Whitney?

A. No.

Q. How did you learn that he was in Payne-Whitney?

A. He was allowed to call, and called me.

Q. You recollect that was June 20th, 2006?

A. I think it was June 21st, June 22nd. I know the days more or less. I have them on a calendar at home. Because as a physician, I take care also of a bit of what happens to him and, you know, my husband.

Q. When you say take care, do you give him treatment?

A. No. I take care as a wife. I know when my husband is in the hospital and not

Nunzia Fatica Gallo

sleeping at home and is not there. Where is he, is he missing? He was in the hospital around that time.

Q. Around that time he was in the hospital?

A. That's why I recall June 20th.

Q. Did you look at any calendars or any written materials at all in order to determine that it was June 20th, 2006 when you wrote this affidavit?

A. No.

Q. You just --

A. Okay. Again, he was in the hospital June 21st. I remember. And his telephone call took place the day before or two days before.

Q. A day or two before he was in?

A. Yes.

Q. June 20th was actually the original affidavit that he gave you before you retyped it?

MR. DeTOFFOL: Counsel, that's not a question. That's argumentative. We are not at trial.

Nunzia Fatica Gallo

MR. KORAL: It is not meant to be argumentative.

MR. DeTOFFOL: It is not an open-ended question. I object to that question. Please rephrase it.

Don't answer.

Q. Was the date June 20th, 2006 --

A. I don't recall.

Q. You may have changed that date?

A. I don't recall.

Q. You don't recall whether --

A. It is approximately the date.

Q. I am just asking you about when you typed the affidavit. And you said you made a couple of changes and --

A. I put the dates --

Q. Don't interrupt me. You made a couple of changes and you identified what they were, the spelling of your name, and using the word intimate instead of gay.

Do you recall a change in the date?

A. There was no date.

Q. The date was blank?

A. In June 2006 -- I don't recall. I

Nunzia Fatica Gallo

put the date June 20th. He went into the hospital on June 21st or 22nd.

Q. It was a couple of days before he went into the hospital, and you were using your memory as to what date he went in?

A. Yes.

Q. Do you recollect what Mr. Libutti said when he first contacted you when you first answered the telephone?

A. Yes.

Q. What did he say?

A. He said hi, how are you in Italian. The conversations took place in Italian. He said that after long-time observation he came to conclusion that my husband Francesco Gallo was indeed gay. He used the word gay.

Q. He used the word gay?

A. Gay, no.

Q. In Italian they use the word gay?

A. Yes, they use the word gay in Italian. If I don't get interrupted, it will come better to me.

He said to me that I know he is having -- he said he is having a gay

Nunzia Fatica Gallo

relationship with the Turk. As a matter of fact, I know his name is Alex Oskuz. He referred to him as the Turk.

Q. That's the first thing that Mr. Libutti said after saying hi, how are you? You thought about it and came to the conclusion that your husband is having a gay relationship?

A. He said hi, how are you? I observed, you know -- he said words like I feel bad for you, but I came to the conclusion -- I don't recall the exact words -- he said I came to the conclusion that your husband is actually gay and he is having an affair or gay relationship with the Turk.

Q. You don't remember --

A. So that --

MR. DeTOFFOL: You are cutting her off. Please allow her to continue.

Q. Was there anything else that you wanted to say?

A. Should I go through everything?

Q. No. I am just asking you what Mr. Libutti said to you in the conversation.

Nunzia Fatica Gallo

MR. DeTOFFOL: She asked you guys not to interrupt.

MR. KORAL: The record will reflect --

MR. DeTOFFOL: It will not reflect your interruption and the promptness with which you interrupted her.

MR. KORAL: It will certainly reflect the promptness that you interrupt me.

MR. DeTOFFOL: That matches the frequency that you are interrupting her. Do you want to --

MR. KORAL: If you want to get out of here by noon, don't interrupt.

MR. DeTOFFOL: Don't interrupt her. I am here to keep a clean record. You are interrupting her.

MR. KORAL: That's not true.

BY MR. KORAL:

Q. You said that you know Mr. Libutti very well?

A. You know.

Q. You were the doctor to his

Nunzia Fatica Gallo

children?

A. Yes.

Q. Was there a time where your daughter was dating his son?

A. Dating is totally -- they are different age, you know. They went out because they went to the same school. Essentially I took care of all of the children.

I was the pediatrician of all children of Mr. Libutti. And yes, I would be called a lot, you know, by him or by the wife.

Q. Mr. Libutti would call you a lot?

A. A lot, appropriately. So, you know.

Q. Were you and his wife socially friendly?

A. We never met alone. We met with other people for birthday parties, for visits, but we never met alone. We never went out alone.

Q. Mr. Libutti, did you regard him as a friend?

A. I regard him as a friend.

Nunzia Fatica Gallo

Q. Did your husband ever tell you there were rumors that he was gay?

A. No, never.

Q. Before the telephone call with Mr. Libutti around June 20th, 2006, were you aware that Mr. Oskuz, the Turkish man, had a lawyer right write a letter to Alitalia accusing your husband of sexual harassment?

A. No.

Q. Your husband never told you that?

A. No.

Q. Did Mr. Libutti mention that in his telephone conversation around June 20th?

A. If you see paragraph four in the same conversation --

Q. You do not have to read it out loud.

A. Mr. Libutti felt sorry for me. And he said he will take care of whatever the Turk was trying to get out of Francesco Gallo, but on one condition, that Franco should never sue Alitalia.

