# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 07 CV 06418 (CM)(HP)

------------------------------------------------X

FRANCESCO GALLO,

                          Plaintiff,

        -against-

ALITALIA- LINEE AEREE ITALIANE –
SOCIETA PER AZIONI,
PIERANDREA GALLI, and
GIULIO LIBUTTI,

           Defendants

------------------------------------------------X

STATE OF NEW YORK    )
                      ) ss.:
COUNTY OF NEW YORK  )

      I, NUNZIA FATICA GALLO, do hereby state and declare under the penalties of

perjury as follows:

1. I am over the age of 18 and reside in the State of New York.

2. I am the wife of Francesco Gallo.

3. On June 20, 2006, I received a telephone call from Mr. Giulio Libutti, Mr.
   Libutti told me that my husband was an homosexual and that he had an
   intimate relationship with Mr. Oskuz.

4. During the same conversation Mr. Libutti told me that he was very sorry for
   me, that he wanted to help me and that he was not asking my husband to repay
   the amount that Alitalia had to pay Mr. Oksuz for his claims.

5. Mr. Libutti told me to convince my husband to not sue Mr. Libutti and Alitalia.

6. Mr. Libutti also told me that if my husband would sue Alitalia, he would ruin my husband's reputation in the world.

7. The defamatory statements were false.

8. Coincidentally after that conversation, many people had called me and offered me their support.

_____
NUNZIA FATICA GALLO

JULY 2, 2008

Sworn to and subscribed before

me this 2 day of June 2008

_____
Notary Public

YASMIN ISHMAEL
Notary Public, State of New York
No. 01IS6152854
Qualified in Queens County
Commission Expires Sept. 25, 2010

07/02/2008

Exhibit B

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x
FRANCESCO GALLO,
                         Plaintiff,
         -against-

ALITALIA-LINEE AEREE ITALIANE-
SOCIETA PER AZIONI, PIERANDREA GALLI,
and GIULIO LIBUTTI,

                         Defendants.
----------------------------------------x

                    August 15, 2008
                    9:30 a.m.


    Deposition of NUNZIA FATICA GALLO, a

non-party witness, held at the offices

of Vedder Price, P.C., 1633 Broadway,

New York, New York 10019, before Michael

Catania, a Shorthand Reporter and Notary

Public of the State of New York.

Page 6

Nunzia Fatica Gallo

1
2    privilege.
3        MR. KORAL:  As to when you were
4    engaged?
5        MR. DeTOFFOL:  Attorney-client
6    privilege.
7        MR. KORAL:  We may have to call the
8    magistrate on this.  Are you serious that
9    you think that this is privileged, to ask
10   her when you were engaged?
11       MR. KOCIAN:  Why don't we table
12   that and move on.
13       MR. KORAL:  Yes, we will.  I would
14   like to see if counsel would like to
15   reconsider the objection.
16       MR. DeTOFFOL:  Where are you going
17   with this?  I'm asking the question.
18       MR. KOCIAN:  I do not see how this
19   is relevant to today's proceeding.  I
20   join in the objection.
21       MR. KORAL:  You are instructing the
22   witness not to answer this question?
23       MR. DeTOFFOL:  I am raising the
24   privilege.
25       MR. KORAL:  The answer is that you

Page 7

Nunzia Fatica Gallo

1
2    are instructing her not to answer.
3        MR. DeTOFFOL:  Yes.
4    BY MR. KORAL:
5        Q.   How long have you known
6    Mr. DeToffol?
7        MR. DeTOFFOL:  I object again.
8        Do not answer.
9        Q.   Have you been represented by any
10   other attorney in connection with this
11   lawsuit, ever?
12       MR. DeTOFFOL:  Do you understand
13   the question?
14       A.   No, I am not being represented by
15   anyone else.
16       Q.   Mr. DeToffol is the only attorney
17   who has represented you?
18       A.   Yes.
19       THE WITNESS:  Can I speak with you?
20       Q.   Specifically Mr. Derrick Smith and
21   the law firm of Akin & Smith have never
22   represented you?
23       A.   No.
24       Q.   Have you discussed this case with
25   Mr. Derrick Smith at any time?