That was a decision sine quo non, otherwise Alitalia and Mr. Libutti would not

Nunzia Fatica Gallo

help him. This was the first time I heard there was something legally happening by the Turkish -- Mr. Oskuz who, again, Franco -- against Franco.

I told Mr. Libutti do not talk to me about this. He insisted that I should be the ambassador, the one to tell Franco this.

Q. Your husband was not in the hospital yet, is that right, and you wanted Mr. Libutti to talk to your husband and not to you about that matter?

MR. DeTOFFOL: Can you read it.

MR. KORAL: I will rephrase it.

Q. You told Mr. Libutti that he should discuss this with your husband and not with you?

A. Yes.

Q. And your husband was not at Payne-Whitney at the time?

A. No.

Q. Did Mr. Libutti give you any information about what kind of charges or complaints Oskuz was making?

A. No.

Nunzia Fatica Gallo

Q. He did not tell you anything; he just told you that we will settle with Mr. Oskuz?

A. Exactly.

MR. DeTOFFOL: You mischaracterized her earlier testimony.

MR. KORAL: I will clarify.

Q. Did he tell you that Alitalia had already settled Mr. Oskuz's complaint?

A. No. He made me understand that it was for the future and he did not tell me -- it already happened.

Q. You can't answer that?

A. No. He made me understand that it will take place. As I told you --

THE WITNESS: Should I repeat myself?

MR. DeTOFFOL: No, just answer the question, if you can remember what it was.

Q. So that Libutti said that there was a condition on Alitalia helping protecting your husband against this complaint from the Turkish guy, and that was that he would

Nunzia Fatica Gallo

promise not to sue Alitalia; is that correct?

A. Correct.

Q. Did you ask Mr. Libutti what Mr. Oskuz was accusing him of?

A. No.

Q. You never met Mr. Oskuz yourself, did you?

A. Never.

Q. Do you know who Pierandrea Galli is?

A. I do.

Q. He was also an executive at Alitalia for a time here in New York?

A. I don't know his exact position. The positions change, you know. I know he was working in a high level position. I don't know the position.

Q. He was in New York for a time and he was in Rome afterwards; is that correct?

A. I don't know. You know, people come and go. It's a very revolving door type of company. He left, came back.

Q. Did you regard Mr. Galli as a friend?

Nunzia Fatica Gallo

BY MR. KORAL:

A. I took time to go to the restroom.

Q. You don't have to tell me that. I'm not your doctor. It's all right. We are close to finishing.

Prior to June 20th, 2006, did you ever hear any rumors that your husband and Gino Ferrara had had a gay relationship?

A. No.

MR. KOCIAN: Note my objection.

Q. Did you ever tell anybody that you thought they had a gay relationship prior to June 20th, 2006.

MR. DeTOFFOL: Go ahead. You can answer.

Can you read the question.

(Question read back by the reporter.)

MR. DeTOFFOL: I'm going to object to the scope.

MR. KORAL: That means that you are instructing her not to answer?

MR. DeTOFFOL: I strongly advise her not to answer.

Nunzia Fatica Gallo

MR. KORAL: Are you instructing her?

MR. DeTOFFOL: No.

Q. Then you can answer the question. The question is: Before June 20th, 2006 did you ever tell anybody that you thought Gino Ferrara and your husband had a gay relationship?

MR. KOCIAN: Objection. Beyond the scope.

Q. Are you refusing to answer the question?

THE WITNESS: Am supposed to answer?

A. No, I did not hear anything about --

Q. I asked you that already. Did you ever tell anybody that you thought --

A. No, I did not.

Q. I want to return to the telephone conversation with Mr. Libutti, the one that is discussed in paragraph three of the affidavit.

Do you remember anything else about that telephone conversation?

Nunzia Fatica Gallo

A. I recall whatever is written hear.

Q. And that's if --

A. Yes.

Q. Did Mr. Libutti call you at home?

A. He called me at the hospital.

Q. On the cellular telephone, on your cellular telephone?

A. Office telephone. Office has different telephones.

Q. How long did the conversation last?

A. Brief.

Q. A couple of minutes?

A. I don't recall, but it was brief.

Q. Do you recall anything else that you said in that conversation?

A. I insisted that he speak to him very much. I insisted maybe twice or maybe three times, please speak to him. Please speak to him directly.

Q. Did you ever learn from your husband whether Mr. Libutti did speak to him?

A. No, he never spoke to him.

Q. Do you know that?

A. He called my house the same day,

Nunzia Fatica Gallo

evening. I don't recall -- Mr. Libutti said that to me, and he was very upset. He was very -- how can I say -- preoccupied. And he was already not doing well. And a day or two later he went to hospital. And as, you know, he was admitted to the hospital.

Q. Let's talk about the conversation with your husband. What exactly did you tell him?

A. I told him Mr. Libutti said that he will help you against Mr. Oskuz's case, which I didn't know exactly what was. I don't ask people. The people tell me. Otherwise I don't ask.

He will help you on the condition that you will not sue Alitalia. And he asked me why doesn't he tell me himself? And I said to him -- and I ask him the same question, but he did not answer.

Q. Did your husband indicate to you that he knew that Oskuz was making some case against him?

A. No. I think he was preoccupied -- I mean he was like mad or something, and he