Page 8

Nunzia Fatica Gallo

1
2        A.   No.
3        Q.   Have you ever met Derrick Smith?
4        A.   Yes.
5        Q.   How many times?
6        A.   Once.
7        Q.   Could you tell me when that was?
8        A.   I met him briefly in and out
9    yesterday.
10       Q.   That was the first time you met
11   Derrick Smith?
12       A.   Yes.
13       Q.   Had you ever spoken do Derrick
14   Smith before?
15       A.   No.
16       Q.   Had you ever spoken to anybody from
17   his office before?
18       A.   No.
19       Q.   Okay.
20       A.   You mean your office?
21       Q.   No, his office, the firm of Akin &
22   Smith, or any attorney associated with them or
23   any paralegal associated with that firm.
24       A.   No.
25       Q.   Are you presently employed?

Page 9

Nunzia Fatica Gallo

1
2        A.   Yes, I am.
3        Q.   Where are you employed?
4        A.   I am employed at Boriken
5    Neighborhood Health Center, associated with
6    Mount Sinai Hospital.  I am associate
7    professor at The Hospital for Special Surgery.
8        Q.   Do you see patients at The Hospital
9    for Special Surgery?
10       A.   And Cornell Medical Center.
11       Q.   How long have you been employed at
12   Boriken Neighborhood Health Center?
13       A.   One month.
14       Q.   Prior to that where were you
15   employed?
16       A.   Cornell University, at The Hospital
17   for Special Surgery, for 25 years.  I was
18   trained there, and I became an attending.
19       Q.   Do you have a private practice
20   apart from your appointments at Cornell,
21   Boriken, and The Hospital for Special Surgery?
22       A.   It is a faculty practice with the
23   institutions.
24       Q.   So that you see private patients?
25       A.   Yes, I do.  But within the

**Page 22**

```
 1              Nunzia Fatica Gallo
 2         MR. DeTOFFOL:  Sir, I will object
 3    to this being outside the scope.
 4         MR. KORAL:  She was served Friday,
 5    and your representing that she was served
 6    Tuesday is incorrect.
 7    A.    21 years of age, 18, 18, 15.
 8    Q.    Two of these are boys, sons?
 9    A.    Okay.  Alessandro, 21 years of age.
10    Nicoletta Gallo is a girl; she was born
11    July 10th, 1990.  Massilliano Gallo, he was
12    born July 10th, 1990.  Clara Gallo, she was
13    born August 25th, 1992.
14         MR. DeTOFFOL:  Note that we are not
15    objecting to not receiving or maintaining
16    that we never received the subpoena.
17         MR. KORAL:  I understand that.  You
18    said that you did not receive it until
19    Tuesday.
20         MR. DeTOFFOL:  That is not an issue
21    here.
22         MR. KORAL:  That is correct.
23    I'm going to mark as Nunzia --
24         THE WITNESS:  You can put both last
25    names.  Whatever you like.
```

**Page 23**

```
 1              Nunzia Fatica Gallo
 2         MR. KORAL:  Mark the subpoena under
 3    the name of Nunzia Fatica Gallo as Nunzia
 4    Fatica Gallo Exhibit No. 1.
 5         (Nunzia Fatica Gallo Exhibit 1,
 6    subpoena, marked for identification, as
 7    of this date.)
 8    BY MR. KORAL:
 9    Q.    Have you looked at this exhibit?
10    A.    Yes, I did.
11    Q.    Is that your signature on the
12    second page?
13    A.    Yes, it is.
14    Q.    Do you remember when you signed it?
15    A.    July 2nd, 2008.
16    Q.    Where were you when you signed it?
17    A.    I was in front of a notary public.
18    Q.    Where were you when you signed it?
19    A.    57th Street at First Avenue.
20    Q.    Was this in a lawyer's office?
21    A.    It was a Citibank.  I am a client
22    there, and they told me that I could use their
23    notary.
24    Q.    Had you ever met someone called
25    Yasmin Ishmael before?
```

**Page 24**

```
 1              Nunzia Fatica Gallo
 2    A.    No, I didn't.  No.
 3    Q.    Did you prepare this document by
 4    yourself?
 5         MR. DeTOFFOL:  I will object to
 6    form.  What do you mean by prepare?
 7    Q.    Did you type this?
 8    A.    Yes, I did.
 9    Q.    By yourself?
10    A.    Yes.
11    Q.    You typed the caption on the top of
12    it?
13    A.    I have a computer.  I did it at
14    home.
15    Q.    Did anybody help you prepare it?
16    A.    No.
17    Q.    Did your husband advise you about
18    anything, any form that it should take and
19    what it should look like?
20    A.    No.
21    Q.    Nobody else did?
22    A.    No.
23    Q.    Have you ever signed an affidavit
24    before?
25    A.    No.
```

**Page 25**

```
 1              Nunzia Fatica Gallo
 2    Q.    Have you ever written an affidavit
 3    before?
 4    A.    No.
 5    Q.    How did you know what an affidavit
 6    should look like?
 7    A.    I saw an affidavit before, and I
 8    copied.
 9    Q.    What affidavit did you see before?
10    A.    I saw this one, but I typed this
11    myself.
12    Q.    You said that you saw an affidavit
13    before?
14    A.    I saw this affidavit before.
15    Q.    You saw an earlier version of it?
16    A.    Yes.  I typed it myself.
17    Q.    How did you come to see this
18    earlier version of this affidavit?
19    A.    My husband gave it to me.
20    Q.    Your husband gave it to you?
21    A.    Yes.
22    Q.    When did he do that?
23    A.    A month -- two or three weeks
24    before.  I don't recall.
25    Q.    Two or three weeks prior to
```

8 (Pages 26 to 29)

Page 26

```
1              Nunzia Fatica Gallo
2    July 2nd, 2008?
3         A.   Yes.
4         Q.   What did he say when he gave it to
5    you?
6         A.   He said if you agree, you can sign
7    it. But I changed it; I worded it myself.
8         Q.   I think that I understand you. You
9    said that your husband gave you an affidavit
10   and said he would like to have you sign
11   this --
12        A.   No; he give it to me. I don't
13   recall exactly what he said.
14        Q.   Generally what did he say?
15        A.   He said this is what you said
16   because it is true that this happened. And if
17   you feel that this is true, then you can sign
18   it.
19             I said can I have this?  And he
20   said yes. I made my own affidavit with my own
21   computer.
22        Q.   Did you make any changes to what
23   was in the affidavit your husband gave you?
24        A.   Yes, I made some changes.
25        Q.   Can you --
```

Page 27

```
1              Nunzia Fatica Gallo
2         A.   I made some changes.
3         Q.   You made some changes?
4         A.   Yes.
5         Q.   You said -- do you have an original
6    copy?
7         A.   No, I don't.
8         Q.   Looking through the paragraphs of
9    this affidavit numbered one through eight, can
10   you show me which paragraphs you made changes
11   to?
12        A.   I think my name was spelled wrong.
13   I think that this said that the relationship
14   with Mr. Oskuz was a gay relationship, and I
15   changed it to intimate. Intimate felt better
16   to me. Essentially everything was the same.
17        Q.   Those are the only two changes you
18   remember, the spelling of your name and
19   changing the word gay to intimate?
20        A.   Correct.
21        Q.   Did you discuss making those
22   changes with your husband?
23        A.   Not at all.
24        Q.   Why did it take you two or three
25   weeks to make those two changes?
```

Page 28

```
1              Nunzia Fatica Gallo
2         A.   I just was busy with the Regents
3    examinations and I didn't think -- I didn't
4    know there was a deadline.
5              To be honest, my husband never told
6    me that there was a deadline.  He never
7    pressed me.  He said whatever you feel like
8    doing, and very nice that way.
9              I didn't even know there was a
10   deadline.  I thought I could take three years
11   to do it.  I didn't know there was a deadline.
12   I didn't know.  Was there a deadline?
13        Q.   I'm not answering questions.
14        A.   Okay. He said if you feel --
15        MR. DeTOFFOL:  Okay.  You answered
16   the question.  He will ask you another
17   question.
18        Q.   Did you ask your husband why he
19   wanted you to sign an affidavit?
20        A.   No.
21        Q.   Do you understand why he wanted you
22   to sign an affidavit now?
23        MR. DeTOFFOL:  I object to that
24   question.
25        MR. KORAL:  Okay.
```

Page 29

```
1              Nunzia Fatica Gallo
2         Q.   You can answer.
3         MR. DeTOFFOL:  Can you read it
4    back.
5         (Question read back by the
6    reporter.)
7         MR. DeTOFFOL:  That's a compound
8    question.  I'm objecting to form.
9         MR. KOCIAN:  I join in the
10   objection.
11        Q.   You can answer.
12        MR. DeTOFFOL:  I mean you can try
13   to answer it, if you understand the
14   question.  And if you don't, then say you
15   don't understand the question.
16        A.   I don't understand the question.
17        Q.   Sitting here today, do you
18   understand why your husband gave you an
19   affidavit to sign?
20        MR. DeTOFFOL:  What do you mean by
21   understand?  That's my problem.
22        MR. KORAL:  You can have the
23   problem, and you can keep reminding the
24   witness.
25        A.   I don't understand.
```

10 (Pages 34 to 37)

Page 34

Nunzia Fatica Gallo
1
2  you have an ID?  And I gave them my driver's
3  license and sign, sign.  That's all.
4      Q.   And then she gave it back to you?
5      A.   Yes.
6      Q.   Nobody else was there?
7      A.   I didn't know that there was
8  supposed to be anybody else.
9      Q.   I didn't say that there was
10  supposed to be anybody else.  I am asking you
11  if there was anybody else there.
12      A.   No.
13      Q.   What did you do with this affidavit
14  after you had it signed at the Citibank at
15  57th Street?
16      A.   I was late at work because the bank
17  opens at nine, and I'm supposed to be at work
18  at eight.  I waited for the bank to open, and
19  I went to work.
20          And in the evening I went home and
21  left it on table for my husband on the -- what
22  do you call it?  Working table.
23      Q.   You did not speak to him about it?
24      A.   I said I signed it.  I saw him
25  later and I said I signed it.

Page 35

Nunzia Fatica Gallo
1
2      Q.   Your husband testified that the two
3  of you don't communicate except about
4  absolutely essential things.
5      A.   Correct.
6      Q.   How long has that been true?
7          MR. DeTOFFOL: Counsel, I'm going
8  to object to it because I think that's
9  outside the scope.  She testified at
10  length about the interaction with respect
11  to being present with it and delivering
12  it.
13          MR. KORAL: He is not instructing
14  you not to answer.
15          MR. DeTOFFOL: I am.
16          MR. KORAL: We will take that up
17  with the magistrate.  You don't have to
18  say anything further.
19      Q.   Did you make a copy of it before
20  you left it on your husband's work table?
21      A.   No.
22      Q.   Is your husband's work table in a
23  common area of the house, or in a room that is
24  just his?
25      A.   I put it in a folder.  I did not

Page 36

Nunzia Fatica Gallo
1
2  make a copy and I left it under a piece like
3  this, a piece of folder or book.  I said it is
4  under -- I don't know what the word is in
5  English.  It is on your scritorio or your
6  working table.  What to you call this?  Under
7  your working desk, sorry.
8      Q.   You did not tell any of your
9  children about this?
10      A.   No.
11      Q.   You left it there on July 2nd, the
12  same day you signed it and had it notarized?
13      A.   July 2nd was a weekday, right?
14          MR. KORAL: July 4th was a Friday,
15  and --
16          MR. DeTOFFOL: Just do it from your
17  memory.
18      A.   It was in the evening, a weekday.
19  Maybe it was a Friday.
20      Q.   You left it the same day?
21      A.   I left it the same day.
22      Q.   Did you tell your husband that you
23  had left it on his work table?
24      A.   I already told you that I told him
25  that it was on the table.  I told you a few

Page 37

Nunzia Fatica Gallo
1
2  minutes ago that I advised him that it was on
3  the table.
4      Q.   Did you ever discuss the affidavit
5  with him again?
6      A.   No.
7      Q.   You never asked him what he did
8  with it?
9      A.   No.
10      Q.   Did you ever see it again until the
11  last week or so?
12      A.   No.
13      Q.   Did you ask him for a copy when you
14  realized you were going to be deposed about
15  it?
16      A.   No.
17      Q.   Is he in New York right now?
18          MR. DeTOFFOL: Objection.
19          Don't answer.
20          MR. KOCIAN: I join in the
21  objection.
22          MR. KORAL: You are instructing her
23  not to answer?
24          MR. DeTOFFOL: Yes; scope.
25          MR. KORAL: Scope, is that what you

Page 38

Nunzia Fatica Gallo

1  said?
2       MR. DeTOFFOL:  I'm going to keep my
3  objections limited in accordance with the
4  federal rules.  I am limiting the
5  objection.
6       I will just say scope from here
7  forward when I object to your question
8  being outside the scope of the mandates
9  for this deposition.
10      MR. KORAL:  And you can say
11 privilege if you wish.
12 BY MR. KORAL:
13      Q.   Let's take a look at this
14 affidavit.  In paragraph three you state that
15 on June 20th, 2006, you received a telephone
16 call from Mr. Giulio Libutti.
17      How do you remember that it was
18 exactly on June 20th that you received a
19 telephone call from Mr. Giulio Libutti?
20      A.   I recall -- I could be wrong by a
21 day or two, but my husband has been in the
22 hospital many times in the last six years, and
23 I remember that the day after or so he went to
24 the hospital.

Page 39

Nunzia Fatica Gallo

1       He went to New York Presbyterian,
2  Payne-Whitney, Weil Medical College on
3  525 East 68th Street, Payne-Whitney
4  psychiatric unit, inpatient unit.
5       I know that it was around that
6  time.
7       Q.   Did you take him to the hospital on
8  the day that he went to Payne-Whitney?
9       A.   No.
10      Q.   How did you learn that he was in
11 Payne-Whitney?
12      A.   He was allowed to call, and called
13 me.
14      Q.   You recollect that was June 20th,
15 2006?
16      A.   I think it was June 21st,
17 June 22nd.  I know the days more or less.  I
18 have them on a calendar also.  Because as a
19 physician, I take care also of a bit of what
20 happens to him and, you know, my husband.
21      Q.   When you say take care, do you give
22 him treatment?
23      A.   No.  I take care as a wife.  I know
24 when my husband is in the hospital and not

Page 40

Nunzia Fatica Gallo

1  sleeping at home and is not there.  Where is
2  he, is he missing?  He was in the hospital
3  around that time.
4       Q.   Around that time he was in the
5  hospital?
6       A.   That's why I recall June 20th.
7       Q.   Did you look at any calendars or
8  any written materials at all in order to
9  determine that it was June 20th, 2006 when you
10 wrote this affidavit?
11      A.   No.
12      Q.   You just --
13      A.   Okay.  Again, he was in the
14 hospital June 21st.  I remember.  And his
15 telephone call took place the day before or
16 two days before.
17      Q.   A day or two before he was in?
18      A.   Yes.
19      Q.   June 20th was actually the original
20 affidavit that he gave you before you retyped
21 it?
22      MR. DeTOFFOL:  Counsel, that's not
23 a question.  That's argumentative.  We
24 are not at trial.

Page 41

Nunzia Fatica Gallo

1       MR. KORAL:  It is not meant to be
2  argumentative.
3       MR. DeTOFFOL:  It is not an
4  open-ended question.  I object to that
5  question.  Please rephrase it.
6       Don't answer.
7       Q.   Was the date June 20th, 2006 --
8       A.   I don't recall.
9       Q.   You may have changed that date?
10      A.   I don't recall.
11      Q.   You don't recall whether --
12      A.   It is approximately the date.
13      Q.   I am just asking you about when you
14 typed the affidavit.  And you said you made a
15 couple of changes and --
16      A.   I put the dates --
17      Q.   Don't interrupt me.  You made a
18 couple of changes and you identified what they
19 were, the spelling of your name, and using the
20 word intimate instead of gay.
21      Do you recall a change in the date?
22      A.   There was no date.
23      Q.   The date was blank?
24      A.   In June 2006 -- I don't recall.  I

12 (Pages 42 to 45)

Page 42

Nunzia Fatica Gallo

1
2  put the date June 20th. He went into the
3  hospital on June 21st or 22nd.
4      Q.   It was a couple of days before he
5  went into the hospital, and you were using
6  your memory as to what date he went in?
7      A.   Yes.
8      Q.   Do you recollect what Mr. Libutti
9  said when he first contacted you when you
10  first answered the telephone?
11      A.   Yes.
12      Q.   What did he say?
13      A.   He said hi, how are you in Italian.
14  The conversations took place in Italian. He
15  said that after long-time observation he came
16  to conclusion that my husband Francesco Gallo
17  was indeed gay. He used the word gay.
18      Q.   He used the word gay?
19      A.   Gay, no.
20      Q.   In Italian they use the word gay?
21      A.   Yes, they use the word gay in
22  Italian. If I don't get interrupted, it will
23  come better to me.
24          He said to me that I know he is
25  having — he said he is having a gay

Page 43

Nunzia Fatica Gallo

1
2  relationship with the Turk. As a matter of
3  fact, I know his name is Alex Oskuz. He
4  referred to him as the Turk.
5      Q.   That's the first thing that
6  Mr. Libutti said after saying hi, how are you?
7  You thought about it and came to the
8  conclusion that your husband is having a gay
9  relationship?
10      A.   He said hi, how are you? I
11  observed, you know — he said words like I
12  feel bad for you, but I came to the
13  conclusion — I don't recall the exact
14  words — he said I came to the conclusion that
15  your husband is actually gay and he is having
16  an affair or gay relationship with the Turk.
17      Q.   You don't remember —
18      A.   So that —
19          MR. DeTOFFOL:  You are cutting her
20  off. Please allow her to continue.
21      Q.   Was there anything else that you
22  wanted to say?
23      A.   Should I go through everything?
24      Q.   No.  I am just asking you what
25  Mr. Libutti said to you in the conversation.

Page 44

Nunzia Fatica Gallo

1
2      MR. DeTOFFOL:  She asked you guys
3  not to interrupt.
4      MR. KORAL:  The record will
5  reflect —
6      MR. DeTOFFOL:  It will not reflect
7  your interruption and the promptness with
8  which you interrupted her.
9      MR. KORAL:  It will certainly
10  reflect the promptness that you interrupt
11  me.
12      MR. DeTOFFOL:  That matches the
13  frequency that you are interrupting her.
14  Do you want to —
15      MR. KORAL:  If you want to get out
16  of here by noon, don't interrupt.
17      MR. DeTOFFOL:  Don't interrupt her.
18  I am here to keep a clean record. You
19  are interrupting her.
20      MR. KORAL:  That's not true.
21  BY MR. KORAL:
22      Q.   You said that you know Mr. Libutti
23  very well?
24      A.   You know.
25      Q.   You were the doctor to his

Page 45

Nunzia Fatica Gallo

1
2  children?
3      A.   Yes.
4      Q.   Was there a time where your
5  daughter was dating his son?
6      A.   Dating is totally — they are
7  different age, you know. They went out
8  because they went to the same school.
9  Essentially I took care of all of the
10  children.
11          I was the pediatrician of all
12  children of Mr. Libutti. And yes, I would be
13  called a lot, you know, by him or by the wife.
14      Q.   Mr. Libutti would call you a lot?
15      A.   A lot, appropriately. So, you
16  know.
17      Q.   Were you and his wife socially
18  friendly?
19      A.   We never met alone. We met with
20  other people for birthday parties, for visits,
21  but we never met alone. We never went out
22  alone.
23      Q.   Mr. Libutti, did you regard him as
24  a friend?
25      A.   I regard him as a friend.

14 (Pages 50 to 53)

Page 50

Nunzia Fatica Gallo

1
2      Q.    Did your husband ever tell you
3  there were rumors that he was gay?
4      A.    No, never.
5      Q.    Before the telephone call with
6  Mr. Libutti around June 20th, 2006, were you
7  aware that Mr. Oskuz, the Turkish man, had a
8  lawyer right write a letter to Alitalia
9  accusing your husband of sexual harassment?
10      A.    No.
11      Q.    Your husband never told you that?
12      A.    No.
13      Q.    Did Mr. Libutti mention that in his
14  telephone conversation around June 20th?
15      A.    If you see paragraph four in the
16  same conversation --
17      Q.    You do not have to read it out
18  loud.
19      A.    Mr. Libutti felt sorry for me.  And
20  he said he will take care of whatever the Turk
21  was trying to get out of Francesco Gallo, but
22  on one condition, that Franco should never sue
23  Alitalia.
24         That was a decision sine quo non,
25  otherwise Alitalia and Mr. Libutti would not

Page 51

Nunzia Fatica Gallo

1
2  help him.  This was the first time I heard
3  there was something legally happening by the
4  Turkish -- Mr. Oskuz who, again, Franco --
5  against Franco.
6         I told Mr. Libutti do not talk to
7  me about this.  He insisted that I should be
8  the ambassador, the one to tell Franco this.
9      Q.    Your husband was not in the
10  hospital yet, is that right, and you wanted
11  Mr. Libutti to talk to your husband and not to
12  you about that matter?
13         MR. DeTOFFOL:  Can you read it.
14         MR. KORAL:  I will rephrase it.
15      Q.    You told Mr. Libutti that he should
16  discuss this with your husband and not with
17  you?
18      A.    Yes.
19      Q.    And your husband was not at
20  Payne-Whitney at the time?
21      A.    No.
22      Q.    Did Mr. Libutti give you any
23  information about what kind of charges or
24  complaints Oskuz was making?
25      A.    No.

Page 52

Nunzia Fatica Gallo

1
2      Q.    He did not tell you anything; he
3  just told you that we will settle with
4  Mr. Oskuz?
5      A.    Exactly.
6         MR. DeTOFFOL:  You mischaracterized
7  her earlier testimony.
8         MR. KORAL:  I will clarify.
9      Q.    Did he tell you that Alitalia had
10  already settled Mr. Oskuz's complaint?
11      A.    No.  He made me understand that it
12  was for the future and he did not tell me --
13  it already happened.
14      Q.    You can't answer that?
15      A.    No.  He made me understand that it
16  will take place.  As I told you --
17         THE WITNESS:  Should I repeat
18  myself?
19         MR. DeTOFFOL:  No, just answer the
20  question, if you can remember what it
21  was.
22      Q.    So that Libutti said that there was
23  a condition on Alitalia helping protecting
24  your husband against this complaint from the
25  Turkish guy, and that was that he would

Page 53

Nunzia Fatica Gallo

1
2  promise not to sue Alitalia; is that correct?
3      A.    Correct.
4      Q.    Did you ask Mr. Libutti what
5  Mr. Oskuz was accusing him of?
6      A.    No.
7      Q.    You never met Mr. Oskuz yourself,
8  did you?
9      A.    Never.
10      Q.    Do you know who Pierandrea Galli
11  is?
12      A.    I do.
13      Q.    He was also an executive at
14  Alitalia for a time here in New York?
15      A.    I don't know his exact position.
16  The positions change, you know.  I know he was
17  working in a high level position.  I don't
18  know the position.
19      Q.    He was in New York for a time and
20  he was in Rome afterwards; is that correct?
21      A.    I don't know.  You know, people
22  come and go.  It's a very revolving door type
23  of company.  He left, came back.
24      Q.    Did you regard Mr. Galli as a
25  friend?

16  (Pages 58 to 61)

**Page 58**

Nunzia Fatica Gallo

1  Nunzia Fatica Gallo
2  BY MR. KORAL:
3      A.  I took time to go to the restroom.
4      Q.  You don't have to tell me that.
5  I'm not your doctor.  It's all right.  We are
6  close to finishing.
7          Prior to June 20th, 2006, did you
8  ever hear any rumors that your husband and
9  Gino Ferrara had had a gay relationship?
10     A.  No.
11         MR. KOCIAN:  Note my objection.
12     Q.  Did you ever tell anybody that you
13  thought they had a gay relationship prior to
14  June 20th, 2006.
15         MR. DeTOFFOL:  Go ahead.  You can
16  answer.
17         Can you read the question.
18         (Question read back by the
19  reporter.)
20         MR. DeTOFFOL:  I'm going to object
21  to the scope.
22         MR. KORAL:  That means that you are
23  instructing her not to answer?
24         MR. DeTOFFOL:  I strongly advise
25  her not to answer.

**Page 59**

Nunzia Fatica Gallo

1  Nunzia Fatica Gallo
2         MR. KORAL:  Are you instructing
3  her?
4         MR. DeTOFFOL:  No.
5      Q.  Then you can answer the question.
6  The question is:  Before June 20th, 2006 did
7  you ever tell anybody that you thought Gino
8  Ferrara and your husband had a gay
9  relationship?
10         MR. KOCIAN:  Objection.  Beyond the
11  scope.
12     Q.  Are you refusing to answer the
13  question?
14         THE WITNESS:  Am supposed to
15  answer?
16     A.  No, I did not hear anything
17  about --
18     Q.  I asked you that already.  Did you
19  ever tell anybody that you thought --
20     A.  No, I did not.
21     Q.  I want to return to the telephone
22  conversation with Mr. Libutti, the one that is
23  discussed in paragraph three of the affidavit.
24         Do you remember anything else about
25  that telephone conversation?

**Page 60**

Nunzia Fatica Gallo

1  Nunzia Fatica Gallo
2      A.  I recall whatever is written hear.
3      Q.  And that's if --
4      A.  Yes.
5      Q.  Did Mr. Libutti call you at home?
6      A.  He called me at the hospital.
7      Q.  On the cellular telephone, on your
8  cellular telephone?
9      A.  Office telephone.  Office has
10  different telephones.
11     Q.  How long did the conversation last?
12     A.  Brief.
13     Q.  A couple of minutes?
14     A.  I don't recall, but it was brief.
15     Q.  Do you recall anything else that
16  you said in that conversation?
17     A.  I insisted that he speak to him
18  very much.  I insisted maybe twice or maybe
19  three times, please speak to him.  Please
20  speak to him directly.
21     Q.  Did you ever learn from your
22  husband whether Mr. Libutti did speak to him?
23     A.  No, he never spoke to him.
24     Q.  Do you know that?
25     A.  He called my house the same day,

**Page 61**

Nunzia Fatica Gallo

1  Nunzia Fatica Gallo
2  evening.  I don't recall -- Mr. Libutti said
3  that to me, and he was very upset.  He was
4  very -- how can I say -- preoccupied.  And he
5  was already not doing well.  And a day or two
6  later he went to hospital.  And as, you know,
7  he was admitted to the hospital.
8      Q.  Let's talk about the conversation
9  with your husband.  What exactly did you tell
10  him?
11     A.  I told him Mr. Libutti said that he
12  will help you against Mr. Oskuz's case, which
13  I didn't know exactly what was.  I don't ask
14  people.  The people tell me.  Otherwise I
15  don't ask.
16         He will help you on the condition
17  that you will not sue Alitalia.  And he asked
18  me why doesn't he tell me himself?  And I said
19  to him -- and I ask him the same question, but
20  he did not answer.
21     Q.  Did your husband indicate to you
22  that he knew that Oskuz was making some case
23  against him?
24     A.  No.  I think he was preoccupied --
25  I mean he was like mad or something, and he

Global Deposition Services, Inc
212-867-7766